BROOKS | KUSHMAN
INTELLECTUAL PROPERTY LAW



Our F



**Ernie L Brooks**
***President***

Attorney at Law; Registered Patent Attorney

### Education

J.D., *summa cum laude*, Georgetown Law School, Wayne State University

M.S., Electrical Engineering, Purdue University

B.S., Electrical Engineering, General Motors Institute

### Organizations & Affiliations

State Bar of Michigan

American Bar Association

Michigan Intellectual Property Law Association

## Ernie L Brooks

Tel (248) 358-4400
Fax (248) 358-3351
ebrooks@brookskushman.com [send e-mail]

Managing Partner Ernie Brooks has a credo that not only guides his practice, but serves as a touchstone throughout the firm he helped to found: Brooks Kushman seeks the best result, at the lowest cost to the client, and in the shortest possible time.

Ernie is among the nation's most experienced intellectual property litigators, having tried more than 50 cases to a decision—including 20 jury trials—and having argued more than 40 appeals. He has fostered a reputation for making the courtroom central to his practice. As a rule, only a very small percentage of intellectual property disputes end in trial; Ernie's clients turn to him when they know that going to trial is a strategic decision, not a vague possibility - over a third of the cases in which he is involved end up in trial.

In his nearly 30 years of litigation practice, Ernie has tried cases in both state and federal courts in 20 states, and has argued appeals in the Fifth, Sixth, Seventh, Ninth, and Federal circuits. His record of success includes a $41 million bench judgment and a $36.5 million jury verdict in favor of plaintiffs that he represented; he has also represented defendants in cases resulting in invalidity and non-infringement jury decisions on asserted patents.

When trying a case, Ernie keeps his focus squarely on the key elements that will garner results, and builds the case around those key elements—rejecting the costly "no-stone-unturned" approach favored by many IP litigators. The initial strategy developed for a case will be continuously refined, and all efforts directed toward implementing that strategy. Ernie also believes it critical to work very closely with expert witnesses and guide their work, keeping them sharply focused on the client's overall objectives.

Another factor that distinguishes Ernie's approach to litigation is his belief that it is critical to treat damages as an independent matter equal in importance to liability. Rather than simply turning the question of damages over to experts, Ernie takes responsibility for ascertaining and analyzing the damages issues.

PRACTICE A
IP & Business
Licensing
Technical Desi
Trade Secrets

RELATED C
RELATED P

email t
print th
a a adjust t

B|K
Copyright © 2005, Brooks Kushman P.C.

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.

STORAGE TECHNOLOGY CORPORATION, Plaintiff,
v.
CISCO SYSTEMS, INC., Defendant.

**No. Civ. 00-2253 (JNE/JGL).**

Sept. 25, 2003.

Ernie L. Brooks, and Thomas A. Lewry, Brooks & Kushman P.C., Richard P. Mahoney, Mahoney, Dougherty and Mahoney, P.A., and Timothy R. Schulte, Storage Technology Corporation, for Plaintiff Storage Technology Corporation.

Roy A. Ginsburg, Joseph W. Hammell, and Clifford S. Anderson, Dorsey & Whitney LLP, and Neal Rubin, Cisco Systems, Inc., for Defendant Cisco Systems, Inc.

ORDER

ERICKSEN, J.

***1** Storage Technology Corporation (Storage) brought this action against Cisco Systems, Inc. (Cisco) asserting claims for interference with contractual relations, inducing breach of contract, corporate raiding, conversion, misappropriation of trade secrets under the Minnesota Uniform Trade Secret Act (MUTSA), Minn.Stat. § § 325C.01-.08 (2002), and breach of fiduciary duties. The case is before the Court on Cisco's motion for summary judgment. For the reasons set forth below, the Court grants the motion.

I. BACKGROUND

Storage is a technology company that focuses on storage networking. In late 1999 and into 2000, several of its employees left to join NuSpeed, Inc., a start-up company that opened in January 2000. NuSpeed sought to develop a storage-networking product. In September 2000, Cisco acquired NuSpeed for $450 million in Cisco stock. The next month, Storage commenced this action. Cisco now moves for summary judgment.

II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

A. Interference with contractual relations

Storage asserts that Cisco interfered with noncompete, nonsolicitation, and nondisclosure provisions in contracts of former Storage employees. Under Minnesota law, the elements of a claim for tortious interference with contractual relations are: (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) the intentional procurement of its breach; (4) without justification; and (5) damages. *Kallok v. Medtronic, Inc.,* 573 N.W.2d 356, 362 (Minn.1998); *Kjesbo v. Ricks,* 517 N .W.2d 585, 588 (Minn.1994). Cisco argues *inter alia* that it is entitled to summary judgment because Storage failed to submit evidence of its damages resulting from the alleged breaches.

Citing *Miller v. Miller,* 222 N.W.2d 71, 78 (Minn.1974), Storage asserts that "[d]amages for ... interference with contract ... are determined under the law of unjust enrichment." The Court disagrees. Considering the doctrine of corporate opportunity,

*Miller* set forth the standards to determine whether a business opportunity belongs to a corporation. *Id.* at 78-81. *Miller* does not establish the measure of damages for interference with contractual relations.

***2** Under Minnesota law, damages for interference with contract are limited to those that "might have been recovered for a breach of the contract itself." *Swaney v. Crawley*, 157 N.W. 910, 911 (Minn.1916); *see Pothoff v. Jefferson Lines, Inc.*, 363 N.W.2d 771, 777 (Minn.Ct.App.1985). Damages for breach of contract must be proved to a reasonable certainty. *Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1016 (8th Cir.2001). Recovery of speculative, remote, or conjectural damages is not allowed. *Id.* "Once the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery so long as there is a reasonable basis upon which to approximate the amount." *Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn.1977).

Here, Storage claims neither lost sales nor lost profits as a result of the alleged breaches, and Storage does not identify any quantifiable damages resulting from the alleged breaches. [FN1] The sole measure of damages offered by Storage is contained in the expert report of George Norton, who opines that Storage's damages are $450 million, the acquisition price of NuSpeed. Norton's analysis does not satisfy Storage's burden to submit evidence of its damages.

FN1. At the motion hearing Storage advanced a curious argument regarding the damages element, asserting that it had satisfied the element because it experienced delay and disruption from its employees' departures: "We had to hire people to replace them. We had to spend money for the training of others." The Court inquired: "How much is that worth and who is going to testify about that? Has the time come and gone?" Storage responded: "Nobody.... [T]hat is not our damages theory.... [W]e are not going to quantify it, because that is not what we are claiming." Storage's attempt to avoid summary judgment based on alleged damages that it expressly disclaims is unavailing.

As evidenced by his deposition testimony, Norton's analysis bears no relation to the damages resulting from the alleged breaches of contracts:

Q: And when you were trying to come up with a value of damages, you did not try to assess damages based on any specific breach of any particular provision of any contract, correct?

A: Correct.

To similar effect is a later exchange at the deposition:

Q: Do you in your analysis consider any way in which [Storage's] situation would have been different but for the alleged breaches of contractual ... duties by former [Storage] employees?

A: No.

Under these circumstances, the Court finds the following remarks of the Seventh Circuit particularly appropriate:

> For years we have been saying, without much visible effect, that people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence. *Post hoc ergo propter hoc* will not do; nor the enduing of simplistic extrapolation and childish arithmetic with the appearance of authority by hiring a professor to mouth damages theories that make a joke of expert knowledge. The expert should have tried to separate the damages that resulted from [a competitor's lawful conduct] from the damages that resulted from particular forms of misconduct allegedly committed by that competitor.... No such effort was made.

*Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415-16 (7th Cir.1992) (citations omitted). "Allowance for uncertainty is one thing, and rank speculation another." *Zazu Designs v. L'Oreal S.A.*, 979 F.2d 499, 506 (7th Cir.1992) (citation omitted).

Storage's reliance on Norton to establish its damages from the alleged breaches of contracts by its former employees is misplaced. Having failed to identify any damages resulting from its former employees' alleged breaches of contract and failed to offer any reasonable basis to measure the alleged damages resulting from those breaches, Storage has not satisfied its burden to submit evidence to create a genuine issue of material fact with respect to the fifth element of its claim for interference with contractual relations. The Court therefore concludes that Cisco is entitled to summary judgment on this claim.

B. Inducing breach of contract

***3** The elements of a claim for inducing breach of contract are the same as those of the claim for interference with contractual relations. *Asklason v. Home Savings Association*, 416 N.W.2d 786, 788 (Minn.Ct.App.1987) (citing *Royal Realty Co. v. Levin*, 69 N.W.2d 667, 671 (Minn.1955)). Because Storage failed to submit evidence to establish its damages from the alleged breaches of contract, Cisco

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

is entitled to summary judgment on this claim as well.

C. Corporate raiding

The parties dispute whether a cause of action for corporate raiding exists under Minnesota law. Storage characterizes the cause of action as a "systematic and massive program of hiring another company's employees." Storage contends that raiding is a form of unfair competition that is likely to be recognized in Minnesota, if it is not already part of Minnesota's law of unfair competition. The sole case cited by Storage to support its contention is *Medtronic, Inc. v. Eli Lilly & Co.*, Civ. No. 4-89-277, 1990 WL 61161 (D.Minn.Fed.1, 1990). *Medtronic* does not recognize a cause of action for corporate raiding. Nor does the case predict whether the Minnesota Supreme Court would recognize such a cause of action if presented with the opportunity to do so. Instead, *Medtronic* analyzes allegations of improper solicitation of employees as a claim for tortious interference with prospective contractual relations. *Id.* at *2. In short, the Court finds Storage's reliance on *Medtronic* misplaced.

Relying on the disfavor with which Minnesota regards noncompete clauses and other restrictive covenants in employment contracts as restraints of trade, *see, e.g., Nat'l Recruiters, Inc. v. Cashman,* 323 N.W.2d 736, 740 (Minn.1982); *Ecolab, Inc. v. Gartland,* 537 N.W.2d 291, 294 (Minn.Ct.App.1995), Cisco contends that Minnesota does not recognize such a cause of action and that the Minnesota Supreme Court would not recognize it. The rationale underlying Minnesota's disfavor of restrictive covenants in employment contracts, that "their enforcement decreases competition in the marketplace and restricts the covenantor's right to work and his ability to earn a livelihood," *Jim W. Miller Constr., Inc. v. Schaefer,* 298 N.W.2d 455, 458 (Minn.1980), counsels against recognition of a novel cause of action that inhibits mobility in the workforce.

Given that Storage has not identified any case that either recognizes or predicts the recognition of a cause of action for corporate raiding in Minnesota law, that Minnesota views noncompete clauses and other restrictive covenants in employment contracts with disfavor, and that Minnesota law affords Storage causes of action for interference with contractual relations and inducing breach of contract, the Court declines to presume that the Minnesota Supreme Court would recognize a cause of action for corporate raiding if presented with the opportunity to do so.

In addition, Storage's failure to submit a viable damages theory entitles Cisco to summary judgment on the claim. Norton's analysis bears no relation to Storage's raiding claim:

*4 Q: As part of your analysis do you consider in any way how [Storage's] situation would have been different but for the alleged raiding of employees?
A: No.

For these reasons, Cisco is entitled to summary judgment on Storage's corporate raiding claim.

D. Conversion

Conversion is "an act of willful interference with personal property, 'done without lawful justification by which any person entitled thereto is deprived of use and possession." ' *DLH, Inc. v.. Russ,* 566 N.W.2d 60, 71 (Minn.1997) (quoting *Larson v. Archer-Daniels-Midland Co.,* 32 N.W.2d 649, 650 (Minn.1948)). In *H.J., Inc. v. International Telephone & Telegraph Corp.,* 867 F.2d 1531 (8th Cir.1989), the Eighth Circuit stated that it had "found no Minnesota cases which define the bounds of 'personal property' subject to conversion," and applied the general rule that a cause of action for conversion "applies to tangible property, or intangible property customarily merged in, or identified with, some document." *Id.* at 1547. In *Bloom v. Hennepin County,* 783 F.Supp. 418 (D.Minn.1992), the court applied *H.J.* and concluded that Minnesota does not extend the tort of conversion to protect property interests in alleged trade secrets. *Id.* at 439-41. In this case, Storage has not distinguished its conversion claim from its MUTSA claim. Consequently, Cisco is entitled to summary judgment on Storage's conversion claim.

Even if the Court expanded Minnesota's law of conversion to apply to the property interest Storage asserts in its alleged trade secrets, Cisco would be entitled to summary judgment because Storage failed to submit a viable damages theory. "The measure of damages in a conversion case is generally the value of the property at the time of the conversion plus interest from that time." *McKinley v. Flaherty,* 390 N.W.2d 30, 32 (Minn.Ct.App.1986). Again, Storage relies on Norton to establish its damages. Norton does not know what technology Storage claims was taken from it:

Q: Do you know what the technology is that [Storage] claims was taken?
A: No.

Not surprisingly, Norton does not attempt to value the technology that was allegedly converted:

Q: Well, you're trying to evaluate the people and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

the technology, correct?
A: At NuSpeed?
Q: Right.
A: Yes.
Q: Are you trying to differentiate between the people in technology who were once at [Storage] or are you just grouping it all together at NuSpeed?
A: It's not a matter of grouping it together, it's a matter of looking at the totality of what NuSpeed was, which was people and technology, and as you pointed out, venture capitalists, savvy venture capitalists in the background and good banking connections, and apparently a very impressive presentation capability as well.
Q: [Storage] had the opportunity itself to evaluate the worth of its employees and its technology, right?
A: I have no way to know.
Q: Do you think in the assessment of its worth of the people that used to work at [Storage] and the intellectual property that allegedly was misappropriated from [Storage], that [Storage's] own opinions as to the value of those people and technology should be taken into consideration?
***5** A: Not in my opinion.
Q: Why not?
A: My opinion relates to what Cisco actually paid, not what [Storage] might have thought.
Q: So you didn't consider in any way any valuation [Storage] may have placed on these people or technology; is that correct?
A: I don't recall doing that.
....
Q: Do you analyze in any way how [Storage's] situation would have been any different but for the alleged conversion of trade secrets?
A: No.

For these reasons, Cisco is entitled to summary judgment on the conversion claim.

E. Misappropriation of trade secrets

The MUTSA protects certain information by providing for an action for misappropriation of a trade secret. *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 897 (Minn.1983). A plaintiff asserting a misappropriation claim must identify the trade secrets that it seeks to protect. *See Fox Sports Net N. L.L.C. v. Minn. Twins P'ship*, 319 F.3d 329, 335 (8th Cir.2003); *Electro-Craft*, 332 N.W.2d at 897-98. Cisco argues that Storage has failed to identify the trade secrets that were allegedly misappropriated.

Storage asserts that its supplemental response to one of Cisco's interrogatories identifies the misappropriated trade secrets. According to Cisco, the Court cannot consider the supplemental response because it fails to comply with the requirements of Rule 56(e) of the Federal Rules of Civil Procedure, which provides in relevant part: "[A]ffidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *See Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 635 n.20 (8th Cir.2000) (stating that documents that fail to comply with Rule 56(e) cannot be considered in deciding motion for summary judgment); *Causey v. Balog*, 162 F.3d 795, 803 n.4 (4th Cir.1998). The supplemental response's verification states:

> ROBERT E. MUNSEY, an employee of [Storage], verifies the foregoing interrogatory answers on behalf of [Storage]. The matters stated in the answers are not necessarily within my personal knowledge. The facts stated have been assembled by authorized personnel, including counsel. The facts stated are true to the best of my current knowledge and belief.

The verification fails to show affirmatively that Munsey is competent to testify to the matters stated in the supplemental response. Accordingly, the Court cannot consider the supplemental response in deciding Cisco's motion.

The same conclusion is warranted with respect to Storage's Particularized Trade Secret Statement and its Supplemental Particularized Trade Secret Statement. Storage's counsel prepared the statements; Storage personnel did not verify them. They are not evidence that the Court can consider in deciding Cisco's motion. *See* Fed.R.Civ.P. 56(e).

Putting aside Storage's failure to submit evidence identifying its alleged trade secrets, the trade secret statements and the supplemental response do not definitively set forth the alleged trade secrets at issue. The particularized trade secret statements states: "The list of trade secrets is based on [Storage's] best knowledge on November 28, 2001. Trade secret discovery has not yet begun. As [Storage] learns more information [in] discovery, this list may be revised or supplemented." Similarly, the supplemental particularized trade secret statement states:

> ***6** The following sections provide background information to place the trade secrets into the context of this case. The information contained here is based on [Storage's] best information to date. However, discovery on the trade secret part of this lawsuit has not yet begun. Accordingly, the information presented in this document is likely to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

change as discovery progresses.

The supplemental response details how the trade secrets contained in the supplemental particularized trade secret statement were misappropriated. In short, Storage has failed to identify with sufficient specificity the trade secrets at issue in this case. Accordingly, Cisco is entitled to summary judgment. *See* Electro-Craft, 332 N.W.2d at 897 ("Without a proven trade secret there can be no action for misappropriation, even if [a defendant's] actions were wrongful.").

Without regard to Storage's failure to identify the trade secrets at issue in this case, the lack of evidence to support findings that the information Storage seeks to protect is a trade secret and that Cisco misappropriated that information entitles Cisco to summary judgment. Storage contends that Cisco misappropriated trade secrets embodied in Storage's SAN Appliance. Specifically, Storage asserts that Cisco's SN 5420 is identical architecturally, operationally, and structurally to the SAN Appliance.

A trade secret is information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Minn.Stat. § 325C.01, subd. 5. In other words, for information to qualify as a trade secret: (1) the information must be neither generally known nor readily ascertainable; (2) the information must derive independent economic value from secrecy; and (3) the plaintiff must make reasonable efforts to maintain secrecy. *Electro-Craft*, 332 N.W.2d at 899; *Widmark v. Northrup King Co.*, 530 N.W.2d 588, 592 (Minn.Ct.App.1995).

Storage derives its characterization of the SAN Appliance from an 8-page draft slide presentation. The presentation includes a slide comparing reasons why Storage should build the SAN Appliance with reasons why Storage should continue to buy a comparable product from another company. Other documentation reveals that the SAN Appliance did not advance beyond Phase 0 of Storage's product development process. That process commences with a product idea checklist. A product line team evaluates the checklist. If approved, a product proposal is prepared. Phase 0 concludes with a review of the proposal. Phase 1 commences with approval of the proposal, proceeds to formation of a "core team," then turns to project planning. Phase 1 includes product specification: functional, configuration, and physical requirements, and agency standards. Phase 1 concludes with another review. Phase 2 begins with approval, proceeds to allocation of resources to develop the product, verifies and tests the product, and concludes with another review. Phase 3 includes another approval, final testing, and the product's release. Viewed in the light most favorable to Storage, the record does not contain sufficient evidence to establish that the information related to the SAN Appliance constitutes a trade secret.

*7 With regard to whether the information embodied in the SAN Appliance is generally known or readily ascertainable, the Court notes that "mere variations on widely used processes cannot be trade secrets." *Electro-Craft*, 332 N.W.2d at 899. A unique combination of known elements may constitute a trade secret. *Id.* Here, the SAN Appliance was contemplated as a replacement for a product that Storage already purchased from another company. Storage cannot claim trade secrets in information that is readily available in the marketplace.

Turning to the statutory requirement of independent economic value from secrecy, it carries forward the common law requirement that information must provide a competitive advantage to constitute a trade secret. *Id.* at 900. Whether a plaintiff developed the information at its own expense is a factor in considering whether the information provides a competitive advantage. *Id.* at 901 n.12. Here, the SAN Appliance never proceeded beyond Phase 0 of Storage's product development process. Consequently, Storage did not undertake Phase 1's product specification. Nor did Storage allocate resources to develop the SAN Appliance as contemplated in Phase 2. Indeed, a block diagram in the slide presentation reveals that Storage had not specified which components to use in the SAN Appliance. Viewed in the light most favorable to Storage, the record does not support Storage's contention that the information embodied in the SAN Appliance derives independent economic value from secrecy.

As to the requirement of reasonable efforts to maintain the secrecy of the information, the MUTSA requires neither the maintenance of absolute confidentiality nor the implementation of specific measures to maintain the secrecy of a trade secret. Minn.Stat. § 325C.01, subd. 5; *Electro-Craft*, 332 N.W.2d at 901. A plaintiff asserting a misappropriation claim must demonstrate that it undertook some effort to keep the information secret. *Electro-Craft*, 332 N.W.2d at 901. Here, Storage

used general employee- confidentiality agreements, but such agreements are insufficient to satisfy the statutory requirement. *See* id. at 902. Given its rejection early in the product development process, very little information about the SAN Appliance exists. What little information does exist was not the subject of reasonable efforts to maintain its secrecy. For example, the author of the slide presentation did not mark it as confidential because he did not believe the design of the SAN Appliance was confidential, proprietary, or a trade secret. None of the limited documentation of the SAN Appliance was marked confidential. *See* *Fox Sports Net N., LLC, v. Minn. Twins P'ship*, 319 F.3d 329, 336 (8th Cir.2003). Nor did Storage secure the documentation related to the SAN Appliance. Storage admits that it found the documentation on back-up disks left behind by departing employees. Moreover, upon the resignation of the slide presentation's author, Storage did not inform him of the secrecy of the SAN Appliance. *See* *Electro-Craft*, 332 N.W.2d at 903. In short, viewed in the light most favorable to Storage, the record reveals that Storage did not subject information about the SAN Appliance to reasonable efforts to maintain its secrecy.

***8** Assuming that Storage had established the existence of a trade secret in the information embodied in the SAN Appliance, Cisco would still be entitled to summary judgment because the record does not contain evidence to support a finding of misappropriation by Cisco. "Misappropriation involves the acquisition, disclosure, or use of a trade secret through improper means." *Id.; see* Minn.Stat. § 325C.01, subd. 3. "[D]irect evidence of industrial espionage is rarely available and not required" to establish a claim of trade secret misappropriation. *Pioneer Hi-Bred Int'l v. Holden Foundation Seeds, Inc.*, 35 F.3d 1226, 1239 (8th Cir.1994). Here, there is no direct evidence of misappropriation. Instead, Storage relies on Cisco's access to its alleged trade secrets and the similarity between Cisco's products and Storage's alleged trade secrets to establish misappropriation. *See* *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1361 (Fed.Cir.2002) (citing *Sokol Crystal Prods., Inc. v. DSC Communications Corp.*, 15 F.3d 1427, 1429 (7th Cir.1994)).

It is undisputed that Cisco had access to Storage's alleged trade secrets via the employees who left Storage to work for NuSpeed. Turning to whether Cisco's SN 5420 is similar to Storage's alleged trade secrets, Storage relies on Brian Berg, who describes himself as "an independent consultant in the area of computer software and computer peripheral devices" and "an expert in computer mass storage devices and their interfaces." According to Berg, some of Cisco's products are similar to the SAN Appliance. He offers two opinions:

> While at NuSpeed, and later Cisco, former [Storage] employees developed designs the same as, or very similar to, designs these same employees developed previously at [Storage]. The designs in question, which related to combining networking and storage capabilities, had been pursued at [Storage] since at least 1994.
>
> NuSpeed, and later Cisco, misappropriated [Storage] trade secret information in the design of ... the ... SN 5420.... This misappropriation continues in Cisco's development plans.

Cisco contends that Berg's opinion should not be considered. Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Here, Storage does not claim that Cisco misappropriated software. The misappropriation claims relate solely to hardware design. Berg's deposition testimony reveals that he is not qualified as an expert in hardware design:

> ***9** Q: And you would characterize yourself as a software consultant, correct?
>
> A: That's correct.
>
> Q: You are not an expert or profess to be an expert on hardware design, do you?
>
> A: I don't profess to be that, no.

Notwithstanding Berg's concession, Storage contends that the Court should consider Berg's testimony because "[n]othing Berg has done requires him to design hardware or be an expert on hardware design." Storage offers no explanation as to how opinions regarding hardware design of products at Storage, NuSpeed, and Cisco do not require expertise in hardware design. Berg's admission that he is not an expert on hardware design precludes him from offering opinions as to whether the designs of products at NuSpeed and Cisco are similar to those at Storage. Storage has not offered any other evidence to demonstrate the similarities between the SAN Appliance and the SN 5420. Accordingly, the Court concludes that Storage has failed to submit evidence

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

that would support a finding that Cisco misappropriated Storage's trade secrets.

Without regard to whether Berg is an expert in hardware design, Cisco contends that the Court should disregard his opinion because it is not based on sufficient facts or data. At his deposition, Berg acknowledged that he had never physically reviewed the SN 5420, that he had asked to see it, and that Storage had declined his request citing the cost of flying him from California to Colorado. Berg never spoke to any Storage employees who had actually inspected Cisco's SN 5420. [FN2] Under these circumstances, Berg lacks sufficient factual foundation for his opinions. Accordingly, the Court will not consider Berg's opinion and concludes that Storage has failed to submit evidence to create a genuine issue of fact as to whether Cisco misappropriated Storage's trade secrets.

FN2. No Storage employee who inspected the SN 5420 was able to identify any of Storage's alleged trade secrets in Cisco's product.

Even if the record contained evidence of Storage's trade secrets and their misappropriation, Cisco would be entitled to summary judgment because Storage fails to submit a viable damages theory. With regard to damages, the MUTSA provides:

> Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by the misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

Minn.Stat. § 325C.03(a). Again, Storage does not identify any actual loss from the alleged misappropriation. Nor does Storage advance any argument regarding a reasonable royalty. [FN3] Storage's sole contention is that it is entitled to damages for unjust enrichment in the amount of $450 million, the acquisition price of NuSpeed.

FN3. Even if Storage had claimed a reasonable royalty, the sole measure of damages offered by Storage, the acquisition price of NuSpeed, is not a viable measure of the value of a reasonable royalty for its allegedly misappropriated trade secrets. *See* *Alcatel USA, Inc. v. Cisco Sys., Inc.*, 239 F.Supp.2d 660, 671-73 (E.D.Tex.2002); *cf.* *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1375-76 (Fed.Cir.2002) (patent infringement).

***10** Relying on the Restatement (First) of Restitution (1937) § 151, Storage contends that NuSpeed's acquisition price is the proper measure of its unjust enrichment damages. Storage's reliance on section 151 is misplaced because that section applies only to the tortious deprivation of an interest in "land, chattels, or choses in action," *id.* at cmt. a, and because it does not establish the acquisition price of a company as a measure of damages. Instead, "[u]njust enrichment is measured by the profits the defendant obtained from using the trade secret." *LinkCo, Inc. v. Fujitsu Ltd.*, 232 F.Supp.2d 182, 185 (S.D.N.Y.2002) (citing *Electro-Miniatures Corp. v. Wendon Co.*, 771 F.2d 23, 27 (2d Cir.1985)); *see* Restatement (First) of Restitution (1937) § 136. In this case, it is undisputed that neither Cisco nor NuSpeed profited from Storage's alleged trade secrets.

Without regard to Storage's failure to submit a viable damages theory, Norton's analysis is of no use to Storage in this proceeding because he does not know what the allegedly misappropriated trade secrets are. He has not valued them. He does not analyze how Storage would have fared had the alleged misappropriation not taken place. He attributes the entire acquisition price to the allegedly misappropriated trade secrets, presuming that the acquisition price is wholly attributable to interests that rightfully belong to Storage. He fails, however, to distinguish between the tangible and intangible assets acquired by Cisco, to account for goodwill, and to apportion Storage's alleged damages to its various causes of action. In short, Norton's opinion amounts to nothing more than rank speculation. For these reasons, Cisco is entitled to summary judgment on Storage's MUTSA claim.

F. Breach of fiduciary duties

Storage's claim for breach of fiduciary duties is premised on the conduct of Mark Schrandt in December 1999. Storage asserts that Schrandt breached his fiduciary duties to it in the time between his acceptance of an offer from NuSpeed in early

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

December, and his resignation from Storage at the end of that month. A claim for breach of fiduciary duty includes four elements: (1) the existence of a duty; (2) breach of that duty; (3) causation; and (4) and damages. *Conwed Corp. v. Employers Reinsurance Corp.*, 816 F.Supp. 1360, 1362 n.3 (D.Minn.1993). Cisco argues *inter alia* that it is entitled to summary judgment because Storage has failed to submit evidence of its damages resulting from the alleged breaches. The Court agrees.

Again, Storage relies on Norton to establish its damages. Norton's deposition testimony reveals that his analysis bears no relation to Storage's claim for breach of fiduciary duties:

> Q: Do you in your analysis consider any way in which [Storage's] situation would have been different but for the alleged breaches of ... fiduciary duties by former [Storage] employees?
> A: No.

Because Storage failed to submit a viable damages theory, Cisco is entitled to summary judgment on this claim.

III. CONCLUSION

***11** Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Cisco's motion for summary judgment [Docket No. 127] is GRANTED.
2. Count 1, Count 2, Count 3, Count 4, Count 5, and Count 6 of Storage's Complaint [Docket No. 1] are DISMISSED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

2003 WL 22231544 (D.Minn.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.
11 U.S.P.Q.2d 1328
1989 WL 418783 (C.D.Cal.), 99 A.L.R. Fed. 265, 11 U.S.P.Q.2d 1328
(Cite as: 11 U.S.P.Q.2d 1328)



C

Stilwell Development Inc.
v.
Chen

District Court, C. D. California

No. CV86-4487-GHK

Decided April 25, 1989
United States Patents Quarterly Headnotes

**TRADEMARKS AND UNFAIR TRADE PRACTICES**
**[1] Trade secrets -- State statutes (§ 400.09)**
**REMEDIES**
**Monetary -- Attorney's fees; costs -- Trademarks and unfair trade practices (§ 510.0907)**
Cal. Civ. Code 3426.4, which authorizes award of attorney's fees for bad faith claims of misappropriation, applies to action brought after statute's effective date, even if underlying conduct which constituted alleged misappropriation predated statute, since statute's focus is on relevant conduct in bringing and maintaining unauthorized trade secret action, and not on underlying conduct.

**TRADEMARKS AND UNFAIR TRADE PRACTICES**
**[2] Trade secrets -- State statutes (§ 400.09)**
**REMEDIES**
**Monetary -- Attorney's fees; costs -- Trademarks and unfair trade practices (§ 510.0907)**
Claim "made" in bad faith, for purposes of determining eligibility for award of attorney's fees under Cal. Civ. Code 3426.4, is one that is not only brought, but maintained, in bad faith, and "bad faith" means that claim must have been without substance in reality.

**TRADEMARKS AND UNFAIR TRADE PRACTICES**
**[3] Trade secrets -- State statutes (§ 400.09)**
**REMEDIES**
**Monetary -- Attorney's fees; costs -- Trademarks and unfair trade practices (§ 510.0907)**
Plaintiffs who knowingly and intentionally prosecuted specious claim of trade secret misappropriation have made such claim in bad faith, in view of their subjective misconduct and objective speciousness of claim, and thus award of attorney's fees to defendant is warranted pursuant to Cal. Civ. Code 3426.4, although such award cannot include fees incurred in defense of non-trade secret counts.

***1328** Action by Stilwell Development Inc. against Laurence K. Chen, et al., for misappropriation of trade secrets. On defendant's motion for award of attorney's fees. Motion granted.

Kevin P. Roddy, of Musick, Peeler & Garrett, Los Angeles, Calif., for plaintiffs.

Brian A. Sun and John M. Moscarino of O'Neill & Lysaght, Santa Monica, Calif., for defendant Laurence K. Chen.

Don W. Martens and John B. Sganga, of Knobbe, Martens, Olson & Bear, Newport Beach, Calif., for defendant Southwest Laboratories Inc.

Douglas M. Vickery, of Good, Wildman, Hegness & Walley, Irvine, Calif., for remaining defendants.

King, U.S. magistrate.

***1329** This matter is before the court on Defendant Southwest Laboratories, Inc.'s ("Southwest") motion for attorneys' fees on the trade secret and related counts. Southwest bases its request on Cal.Civ.Code § 3426.4 and Fed.R.Civ.P. 11. The court has carefully considered the various papers filed in support of and in opposition to the motion. For the reasons set forth below, Southwest's motion is granted, and the court hereby awards the sum of $71,059.00 to Southwest and against plaintiffs.

*Background*

Plaintiffs' complaint against Southwest included a count of unfair competition for alleged misappropriations of trade secrets. This claim was maintained through the plaintiffs' case in chief. At the end of plaintiffs' presentation of the evidence, the court granted Southwest's motion for a directed verdict on the trade secret count.

In its motion for attorneys' fees, Southwest claims that plaintiffs' trade secret count was made in bad faith within the meaning of Cal.Civ.Code § 3426.4.

COPR. © 2005 The Bureau of National Affairs, Inc.

In the alternative, Southwest argues that plaintiffs' filing of various pre-trial documents asserting and persisting in the trade secret claim violated Fed.R.Civ.P. 11. In support of its fee request, Southwest has provided a detailed itemization and apportionment of the attorneys' fees incurred in defense of the trade secret and other related counts.

Plaintiffs oppose Southwest's application on the grounds that:

1) Cal.Civ.Code § 3426 does not apply to this case;

2) In the alternative, plaintiffs' trade secret claim was not brought in bad faith; and

3) Southwest is not entitled to fees under Fed.R.Civ.P. 11.

*Discussion*

I. *Is Cal.Civ.Code § 3426 Applicable To This Case* ?

Southwest claims attorney's fees under § 3426.4 [FN1] which provides that "[i]f a claim of misappropriation is made in bad faith . . . the court may award reasonable attorney's fees to the prevailing party." Plaintiffs argue that since the alleged misappropriation spanned the effective date of § 3426, [FN2] Southwest must show that it is entitled to attorneys' fees under both the old and the new laws. Since there was clearly no provision for attorneys' fees under the old law, plaintiffs assert that Southwest may not be awarded attorneys' fees in this case.

Plaintiffs rely principally on § 3426.10 which states as follows:

> This title does not apply to misappropriations occurring prior to January 1, 1985. If a continuing misappropriation otherwise covered by this title began before January 1, 1985, this title does not apply to the part of the misappropriation occurring before that date. This title does apply to the part of the misappropriation occurring on or after that date [January 1, 1985] unless the appropriation was not a misappropriation under the law in effect before the operative date of this title.

Plaintiffs contend that because misappropriations which "bridge" the old and new laws are tested under both laws, so should Southwest's request for attorneys' fees.

Section 3426.10 has no application to attorney's fees. It is directed at which law applies in determining the existence of alleged misappropriations which "bridge" the old and new laws. Indeed, the title of § 3426.10 is "*Misappropriations* occurring prior to January 1, 1985; application of title." (Emphasis added). It does not relate to the availability of attorneys' fees under § 3426.4 for unproved allegations of misappropriations which purportedly spanned the effective date of the new act, and plaintiffs have cited no persuasive authority for their argument to the contrary.

Plaintiffs rely on *Religious Technology Center v. Wollersheim*, 796 F.2d 1076, 1090 n.16 (9th Cir. 1986), *cert. denied*, ------------ U.S. ------------, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987), for the proposition that in actions which "bridge" the old and new laws, "both old and new law must be applicable."

In *Wollersheim*, plaintiff church obtained a preliminary injunction against defendant, a splinter church, preventing use or dissemination of certain disputed scriptural materials on the grounds that such materials were trade secrets within the meaning of the California statute. In determining whether the injunction could be sustained on appeal, the Ninth Circuit observed, in a footnote, that the alleged misappropriations which spanned the effective date of § 3426 must be tested under both old and new law. *Id.* This was nothing more than a restatement of the clear provisions of § 3426.10. It did not purport ***1330** to construe the applicability of § 3426.4 to the instant case.

> [1] Moreover, unlike § 3426.10, § 3426.4 focuses on conduct which justifies an award of attorneys' fees, not the underlying conduct which constituted the misappropriation. In this case, Southwest claims that plaintiffs brought and maintained the trade secret count in bad faith. Under § 3426.4, the issue is whether, given the facts of this case, plaintiffs' conduct in bringing and maintaining the trade secret count justifies an award of attorneys' fees. The inquiry has nothing to do with § 3426.10's definition of a continuing misappropriation which spans the effective date of the new law. In this case, inasmuch as the relevant conduct of bringing and maintaining the trade secret count indisputably occurred after the effective date of the new law, [FN3] the court concludes that § 3426.4 is applicable to this case.

II. *Was the Trade Secret Claim Made in Bad Faith* ?

COPR. © 2005 The Bureau of National Affairs, Inc.

Preliminarily, we note there is no dispute that Southwest is the prevailing party on the trade secret claim. The remaining inquiry has three parts. First, we must determine whether a claim "made" in bad faith within the meaning of § 3426.4 is one which is not only brought, but also maintained, in bad faith. Next, we must construe the meaning of "bad faith" within § 3426.4. Finally, we must decide whether plaintiffs' conduct amounts to bad faith under the appropriate standards.

A. *Meaning of "Made" in Bad Faith*

[2] Southwest argues that making a claim of misappropriation in bad faith within the meaning of § 3426.4 includes the bringing and maintaining of such claim. It cites *Curtis v. County of Los Angeles*, 172 Cal.App. 3d 1243, 1252, 218 Cal.Rptr. 772, 777 (1985) which held that under the California Tort Claim statute, the term "brought" includes conduct which continued and maintained an action. Plaintiffs have not disputed Southwest's argument.

Having considered the statutory language, we are convinced that Southwest is correct in its assertion. We note that while "brought" connotes the commencement of an action, the word "made" connotes not only the commencement, but also the prosecution, of the claim. Moreover, since a California Court of Appeal [FN4] has interpreted a California statute utilizing the word "brought" to include actions taken to continue and maintain the claim, we are persuaded that this California statute utilizing the word "made" must, at least, encompass actions taken to maintain the claim.

B. *Meaning of "Bad Faith"*

Section 3426.4 does not define "bad faith." The parties suggest that the court look to state and federal statutes which provide remedies for bad faith conduct. Absent some evidence that § 3426.4 was patterned after federal law, the court is reluctant to look to federal law for guidance on the meaning of state law. [FN5] While the authorities construing Cal.Civ.Pro.Code § 128.5 may be helpful, [FN6] we must ensure that any standards we adopt are consistent with the purpose of this statute as gleaned from the Commissioners' Comment.

The Commissioners' Comment states that "[§ 3426.4] allows a court to award reasonable attorney fees to a prevailing party in specified circumstances as a *deterrent* to *specious* claims of misappropriation. . . ." M. Jager, Trade Secrets Law, APP.AI at 13 (1988) (emphasis added). The Commissioners construe the "bad faith" language of the Uniform Act to encompass deterrable conduct which maintains a specious claim of misappropriation.

***1331** As to deterrence, we conclude that it requires conduct more culpable than mere negligence. To be deterrable, conduct must be at least reckless or grossly negligent, if not intentional and willful. Webster's defines specious as, among other things, "apparently right or proper: superficially fair, just, or correct but not so in reality. . . ." Webster's *Third New International Dictionary* 1287 (1986). Thus, the claim must have been without substance in reality, if not frivolous.

We now review plaintiffs' conduct on the standards of subjective misconduct and objective speciousness.

C. *Plaintiffs'* Conduct

Among the claims in the complaint, plaintiffs alleged a claim of unfair competition for alleged misappropriations of trade secrets. This claim was maintained through the end of plaintiffs' case in chief, at which time the court granted Southwest's motion for directed verdict.

In order to prevail on such claim, plaintiffs had to show that Southwest misappropriated a trade secret. A trade secret is defined as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal.Civ.Code § 3426.1(d) (West Supp. 1989). In this case, plaintiffs alleged that Southwest misappropriated confidential information regarding SleepSafe distributors and the design specifications and manufacturing molds for the SleepSafe device.

Having reviewed the evidence plaintiffs presented at the trial, the court concludes that plaintiffs made the trade secret claim in bad faith within the meaning of § 3426.4.

1. *Speciousness*

Plaintiffs' claim is objectively specious, if not frivolous. While the allegations set forth two misappropriations, plaintiffs offered evidence of

COPR. © 2005 The Bureau of National Affairs, Inc.

neither. As to the alleged confidential distributor lists, plaintiffs simply did not present any, much less credible, evidence that the identities of their distributors were confidential and/or that Southwest misappropriated them. Moreover, there was a total failure of proof that the alleged trade secret was the "subject of efforts that are reasonable under the circumstances to maintain its secrecy."*See* § 3426.1(d)(2).

Also, the functional features of the SleepSafe device were not trade secrets since a device incorporating those features had been sold to the general public before it was shown to Southwest. It is an elementary principle of trade secret law that a product which is marketed to the public cannot be secret. *See A* c *uson Corp. v. Aloka Co., Ltd.*, No. H004601, Cal.App. [10 USPQ2d 1814, 1817-1818] (April 5, 1989), 89 Daily Journal D.A.R. 4625, 4626 (April 11, 1989); *see also* § 3426.1(d)(1) (trade secret must derive independent economic value from not being generally known to the public).

In sum, plaintiffs presented no evidence in support of their claim of trade secrets misappropriation. If anything, the evidence showed there was no secret, no reasonable efforts undertaken to maintain any alleged secrecy, and no misappropriation. Plaintiffs' trade secret claim was specious, at best.

2. *Subjective Misconduct*

While the deterrent purpose of § 3426.4 requires subjective misconduct, the speciousness of the claim is some evidence upon which the court could rely in its assessment of subjective misconduct. As discussed above, the court finds that plaintiffs' claim was specious. Plaintiffs were unable to show either of the essential elements of a trade secret. From this complete failure of proof, the court infers that plaintiffs must have knowingly and intentionally prosecuted a specious claim. [FN7]

***1332** Our conclusion is buttressed by the fact that plaintiffs had superior, if not exclusive, knowledge of whether they undertook any effort to maintain the alleged secrets. Moreover, the legal issue of whether a publicly marketed product could be a secret is both well-established and straightforward. Plaintiffs could not have entertained any good faith, albeit mistaken, belief in bringing, much less maintaining, the trade secret claim.

Because plaintiffs knew, *ab initio* that they had no claim for trade secret misappropriation, their actions in bringing and persisting in the trade secret claim evidence intentional misconduct aimed at harassing Southwest or at gaining an improper advantage by unjustifiably painting Southwest as a dishonest and unfair defendant. Moreover, certainly by the time Southwest retained specialized counsel, plaintiffs knew that they had no proof of any trade secret misappropriation. Yet, they persisted in the claim through their case in chief. This knowing persistence in an invalid claim also demonstrates plaintiffs' subjective bad faith in causing the needless expenditure of money in defense of the trade secret claim.

[3] In view of the foregoing, the court concludes that plaintiffs' subjective misconduct and the objective speciousness of the trade secret claim amount to bad faith under § 3426.4. An award of attorneys' fees against plaintiffs and in favor of Southwest is warranted. [FN8].

III. *The Amount of the Fee*

Plaintiffs challenge Southwest's entitlement to, but not the reasonableness of, the fees sought. Nevertheless, the court has conducted its independent assessment of the reasonableness of the fee request.

A. *Apportionment of the Fee*

Southwest seeks a total of $136,881.45 in fees, consisting of $71,059.00 on the trade secret count, and $65,822.00 on the remaining counts. Having carefully reviewed the fee application, the court concludes that only the fees incurred by Southwest in the defense of the trade secret count should be awarded. While the court accepts counsel's representation that but for the trade secret count, specialized counsel would not have been retained, and that once retained, counsel necessarily performed some services on the other related counts, we conclude that fees incurred on the other counts should not be assessed against plaintiffs for two reasons.

First, defendants Southwest and Skarman derived substantial independent benefit from counsel's skilled representation on the non-trade secret counts. Indeed, it is not unreasonable to conclude that both Southwest and Skarman owe their ultimate victory in no small measure to counsel's overall representation and presence in the case.

Second, § 3426.4 gives the court discretion to award reasonable attorneys' fees to the prevailing party if the claim of misappropriation was made in bad faith. Reasonably read, this statute provides for attorneys' fees reasonably expended in defense of the bad faith

COPR. © 2005 The Bureau of National Affairs, Inc.

claim. It does not permit an award of all attorneys' fees incurred regardless of whether such fees are attributable to the bad faith claim of misappropriation. Accordingly, the court declines to award any fees incurred in defense of the non-trade secret counts.

B. *Reasonableness of the Fee*

Having determined that fees should be awarded, but only for the defense of the trade secret count, the court must decide what is a reasonable fee. Ninth Circuit authority provides that we begin with the lodestar figure which is composed of a determination of a reasonable number of hours multiplied by a reasonable hourly rate. *Jordan v. Multnomah County,* 815 F.2d 1258, 1262 (9th Cir. 1987). The lodestar amount is the predominate element of the analysis, and is strongly presumed to be a reasonable fee. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478546478 U.S. 546--------, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986); *Jordan,* 815 F.2d at 1262. While some of the so-called *Johnson/Kerr* [FN9] factors ***1333** may constitute "other considerations" for purposes of adjusting the lodestar amount, "many of [the *Johnson/Kerr* ] factors usually are subsumed" within the lodestar calculation. *Hensley v. Eckerhart,* 461 U.S. 424, 434 n.9, 103 S.Ct. 1933, 1940 n.9, 76 L.Ed.2d 40 (1983). These factors include (1) the novelty and complexity of the issues, (2) the special skill and experience of counsel, (3) the quality of representation, and (4) the results obtained. *See Blum v. Stenson,* 465 U.S. 886, 898-900, 104 S.Ct. 1541, 1549-50, 79 L.Ed.2d 891 (1984). We now calculate the lodestar amount in light of the foregoing authorities, including the *Johnson/Kerr* factors.

1. *The Hourly Rate*

Southwest's fee request sets forth the hourly rates of the various attorneys and paralegals involved in its defense. The requested hourly rates for attorneys who performed substantial services are $260 for senior partner Don Martens, and $145 for junior partner John Sganga. In assessing the reasonableness of the attorneys' hourly rates, we consider the skill required for performing the services, the customary fee, the experience, reputation and ability of counsel, the time limitations imposed by the circumstances, and the nature and length of counsel's relationship with the client.

The trade secret count required the specialized skills of intellectual property lawyers to analyze the legal issues, to conduct discovery aimed at those issues, and to competently try the claim. Counsel's hourly rates are not disproportionate to rates charged by attorneys in major firms in the Greater Los Angeles area. The fact that counsel specialize in intellectual property matters is further justification for their hourly rates.

Mr. Martens, who performed the lion's share of the work, is a highly experienced specialist whose reputation as a top trial lawyer in his field is well-known in the Los Angeles legal community. In presiding over the trial, the court witnessed first hand Mr. Martens' ability as a skilled trial practitioner who had an extraordinary command of the facts and the law. Mr. Sganga, the attorney who performed pre-trial legal work, is also an experienced intellectual property litigator whose work product demonstrates substantial analytical and writing ability.

Southwest submitted a survey of hourly rates charged by intellectual property lawyers in various cities in the United States. The survey showed that the hourly billing rate for partners in the Los Angeles area in the 75th percentile is $199. In this case, while Mr. Martens' hourly rate exceeds $199, he is clearly above the 75th percentile of intellectual property lawyers in the Los Angeles area in terms of his experience, reputation and ability.

Moreover, specialized counsel were retained some three months before trial. During that period, counsel had to work under considerable time constraints to familiarize themselves with the case, to conduct further discovery, to prepare for trial and to try the case.

Finally, counsel have represented Southwest for many years on intellectual property matters. The fees charged and the effort made on the trade secret claim were consistent with counsel's representation of the client on other matters. In light of the foregoing, the court concludes that counsel's hourly rates are reasonable and appropriate. [FN10]

2. *Hours Reasonably Expended*

Counsel have submitted a detailed itemization of the services rendered. Moreover, the fee request includes an apportionment of those services attributable to the trade secret count and the other related counts. Because the court has determined that fees should be awarded only on the trade secret count, the court has carefully reviewed not only the apportionment methodology, but also the reasonableness of the hours allocated to the trade secret count, and the necessity of the type of services rendered in defense of that count. In this review, the court has also been

mindful of the relevant *Johnson/Kerr* factors.

***1334** (a) *Time and Labor Required*

Southwest claims a total of 291 hours of attorney time and 62 hours of paralegal time on the trade secret count. We are cognizant of the fact that because some overlap is unavoidable when fees are awarded on only one of several counts, an allocation with mathematical precision is not possible. Our review of the hours allocated to the trade secret count leads us to the conclusion that the time spent was not excessive, the tasks undertaken by counsel were reasonably necessary to the defense, the services performed by counsel and the paralegals reflect proper utilization of resources, and there was no unnecessary expenditure of time or duplication of effort by counsel.

(b) *The Novelty and Difficulty of the Issues*

The claim of trade secret misappropriation involved a specialized area of the law. While the law was straightforward and well-established for experienced counsel in the intellectual property area, the very existence of the trade secret issues necessitated the participation of specialized counsel. Moreover, having presided over the trial, the court concludes the the factual issues were complex due to the interrelationship between the trade secret count and the other counts in the complaint. Also, a reasonable amount of discovery was necessary to attempt to uncover the plaintiffs' factual bases for their claim.

(c) *The Amount Involved; The Result Obtained*

Plaintiffs sought a total of $8,000,000.00 in damages on the trade secret claim. The amount involved and the potential exposure to Southwest were great. A substantial effort in defense of the claim was justified. The total claimed attorney time encompasses hours expended through every stage of counsel's representation of Southwest, including three weeks of trial on the trade secret claim.

Moreover, the result achieved was total victory. While the result is not necessarily indicative of counsel's effort, it is some evidence that the expenditure of time and effort was justified since total victory in litigation generally requires a substantial investment of time and resources.

*Conclusion*

Having considered those *Johnson/Kerr* factors which are relevant to this case, the lodestar figure should be 353 hours multiplied by the hourly rates of the respective individuals who performed services on the trade secret count. The lodestar figure is $71,255.00. However, since Southwest requested a slightly lesser amount, we shall award the amount requested. [FN11] The court finds no "other considerations" which would justify any adjustment of the lodestar figure. Accordingly, the court concludes that $71,059.00 is a reasonable fee for the defense of the trade secret count.

*ORDER*

IT IS HEREBY ORDERED that Southwest Laboratories, Inc. shall be, and it hereby is, awarded attorneys' fees under Cal. Civ.Code § 3426.4 against plaintiffs Stilwell Developments, Inc. and Sleepsafe Industries, Inc. in the sum of $71,059.00.

IT IS FURTHER ORDERED that the Clerk shall mail a copy of this Memorandum and Order to counsel of record in this case.

FN1 All references to § 3426, *et seq*. are to Cal. Civ.Code § 3426, *et seq*.

FN2 Cal.Civ.Code § 3426, adopting the Uniform Trade Secrets Act, became effective on January 1, 1985.

FN3 This action was filed on July 9, 1986.

FN4 *Curtis*, 172 Cal.App.3d at 1252, 218 Cal.Rptr. at 777 (1985).

FN5 Southwest suggests that the Commissioners' Comment on § 3426.4 refers us to the attorney's fees section under patent law. *See* 35 U.S.C. § 285 (1982). We disagree. Read in context, the Comment merely states that as in 35 U.S.C. § 285, the court, not the jury, decides the question of attorney's fees. It does not state, nor is it a fair inference, that we should look to or adopt the federal standards for awarding attorney's fees in "exceptional cases" under the patent statute.

FN6 State courts interpreting Cal.Civ.Pro.Code § 128.5 prior to its amendment in 1985 required a showing of subjective bad faith and objective frivolousness. *Abbett Elec. Corp. v. Sullwold*, 193 Cal.App.3d 708, 711- 712, 238 Cal.Rptr. 496, 498 (1987), *review denied*, September 30, 1987. However, as a result of the 1985 amendment, frivolous conduct is defined as that which is either totally and completely without merit or for

COPR. © 2005 The Bureau of National Affairs, Inc.

the sole purpose of harassing an opposing party. Cal.Civ.Pro. Code § 128.5 (West Supp. 1989). Under this specialized definition, frivolousness is not judged solely on an objective standard. A subjective intent to harass is required when the conduct is arguably meritorious. *Weisman v. Bower*, 193 Cal.App.3d 1231, 1239-41, 238 Cal.Rptr. 756, 760 (1987). Under either version of § 128.5, bad faith actions are tested under both objective and subjective standards.

FN7 In their opposition, plaintiffs contend that they offered or attempted to offer proof that "Stilwell invented the cam lock mechanism and that Defendants Chen, Wing Wah Chong and Southwest were involved in manufacturing and distributing a "4-in-1" travel smoke alarm using at least a portion of the SleepSafe mold." This purported evidence is irrelevant to plaintiffs' claim of trade secret misappropriation.First, Stilwell's invention of the cam lock mechanism, even if true, entitles him to no trade secret protection because while there was evidence of public marketing of devices openly containing the cam lock feature, there was no evidence it was protected by federal law. The law is quite clear that absent federal protection under the patent or copyright laws, matters in the public domain may not be protected by state law. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489141489 U.S. 141--------, 109 S.Ct. 971, 980-81, 103 L.Ed.2d 118 [9 USPQ2d 1847, 1854] (1989); *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 232-233, 84 S.Ct. 784, 789, 11 L.Ed.2d 661 [140 USPQ 524, 528], *reh'g denied*, 376 U.S. 973, 84 S.Ct. 1131, 12 L.Ed.2d 87 (1964); *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 237, 84 S.Ct. 779, 782, 11 L.Ed.2d 669 [140 USPQ 528, 530], *reh'g denied*, 377 U.S. 913, 84 S.Ct. 1162, 12 L.Ed.2d 183 (1964). In this case, the California statute does not protect matters which have been marketed to the public. *See* Cal.Civ.Code § 3426.1(d)(1).Moreover, even if the "4-in-1" device had used a portion of the SleepSafe mold, there was no evidence that the mold was, or was meant to be, secret.

FN8 Because fees are warranted under § 3426.4, we need not consider Southwest's alternative request for fees under Fed.R.Civ.P. 11.

FN9 The *Johnson/Kerr* factors refer to the 12 factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) and adopted by the Ninth Circuit in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), *cert. denied sub nom, Perkins v. Screen Extras Guild, Inc.*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). These factors are: (1) the time and labor required, (2) the novelty and difficulty of the issues, (3) the skill required, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) the time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Johnson*, 488 F.2d at 717-719.

FN10 While Southwest provided no survey evidence of the reasonableness of the paralegals' hourly rate, the court is satisfied that in its experience, and as compared with the reasonable rates charged by counsel in this case, $50.00 per hour for certified paralegal services is also reasonable.

FN11 Southwest requested $71,059.00 in attorneys' fees for the defense of the trade secret count.

C.D.Cal.

11 U.S.P.Q.2d 1328

END OF DOCUMENT

COPR. © 2005 The Bureau of National Affairs, Inc.

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. California.
FAS TECHNOLOGIES, LTD. et al., Plaintiffs,
v.
DAINIPPON SCREEN MFG., CO., LTD., Defendant.
**No. C 00-01879-CRB.**

Sept. 21, 2001.

MEMORANDUM AND ORDER RE: ATTORNEY FEES
BREYER, J.

*1 This misappropriation of trade secrets lawsuit arises out of defendant's attempted--and ultimately unsuccessful--sale of extrusion coaters to a California corporation. On May 31, 2001, the Court granted defendants summary judgment on all of plaintiffs' remaining claims with the exception of a common law claim for breach of contract which the Court transferred back to the Northern District of Texas. Defendant now moves for an award of fees and costs under California's misappropriation of trade secrets law and the patent statute.

BACKGROUND

Defendant Dainippon Screen Manufacturing Company ("Dainippon") sells extrusion coaters--the "Slit and Spin"--in direct competition with plaintiff FAS Technologies, Ltd. ("FAS"). The coater is a piece of equipment used to make flat panel displays for the semiconducter industry. On July 19, 1993, Dainippon entered into a Non-Disclosure Agreement with FAS in connection with a proposed joint development agreement. Under the Non-Disclosure Agreement, FAS provided Dainippon with confidential trade secret information including information relating to semiconductor coating, dispensing and automation equipment, business plans, financial information, and projections. The parties ultimately did not enter into any joint developments.

A. The Original Complaint

Five years after the parties entered into the Non-Disclosure Agreement, FAS filed this lawsuit in the Northern District of Texas. FAS alleged that Dainippon used FAS's confidential information to design, manufacture, and market Dainippon's extrusion coaters without FAS's authorization. Specifically, FAS alleged that Dainippon offered to sell extrusion machines to Candescent Technologies Corporation, a prospective customer of FAS, within the United States. Candescent is located within the Northern District of California.

The complaint made claims for patent infringement, misappropriation of trade secrets, breach of the Non-Disclosure Agreement, unfair competition, and tortious interference with prospective business relationship. Dainippon responded by moving to dismiss for lack of personal jurisdiction, or, in the alternative, to transfer to the Northern District of California. In particular, Dainippon argued that because the only transaction identified by FAS was the attempted sale to Candescent, a corporation located in California, the action should be transferred to this District if not dismissed outright. The Northern District of Texas agreed and transferred the action to this District on February 16, 2000.

B. The Second Amended Complaint

FAS subsequently moved for leave to file a second amended complaint. By that motion FAS sought to (1) withdraw the patent infringement claim; (2) restate claims for misappropriation of trade secrets and breach of a Non-Disclosure Agreement; (3) substitute an unfair competition claim under California Business and Professions Code section 17200, *et seq.*, in place of the common law unfair competition claim; and (4) add a new claim for an accounting. Dainippon opposed the amendment, and in particular, the dismissal of the patent claim. The Court granted FAS leave to amend and advised Dainippon that it would consider its request for costs and attorneys fees after deciding the motion to dismiss. The amended complaint sought "world-wide" damages; that is, damages from Dainippon's world-wide sales of the Slit and Spin.

C. Dainippon's First Motion To Dismiss

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

***2** Dainippon moved to dismiss all the claims in the amended complaint, except for the claims arising out of its alleged attempt to sell its device to Candescent, on the ground that the Court does not have personal jurisdiction of Dainippon for such claims. It also contended that the California claims must be dismissed to the extent FAS sought to obtain damages for Dainippon's world-wide conduct, and to the extent FAS sought a world-wide injunction. Dainippon also moved to dismiss on grounds of forum non conveniens, and filed a motion for attorneys fees and costs incurred in defending the voluntarily-dismissed patent claim.

The Court dismissed FAS's new claims that Dainippon misappropriated FAS's trade secrets and interfered with its world-wide sales on the ground that California's laws do not reach conduct that occurred outside of California. *See* Norwest Mortgage, Inc. v. Superior Court, 72 Cal.App.4th 214, 222 (1999). The Court also dismissed without prejudice defendant's motion for attorney's fees and costs arising from the abandoned patent claim.

After the Court issued its order, Dainippon wrote FAS requesting dismissal of the lawsuit since, among other things, it was undisputed that Dainippon had never sold anything to Candescent and therefore FAS could not have suffered any damages and was not entitled to injunctive relief. FAS refused to drop its lawsuit.

D. Dainippon's Motion for Summary Judgment

Dainippon subsequently moved for summary judgment of all of FAS's claims on the ground that it is undisputed that it did not misappropriate any of FAS's trade secrets in connection with the proposed Candescent transaction, and therefore did not violate the misappropriation of trade secrets law, section 17200, or the Non-Disclosure Agreement. Among other things, Dainippon argued that it never actually did any business with Candescent so FAS had not suffered any damage. FAS responded by moving to amend the complaint yet again. It argued that it had learned through its own investigation that Dainippon further misappropriated FAS's trade secrets by using FAS's technology in Japanese patent applications. These new allegations had no nexus to California whatsoever.

The Court denied the motion to amend and granted Dainippon's motion for summary judgment on the ground that FAS had not presented any evidence that Screen's failure to sell any products to Candescent damaged FAS. The Court transferred the common law breach of contract claim back to the Northern District of Texas since that claim alleged conduct unrelated to California in addition to the Candescent transaction. Dainippon now moves for an award of fees and costs under the trade secret and patent statutes.

DISCUSSION

I. Motion for fees and costs pursuant to the trade secret statute

Section 3426.4 of the California Civil Code (which is part of the Uniform Trade Secrets Act "UTSA") provides that "if a claim of [trade secret] misappropriation is made in bad faith, ... the court may award reasonable attorney's fees to the prevailing party." Cal. Civ.Code § 3426.4. "A party may show bad faith under this statute by showing that the plaintiff commenced or maintained a trade secret misappropriation claim in bad faith." Computer Economics, Inc. v. Gartner Group, Inc., 1999 WL 33178020 (S.D.Cal. Dec. 14, 1999). Although "bad faith" is not defined in the UTSA, courts have universally interpreted it to require a finding (1) that plaintiff's claims were objectively specious or frivolous, and (2) that there is evidence of subjective misconduct. *See id.*

***3** "Objective speciousness exists where there is complete lack of evidence supporting plaintiff's claim." *Id.* "Subjective misconduct exists where a plaintiff knows or is reckless in not knowing that its claim for trade secret misappropriation has no merit." *Id.* For example, "[b]ad faith may be inferred where the specific shortcomings of the case are identified by opposing counsel, and the decision is made to go forward despite the inability to respond to the arguments raised." *Alamar Biosciences, Inc. v. Difco Labs., Inc.*, 40 U.S.P.Q.2d 1328, 1331 (C.D.Cal.1989); *see also id.* ("continuing to prosecute a frivolous case may be evidence of such bad faith").

Dainippon divides its motion for fees into two parts: (1) fees incurred *after* the Court's December 15, 2000 ruling which essentially limited this case to the Candescent transaction,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and (2) fees incurred *before* the December 15, 2000 hearing.

A. Fees incurred after December 15, 2000

The Court's December 15, 2000 ruling limited FAS's misappropriation of trade secrets claim to the proposed Candescent transaction--the only alleged conduct with any nexus to California. FAS lacked *any* evidence supporting an award of damages or injunctive relief under such a claim in light of the undisputed fact that Dainippon had not sold anything to Candescent. *See* December 15, 2000 Memorandum and Order at pages 5-6. FAS had no good faith argument that it had been damaged by a sale that never happened. Nor did it have a good faith argument that injunctive relief was warranted in light of the complete absence of any evidence that Dainippon was likely to attempt to sell a coater device to anyone in California.

In a supplemental opposition filed after oral argument, FAS contends that its inability to prove damages is not fatal to its trade secret claim. It argues-- for the first time--that under Civil Code section 3426.3 the Court could have awarded a reasonable royalty. Section 3426.3 provides:

> If neither damages nor unjust enrichment caused by misappropriation are provable, the Court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.

Cal. Civ.Code section 3426.3(b); *Cacique, Inc. v. Robert Reiser & Co., Inc.*, 169 F.3d 619, 623 (9th Cir.1999). Thus, argues FAS, even though it could not prove that it was damaged or that Dainippon was unjustly enriched, the Court could still order a reasonable royalty and therefore its claim was not objectively specious. It contends that the "equipment embodying FAS' trade secrets costs in excess of three million dollars" and thus the "amount of a reasonable royalty clearly is a question of fact for a jury." FAS' Supplemental Opposition at 3.

FAS' argument is unpersuasive for several reasons. First, based on the plain language of the statute, the Court--not the jury--determines if and in what amount a royalty should be awarded. *See* Cal. Civ.Code section 3416.3(b) ( "the Court may order payment of a reasonable royalty").

***4** Second, in opposition to summary judgment FAS did not offer any evidence which would allow the Court to determine what royalty, if any, and for what period of time, would be appropriate. *See* *Unilogic, Inc. v. Burroughs Corporation*, 10 Cal.App. 4th 612, 628 (1992) (affirming nonsuit of misappropriation of trade secret claim on the ground, among others, that the cross-complainant "presented no evidence that would allow the court to determine what royalty, if any, would be reasonable under the circumstances"). Instead, FAS argued that in order to prevail on its misappropriation of trade secret claim it has to show, among other things, that it was actually damaged by the misappropriation or that Dainippon was unjustly enriched. *See* FAS Opposition to Motion for Summary Judgment at 14.

Third, and most importantly, FAS ignores that it brought its misappropriation of trade secret claim under *California* law. The Court ruled in December 2000 that FAS's California misappropriation of trade secret claim was limited to the proposed Candescent sale, the only conduct with any nexus to California. FAS offers no support for its assertion that under California law the Court could order a reasonable royalty to a Texas plaintiff for a Japanese corporation's alleged use of trade secrets it acquired in Texas to develop a product in Japan that is not, and never has been, sold in California. To put it another way, FAS has not been harmed, and Dainippon has not been enriched, by any conduct with any nexus to California; FAS has not cited any case that suggests a royalty may be awarded in such circumstances. Accordingly, the Court finds that after the Court limited FAS's misappropriation of trade secrets claim to the proposed-- and aborted--Candescent transaction, the claim was "objectively specious."

The Court also finds that FAS subjectively engaged in misconduct. After this action was transferred to this district FAS suddenly, and without explanation, moved to voluntarily dismiss its patent claim. Now, in opposition to Dainippon's motion for fees, Ted Snodgrass, FAS's Chief Executive Officer ("CEO") explains that "[b]y the time the case was transferred to the United States District Court for the Northern District of California, it became clear to FAS that Candescent was not going to purchase a coating system from Dainippon, thus any infringement damages would be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*de minimis* and the known infringing act in California had terminated." Snodgrass Decl. at 2-3. Snodgrass's declaration is an admission that FAS knew early on in this litigation that the Candescent transaction had terminated, and therefore that there was no basis for its patent action. It must have also known, therefore, that there was no basis for its other claims which also arose from the Candescent transaction. Instead of withdrawing those claims, however, it amended it complaint to assert a misappropriation of trade secrets claim under California law. Moreover, it continued to pursue those claims even after the Court's December 15, 2000 order and Dainippon's letter to FAS explaining that there was no basis for these claims. Indeed, FAS's opposition and supplemental opposition offer no explanation for why it continued to prosecute the misappropriation of trade secret claim even though the same reasoning that allegedly led FAS to drop its patent claim applies equally to its trade secret claim.

***5** FAS's continued pursuit of its other claims is also evidence of its bad faith. For example, after the Court's December 15, 2000 ruling FAS's claim for tortious interference with prospective business relationship was limited to the Candescent transaction. Although FAS knew that the Candescent transaction had been aborted, it continued to press its claims based on that transaction. While the Court is not and cannot award fees for FAS's pursuit of this common law claim, it is simply evidence of FAS's bad faith in continuing to pursue the Candescent claim.

FAS's belated "royalty" argument does not alter the Court's finding. A plaintiff may obtain a reasonable royalty in a patent case as well as a misappropriation case. *See* Catique, Inc., 169 F.3d at 623. Moreover, as is set forth above, FAS did not make this argument until the oral argument on the motion for attorneys fees. There is no evidence in the record from which the Court could reasonably infer that FAS actually pursued the misappropriation of trade secret claim arising out of the Candescent transaction because it believed it could be awarded a reasonable royalty.

FAS's reliance on *Forcier v. Microsoft Corp.*, 123 F.Supp.2d 520, 529 (N.D.Cal.2000) is equally unavailing. Unlike the plaintiffs in *Forcier,* FAS presented very little, if any, evidence to support its claim for damages and/or unjust enrichment. Moreover, the Court finds that it did not "vigorously pursue" the California misappropriation claim. Instead, its primary response to Dainippon's motion for summary judgment was to move for leave to amend the complaint to include conduct with no relationship to California. This response is evidence that FAS lacked confidence in the merit of its misappropriation claim, especially given that the Court had previously held that California's laws do not reach conduct with no nexus to California. FAS's continued failure to explain why it pursued the misappropriation and other related claims after it knew the Candescent transaction had been abandoned is further evidence that FAS lacked confidence in its claims.

Accordingly, the Court finds that after the Court's December 15, 2000 order FAS pursued the California misappropriation of trade secrets claim in bad faith, that is, that it did not have any objective or subjective basis to pursue the claim.

B. Fees Incurred Before December 15, 2000

Dainippon also seeks an award of fees incurred prior to December 15, 2000 on the ground that FAS should not have pursued a misappropriation claim at all. The Court declines to find that FAS's initiation of the misappropriation claim in the first place was done in bad faith. While FAS's pre-lawsuit investigation was nearly non-existent, the Court has not closely evaluated the merits of FAS's claim as it relates to conduct outside of California in light of FAS's failure to offer any evidence to support its claim as it relates to the Candescent transaction--the only claim that was at issue in this lawsuit.

II. Motion for fees and costs under the patent statute

***6** In patent infringement suits the Court "in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "In awarding attorney fees to a prevailing accused infringer, such exceptional circumstances include, inter alia, ... a frivolous suit." *Bayer Aktiengesellschaft v. Duphar Int'l Research B.V.*, 738 F.2d 1237, 1242 (Fed.Cir.1984). "A frivolous patent suit is one which the patentee knew or, on reasonable investigation, should have known, was baseless." *Haynes International, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1579 (Fed.Cir.1993).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Dainippon contends that an award is appropriate here because there never was any basis to support FAS's patent claim. It contends that even a cursory evaluation of the patent would have revealed the failure of FAS's patent claim. Moreover, it notes that the *only* investigation conducted by FAS before filing suit was reviewing a video presentation at a conference which depicted Dainippon's "Slit and Spin" coating technology.

Given that the Court has never adjudicated the merits of the patent claim, it does not find that this is an extraordinary case warranting sanctions. Although FAS's explanation for why it suddenly dropped the patent claim--the Candescent transaction did not happen and therefore any damages would be nominal--is incredible given that it continued to pursue related claims with the same non-existent damages, FAS's CEO attests that FAS filed suit "based on the opinion of its counsel and patent counsel." Snodgrass Decl. at p. 2. While this artfully worded sentence does not say what the opinion was, the statement suggests that FAS had at least consulted with patent counsel. In light of the absence of any evidence that suggests that patent counsel advised FAS that it had no claim, or that FAS had not developed sufficient information to bring a claim, the Court declines to award fees and costs under Section 285.

III. Whether an award of fees is premature

FAS's primary argument in its written opposition is that an award of fees and costs is premature since a judgment has not yet been issued. It relies on Federal Rule of Civil Procedure 54(d)(2)(B) which provides that a motion for fees must be made "no later than 14 days after entry of judgment; must specify the judgment and the statute, rule or other grounds entitling the moving party to the award; and must state the amount sought." FAS cites no authority, however, which requires a party to wait until judgment is actually issued to file and have heard a motion for fees; the Court has found at least one case in which the court issued its order for fees before the final appealable judgment was issued. *See* *Scott-Harris v. City of Fall River,* 134 F.3d 427 (1st Cir.1997) (court issued order re: attorneys' fees at least one month before appealable judgment was entered and even before motion for judgment notwithstanding the verdict was decided).

While it is true that any order the Court issues regarding fees will not be an enforceable judgment (and therefore appealable) until judgment is issued, there is no reason not to decide this motion now. This Court--not the Texas judge to whom the last remaining claim has been transferred--is in the best position to decide this motion. Moreover, Dainippon indicated at oral argument that it wanted the Court to issue a separate judgment pursuant to Federal Rule of Civil Procedure 54(b).

*7 FAS also argues that the motion is premature because the Texas court has not adjudicated the remainder of its misappropriation claim. There are two problems with this argument. First, FAS does not have a misappropriation claim remaining in this action. The Court transferred only a common law contract claim; it granted summary judgment on FAS's misappropriation claim in its entirety. Second, even if there were a remaining misappropriation claim it would be irrelevant to whether FAS pursued the Candescent misappropriation claim in bad faith.

IV. Amount of fees

Dainippon seeks over $500,000.00 in fees and costs incurred between December 15, 2000 and the Court's granting of summary judgment in May 2001. Given the large amount of fees and costs requested, the Court will refer the motion with respect to the amount of fees to a special master. Federal Rule of Civil Procedure 54(d)(2)(D) provides that "the court may refer issues relating to the value of services [on a fee motion] to a special master under Rule 53." Rule 53 provides for the appointment and compensation of special masters, and in particular, that the compensation to be allowed to a master shall be fixed and charged to the parties as the court directs.

The Court refers the amount of fees to be awarded to special master Lester Levy and directs that the parties split the cost of the special master, unless, after reviewing the parties' submissions, the special master recommends that a particular party pay more because it unreasonably caused the special master to spend more time than necessary. The special master is directed to meet and confer with the parties to determine how to proceed and is authorized to adopt whatever procedures, including the filing of additional

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pleadings, he deems necessary.

CONCLUSION

For the foregoing reasons, Dainippon's motion for attorney fees and costs is GRANTED in part and DENIED in part. The motion pursuant to Civil Code section 3426 for fees and costs incurred after December 15, 2000 is GRANTED, and in all other respects the motion is DENIED.

The issue as to how much in fees and costs should be awarded is referred to special master Lester Levy for findings on what fees and costs were reasonably incurred after December 15, 2000 and a report and recommendation.

The parties are directed to meet and confer concerning the form of a separate judgment pursuant to Federal Rule of Civil Procedure 54(b), and shall submit a proposed separate judgment within 14 days of the date of this Memorandum and Order.

IT IS SO ORDERED.

2001 WL 1159776 (N.D.Cal.)

**Motions, Pleadings and Filings** **(Back to top)**

. 3:00CV01879 (Docket) (May. 24, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, S.D. California.
COMPUTER ECONOMICS, INC., Plaintiff,
v.
GARTNER GROUP, INC., Defendant.
**No. 98-CV-0312 TW (CGA).**

Dec. 14, 1999.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR ATTORNEY'S FEES AND COSTS

WHELAN, J.

I. INTRODUCTIon

***1** Before the Court is Defendant Gartner Group, Inc.'s motion for attorney's fees and costs pursuant to Sections 1717 and 3246.4 of the California Civil Code. Plaintiff Computer Economics, Inc., opposes. All parties are represented by counsel. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. For the reasons expressed below, the Court GRANTS IN PART and DENIES IN PART Gartner's motion.

II. FACTS [FN1]

FN1. The facts set forth in this order are taken largely from the Court's June 10 and 11, 1999 orders.

A. BACKGROUND%I

Plaintiff Computer Economics, Inc. ("CEI") is a newsletter publisher specializing in the information technology industry. CEI publishes eight analytical and investigative newsletters in the fields of corporate computing, Internet marketing and electronic commerce. Defendant Gartner Group, Inc. ("Gartner") is an international publisher of various publications including books, reports, CD-ROM discs, surveys and analyses relating to the computer and information industry.

In November 1995 Mr. Bill Robertson, a representative from Gartner, contacted CEI and arranged a tour of CEI's headquarters. According to CEI, Gartner stated that it was seeking to expand its newsletter publishing business and was investigating possible opportunities for acquisition, including CEI. On January 23, 1996 the parties executed a confidentiality agreement wherein Gartner promised to not disclose or use any of CEI's confidential information except to evaluate a potential transaction with CEI. Shortly thereafter CEI sent Gartner a document containing allegedly confidential information.

On February 16, 1996 Gartner toured CEI's headquarters and allegedly obtained additional confidential and trade secret information. At the conclusion of the tour, Gartner informed CEI that Gartner would not seek to acquire CEI's operations. During the next 18 months Gartner launched nine newsletters in direct competition with CEI, each offering content similar to CEI's newsletters.

B. THIS ACTION

On January 13, 1998 CEI commenced this action against Gartner in San Diego Superior Court. The Complaint asserts state law claims for trade secret misappropriation, breach of contract, breach of the implied covenant of good faith and fair dealing, trademark infringement, unfair competition and fraud. In essence, CEI alleges that Gartner used the confidential information obtained during the February 1996 tour of CEI's facilities to expand its newsletter publication business. In February 1998, Gartner removed this action to federal court based on diversity of citizenship. The case proceeded to discovery.

C. SUMMARY JUDGMENT MOTIONS

On May 4, 1999 Gartner filed two motions for summary judgment: (1) a motion seeking judgment against Plaintiff's claims for trade secret misappropriation, breach of contract, unfair competition and fraud, and (2) a motion seeking judgment against Plaintiff's claim for trademark infringement under California law.

The Court disposed of the motions by two written orders

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

issued on June 10 and 11, 1999. (*See* Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment Re: Trade Secret and Other Claims; Order Denying Defendant's Motion for Summary Judgment Re: Trademark Claim). As to the first motion, the Court concluded (1) that CEI failed to present any evidence that its allegedly confidential information qualified for protection under the Uniform Trade Secret Act, (2) that CEI could not show that Gartner used or disclosed any of CEI's confidential information and (3) that CEI failed to produce any evidence of fraud. Due to this complete failure of proof, the Court granted Gartner's motion as to CEI's claims for trade secret misappropriation, breach of confidentiality agreement, breach of the implied covenant of good faith and fair dealing and fraud. As to the second motion, the Court held that CEI had presented sufficient evidence of Gartner's deliberate and intentional copying of CEI's trademark to resist summary judgment.

*2 CEI's claims for trademark infringement and unfair competition are the only claims remaining in this action. The discovery and pretrial motion cut-off dates have past and the final pretrial conference is set for February 7, 2000. No trial date is set. [FN2]

FN2. The trial date will be set during the final pretrial conference. The Court estimates that trial in this matter will take place sometime in November 2000.

D. THE INSTANT MOTION

On September 13, 1999 Gartner filed a motion seeking an award of costs and attorney's fees. Gartner subsequently withdrew its motion without prejudice and refiled it on November 15, 1999. CEI filed its opposition on November 30, 1999 and Gartner filed its reply on December 8, 1999. The Court thereafter took the motion under submission and issues this order without oral argument pursuant to Civil Local Rule 7.1.d.1.

IV. DISCUSSIOn

Gartner's motion seeks an award of $432,995.72 in costs and attorney's fees based on two separate theories. [FN3] First, Gartner contends that CEI's claims for breach of confidentiality agreement and breach of the implied covenant of good faith and fair dealing both derive from a February 1996 confidentiality agreement that contained a provision entitling a prevailing party to recover its attorney's fees and costs. Gartner argues that because the Court granted summary judgment against CEI's contract claims, it must award Gartner reasonable attorney's fees and costs pursuant to Section 1717 of the California Civil Code. [FN4] *See* Cal. Civ.Code § 1717 (providing that a party who prevails on contract action is entitled to an award of reasonable attorney's fees where underlying contract contains an attorney's fee provision).

FN3. The opening brief of Gartner's motion requested an award of costs and attorney's fees totaling $469,213.49. Gartner's reply brief deducted $36,217.77 from the costs portion of this amount and reduced the total to $432,995.72. (*See* Def.'s Reply at 8).

FN4. Neither party disputes that state law controls the availability of attorney's fees where, as here, the underlying claims arise under state law. *Diamond v. John Martin Co.*, 753 F.2d 1465, 1467 (9th Cir.1985) (holding that state law governs attorney's fees motions in diversity actions). Both parties also agree that California law governs this motion.

Second, Gartner contends that CEI commenced and maintained its trade secret claims despite a complete failure of proof on the essential elements of trade secret misappropriation. Gartner therefore argues that CEI maintained its trade secret claims in bad faith, entitling it to recover attorney's fees pursuant to Section 3426.4 of the California Civil Code. *See* Cal. Civ.Code § 3426.4 ("If a claim of [trade secret] misappropriation is made in bad faith, ... the court may award reasonable attorneys' fees to the prevailing party."). The Court will address each argument in turn.

A. ATTORNEY'S FEES UNDER THE CEI-GARTNER CONTRACT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

According to CEI's Complaint, Gartner breached the terms of the January 1999 confidentiality agreement. The contract provided that Gartner would not use any information provided by CEI for any purpose other than to evaluate a potential transaction with CEI. (*See* Def.'s Mot. for Att'y's Fees, Decl. of David L. Larson, Ex. 1). The contract also provided that "[i]n any event of any action to enforce the terms of this [contract], the prevailing party shall be entitled to recover its costs and attorney's fees." (*Id.*).

Section 1717 of the California Civil Code governs whether a party in a contract dispute may recover attorney's fees and costs. That section reads:

> In any action on a contract, where the contract specifically provides that attorneys' fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorneys' fees in addition to other costs.

***3** Cal. Civ.Code § 1717(a) (West. 1997). The California Supreme Court has clarified that Section 1717 requires an award attorney's fees and costs to a defendant that defeats a plaintiff's contract claims, *even where the plaintiff ultimately prevails on its non-contract claims.* *Hsu v. Abbara,* 9 Cal.4th 863, 876-877, 39 Cal.Rptr.2d 824, 832-833, 891 P.2d 804 (1995). In other words, "[w]hen a party obtains a simple, unqualified victory by completely ... defeating all contract claims in the action and the contract contains a provision for attorney fees, section 1717 entitles the successful party to recover reasonable attorney fees incurred in ... defense of those claims." *Scott Co. of California v. Blount, Inc.,* 20 Cal.4th 1103, 1109, 86 Cal.Rptr.2d 614, 618, 979 P.2d 974 (1999) (citing *Hsu,* 9 Cal.4th at 877, 39 Cal.Rptr.2d at 833). Section 1717 also permits a court to make the prevailing party determination and award attorney's fees even if the case does not proceed to final judgment. *See* Cal. Civ.Code § 1717(b)(1) (West 1997).

Gartner clearly prevailed against CEI's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. By order dated June 10, 1999 the Court dismissed CEI's contract claims because of CEI's failure to provide evidence that Gartner breached any provision of the confidentiality agreement. The Court noted, *inter alia,* that CEI did not produce evidence (1) that Gartner used CEI's confidential or trade secret information for any purpose prohibited by the contract, or (2) that Gartner disclosed CEI's confidential information to a third party. (*See* Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment Re: Trade Secret and Other Claims, at 15-17). CEI, in other words, presented no evidence that Gartner used CEI's confidential information for any purpose other than to evaluate the desirability of acquiring CEI's newsletter operations. Gartner is clearly the "prevailing party" under Section 1717 and is therefore entitled to reasonable attorney's fees and costs incurred defending CEI's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and the closely related and coextensive trade secret misappropriation claim.

1. *THE EFFECT OF THE REMAINING CLAIMS*

CEI contends that the Court must decline to make a prevailing party determination at this stage in the litigation because the Court denied Gartner's summary judgment motions as to CEI's trademark infringement and unfair competition claims. (*See* Pl.'s Opp'n at 4). Citing the California Supreme Court's decision in *Hsu v. Abarra,* 9 Cal.4th 863, 39 Cal.Rptr.2d 824, 891 P.2d 804 (1995), CEI argues that "[t]he prevailing party under a contractual attorneys' fees clause may be a party who loses on a contract claim if that party has otherwise achieved its main litigation objective." (*Id.* at 4:10-12 (citing *Hsu,* 9 Cal.4th at 877, 39 Cal.Rptr.2d at 833)). CEI asserts that because it may prevail on its trademark claims at trial, the Court cannot at this time conclude that CEI has failed to achieve its "main litigation objective." (*Id.* at 4:16-18).

***4** This argument lacks merit. In the same paragraph of *Hsu* relied upon by CEI and in the very next sentence, the Supreme Court squarely rejected CEI's argument and held that a trial court has no authority to consider whether a plaintiff had achieved its "main litigation objective" when the defendant obtains "a simple, unqualified victory on the single contract claim presented by the action." *Hsu,* 9 Cal.4th at 877, 39 Cal.Rptr.2d at 833 (internal quotations omitted). *Hsu* held that a trial court has no discretion to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

deny an attorney's fees motion where the defendant prevails on all contract claims. *Id.* A straightforward application of *Hsu,* therefore, requires this Court to award Gartner all costs and reasonable attorney's fees incurred in connection with CEI's contract claims-even if CEI prevails at trial on the trademark and unfair claims it now asserts represent its "main litigation objective."

2. *CEI'S BELATED REQUEST FOR RECONSIDERATION*

CEI's second argument is clearly a belated attempt to seek reconsideration of the June 10, 1999 order. CEI argues that the Court cannot declare Gartner a prevailing party on its contract claims because Gartner *did,* contrary to the Court's June 10, 1999 order, breach the confidentiality agreement. CEI relies on a purported evidentiary inconsistency in the Court's June 10 and 11, 1999 orders.

CEI observes that the Court's June 11, 1999 order denying Gartner's motion for summary judgment on CEI's trademark claim concluded that evidence suggesting that Gartner intentionally launched a newsletter bearing the exact same title as CEI's successful *Internet Marketing & Technology Report* raised an inference that Gartner deliberately infringed CEI's trademark to exploit the commercial success of CEI's newsletter. CEI contends that this same evidence and analysis supports its position that Gartner breached its confidentiality agreement, requiring the Court to reconsider its June 10 order dismissing CEI's breach of contract claim. FN5

FN5. CEI's opposition brief suggests that the Court's June 11, 1999 order made factual "findings." (*See* Pl.'s Opp'n Mot. Att'y's Fees at 5). The Court's order did not, however, make any factual findings; it merely made evidentiary observations in denying Gartner's motion for summary judgment.

The Court finds the purported inconsistencies between the two June 1999 orders illusory. The fact that Gartner may have deliberately copied the title of *Internet Marketing & Technology Report,* the Court clearly explained, may "speak [ ] to whether Gartner infringed CEI's trademark" but has nothing to do with whether "Gartner used, disclosed, or even possessed CEI's confidential information." (*See* Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment Re: Trade Secret and Other Claims, at 15:10-13). Because CEI's newsletter was available to the public, "Gartner could have copied the title of CEI's [newsletter] without having [had] any contact with CEI or having obtained any confidential information." (*Id.* at 15 n. 7). The Court also noted that CEI failed to produce any evidence that Gartner used any of CEI's confidential information in the creation, development or promotion of its newsletter business. (*Id.* at 16:10-16). FN6 Under the facts of this case, Gartner's alleged acts of trademark infringement add no evidentiary weight to CEI's claims for breach of contract and trade secret misappropriation.

FN6. The Court also noted that CEI could not establish that either the title of its newsletter or the obvious concept that a product's name was critical to its commercial success qualified as confidential or trade secret information. (*See* Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment Re: Trade Secret and Other Claims, at 10, 15). Plaintiff continues to argue this point in its opposition. (*See* Pl.'s Opp'n Mot. Att'y's Fees at 4-5).

*5 Moreover, the Court finds no support for CEI's renewed contention that Gartner made use of the fact that *"Internet Marketing & Technology Report* was CEI's best launch ever, and most successful product." (*See* Pl.'s Opp'n Mot. Att'y's Fees at 4:26-27). As Gartner noted in its summary judgment motion, CEI did not show that it treated the commercial success of its newsletter as confidential. Any such contention would lack merit because CEI disclosed in its Complaint, publicly filed and for the world to see, that "CEI's largest and most successful newsletter is its *Internet Marketing & Technology Report."* (Compl.¶ 9). FN7 CEI also had no response to Gartner's argument that it could not show how Gartner misappropriated this particular piece of information. Indeed, Gartner launched several other newsletters in competition with CEI newsletters other than *Internet Marketing & Technology Report.* There is therefore no factual basis for CEI's contention that Gartner benefitted from the disclosure that one of CEI's newsletters was more

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

successful than the others.

FN7. In opposition to this argument, CEI cited two Connecticut decisions, *Stone v. Goss,* 65 N.J. Eq. 756, 55 A.736 (1909) and *Plastic & Metal Fabricators, Inc. v. Roy,* 163 Conn. 257, 303 A.2d 725 (1972), for the proposition that a plaintiff does not lose the trade secret or confidential nature of its information by disclosing it during litigation.
Neither case applies. *Stone* held that a plaintiff did not necessarily lose trade secret protection where it disclosed its trade secrets during litigation, but emphasized that steps had been taken to ensure confidentiality, including hearing testimony *in camera. Plastic & Metal Fabricators, Inc.* held that a plaintiff did not lose the right to protect its trade secrets by attaching an exhibit to its complaint revealing plaintiff's allegedly confidential manufacturing process, but only after emphasizing that the complaint was on file for a only a few months in the clerk's office before the trial judge ordered the court record sealed.
Here, nearly two years have passed since CEI commenced this action, and CEI has made no attempt to restrict public access to its Complaint.

Having failed to produce evidence that Gartner put the information it acquired from CEI to a prohibited or improper use, the confidentiality and trade secret claims were supported only by Gartner's decision to compete with-and to not acquire-CEI's successful newsletter business. The Court could not permit CEI to go to trial based on these facts without reading into the confidentiality agreement a provision completely prohibiting Gartner from competing with CEI.

The Court finds no inconsistencies between the two June 1999 orders. To the extent CEI's opposition brief requests reconsideration of the Court's June 1999 orders, such request is DENIED.

B. ATTORNEY'S FEES UNDER THE UTSA

Gartner also contends that it is entitled to an award of attorney's fees and costs because CEI maintained and prosecuted its trade secret misappropriation claims in bad faith. Gartner contends that shortly after CEI commenced this action CEI knew that its trade secret misappropriation claim was baseless.

As part of the Uniform Trade Secrets Act ("UTSA"), Section 3426 .4 of the California Civil Code provides that "[i]f a claim of [trade secret] misappropriation is made in bad faith, ... the court may award reasonable attorney's fees to the prevailing party." Cal. Civ.Code § 3426.4 (West 1997). A party may show bad faith under this statute by showing that the plaintiff commenced *or maintained* a trade secret misappropriation claim in bad faith. *Stilwell Dev., Inc. v. Chen,* 11 U.S.P.Q.2d 1328, 1330 (C.D.Cal.1989) (*"Stilwell"* ); *Alamar Biosciences, Inc. v. Difco Labs., Inc.,* 40 U.S.P.Q.2d 1437, 1442 (E.D.Cal.1996).

Although "bad faith" is not defined in the UTSA, courts have interpreted it to achieve the purpose of the statute-to deter specious claims of trade secret misappropriation. *Stilwell,* 11 U .S.P.Q.2d at 1330. In *Stilwell,* the court held that an award of attorney's fees under Section 3426.4 requires the Court to find (1) that plaintiff's claims were objectively specious or frivolous, and (2) that there is evidence of subjective misconduct. *Id.; VSL Corp. v. General Techs., Inc.,* 46 U.S.P.Q.2d 1356, 1359 (N.D.Cal.1998) (*"VSL"* ).

***6** Having reviewed the papers submitted and the record in this case, the Court finds that CEI's maintenance of its trade secret misappropriation claims entitles Gartner to an award of reasonable attorney's fees under Section 3426.4.

1. *OBJECTIVE SPECIOUSNESS*

Objective speciousness exists where there is a complete lack of evidence supporting plaintiff's claim. *Stilwell,* 11 U.S.P.Q.2d at 1331; *VSL,* 46 U.S.P.Q.2d at 1359; *see also Alamar,* 40 U.S.P.Q.2d at 1444 (holding that trade secret claim was objectively specious where evidence clearly showed that claim was barred by statute of limitations).

The Court's June 10, 1999 order found CEI's trade secret misappropriation claim baseless, noting that CEI had failed to produce evidence that any of its allegedly confidential

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

information qualified as a trade secret under the UTSA or that Gartner committed a single act of misappropriation. The Court found that several of CEI's alleged trade secrets could not on their face qualify for trade secret protection because they related to information that was available to the public, such as the topics and titles of CEI's published newsletters. (*See* Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment Re: Trade Secret and Other Claims, at 9-10). CEI also claimed trade secret protection over several vague classes of unprotectable information including "marketing and sales techniques." As to the remaining pieces of allegedly confidential information, CEI could not produce any admissible evidence that its information derived independent economic value from not being generally known as required by Section 3426.1(d)(1). (*Id.* at 11-13). CEI also provided no evidence of trade secret misappropriation. (*Id.* at 14-16).

The Court therefore finds that CEI's complete failure to provide evidence of trade secrets or misappropriation satisfies the objective speciousness requirement. *See Stilwell,* 11 U.S.P.Q .2d at 1131.

2. *SUBJECTIVE MISCONDUCT*

Subjective misconduct exists where a plaintiff knows or is reckless in not knowing that its claim for trade secret misappropriation has no merit. *Stilwell,* 11 U.S.P.Q.2d at 1331-1332. A court may find subjective misconduct by relying on direct evidence of plaintiff's knowledge during certain points in the litigation and may also infer it from the speciousness of plaintiff's trade secret claim and its conduct during litigation. *VSL,* 46 U.S.P.Q.2d at 1359- 1360, *Stilwell,* 11 U.S.P.Q.2d at 1332.

The long history of this litigation provides ample direct and circumstantial evidence that CEI knew or was reckless in not knowing the deficiencies in its trade secret claims. Starting in April 1998 Gartner sent a barrage of letters to CEI attempting to obtain a list of CEI's alleged trade secrets. The letters put CEI on notice that the allegedly confidential information CEI claimed constituted trade secrets was not specific enough to qualify for trade secret protection. For example, a May 19, 1998 letter from Gartner to CEI's counsel informed CEI that the vague nature of its alleged trade secrets raised doubts as to whether CEI could prove either the existence of a trade secret or misappropriation. (*See* Def.'s Mot. for Att'y's Fees, Larson Decl., Ex. 3). CEI's refusal to provide a specific identification of its trade secrets erupted into a discovery dispute before the Magistrate Judge where once again Gartner raised the issue of trade secret specificity.

*7 In November 1998 Gartner conducted a deposition of CEI's Rule 30(b)(6) witness. During deposition Gartner's attorneys repeatedly attempted to determine the basis of CEI's contention that Gartner misappropriated CEI's alleged trade secrets and received evasive answers to direct questions on at least six occasions. The only answer CEI's witness provided that was not based on pure speculation was his opinion that Gartner misappropriated CEI's trade secrets because it copied the title of *Internet Marketing & Technology Report*. *See Alamar Biosciences, Inc.,* 40 U.S.P.Q.2d at 1442 (subjective misconduct inferred where opposing counsel identifies specific deficiencies in plaintiff's case and plaintiff decides to go forward despite inability to respond to arguments). As discussed, the alleged infringement of CEI's trademarks provides no evidence of trade secret misappropriation.

CEI's opposition to Gartner's motion summary judgment filed on May 9, 1999 further revealed CEI's awareness of the deficiencies in its trade secret claims. CEI devoted at least six pages of its opposition brief to attacking the credibility of Mr. Robertson, Gartner's representative, apparently believing that Roberson's alleged lack of credibility could cure CEI's failure to provide evidence of trade secret misappropriation. Many of the arguments CEI presented in opposition to that motion reveal that CEI either knew it had no trade secrets to protect or that it refused to acknowledge the basic prerequisites for protection under the UTSA.

The numerous warnings CEI received from Gartner's counsel, the facial deficiencies revealed in the answers provided by its Rule 30(b)(6) witness, CEI's arguments in opposition to Gartner's motion for summary judgment and the amount of time CEI had to investigate its trade secret misappropriation claim, taken together, provide strong circumstantial evidence that CEI knew or was reckless in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not knowing that it could not provide evidence of trade secrets or misappropriation. The Court therefore finds that Gartner is entitled to attorney's fees under the UTSA. *See* Cal. Civ.Code § 3426.4 (West 1997).

C. *AMOUNT OF FEES*

Where a party is entitled to attorney's fees as a prevailing party, the trial court has broad discretion to determine the reasonableness of requested amount. *Heppler v. J.M. Peters Co., Inc.*, 73 Cal.App.4th 1265, 1296, 87 Cal.Rptr.2d 497, 522 (1999); *Weber v. Langholz*, 39 Cal.App.4th 1578, 1587, 46 Cal.Rptr.2d 677, 683 (1995). "In determining what constitutes a reasonable attorney's fee when a contract ... provides for such an award, courts should consider the nature of the litigation, its difficulty, the amount involved, and the skill required and success of the attorney's efforts, his or her learning, age and experience in the particular type of work demanded, the intricacies and importance of the litigation, the labor and necessity for skilled legal training and ability in trying the cause, and the time consumed." *See, e.g., Contractors Labor Pool, Inc. v. Westway Contractors, Inc.*, 53 Cal.App.4th 152, 168, 61 Cal.Rptr.2d 715, 726 (1997) (citing cases); *Stokus v. Marsh*, 217 Cal.App.3d 647, 657, 266 Cal.Rptr. 90, 96 (1990).

***8** Having read and considered the papers submitted, the Court finds that Gartner has failed to provide sufficient documentation to permit the Court to adequately evaluate the reasonableness of Gartner's requested attorney's fees and costs. The only specific information provided in Gartner's motion consists of a conclusory chart attached to the declaration of David L. Larson, Gartner's lead attorney. (*See* Def.'s Mot. for Att'y's Fees, Decl. of David L. Larson Ex. 11). The chart presents a list of fees and expenses organized in a three-column chart sorted by 13 separate months:

| Date | Fees | Expenses |
|---|---|---|
| 02/27/98 | $1,198.00 | |
| 03/31/98 | $7,550.00 | $272.15 |
| 04/30/98 | $1.242.00 | $92.60 |
| 05/29/98 | $11,080.00 | $328.00 |
| 06/25/98 | $15,447.00 | $1,574.85 |
| [Entries between 07/98 and 04/99] | | |
| 05/28/99 | $29,325.00 | $2,353.33 |
| 06/30/98 | $55,358.00 | $2,249.78 |

(*Id.*) The chart indicates a total for the "Fees" column of $401,990.00 and a total for the "Expenses" column of $67,223.49. The chart makes no attempt, however, to summarize the nature or quantity of the work performed each month, the number of hours spent, the identity and experience level of the attorneys who worked on the case or the hourly rate charged. Without significantly more information, the Court cannot match the amounts claimed with corresponding activity reflected in the record. [FN8]

> FN8. The last entry on the fee chart, for example, indicates that Gartner seeks $55,358.00 in attorney's fees for June 1999. However, Gartner's motion for summary judgment on the trade secret and contract claims was fully briefed by May 27, 1999, the date Gartner filed its reply brief. The Court issued its order granting Gartner's motion as to CEI's trade secret and contract claims on June 10, 1999-and did so without oral argument. There is therefore no basis in the record for any award of attorney's fees or costs incurred for defense of CEI's contract and trade secret claims in June 1999.

The Court finds this case similar to *Martino v. Denevi*, 182 Cal.App.3d 553, 227 Cal.Rptr. 354 (1986), where the court reversed an award of attorney's fees because "[t]he only evidence presented in support of the motion for attorney fees was the attorney's request for a flat fee for 'services rendered." ' *Id.* at 559, 227 Cal.Rptr. at 358. The court found the award of attorney's fees unsupported because "[n]o documents, such as billing or time records, were submitted to the court, nor was an attempt made to explain, in more than general terms, the extent of services rendered to the client." *Id.* The court acknowledged that although parties need not always submit detailed billing records, "in the absence of such crucial information as the number of hours worked, billing rates, types of issues dealt with and appearances made on the client's behalf, the trial court is placed in the position of simply guessing at the actual value

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the attorney's services." Id. at 558, 227 Cal.Rptr. at 358. "That practice is unacceptable and cannot be the basis for an award of fees." *Id.* [FN9] Like the motion condemned in *Martino,* Gartner's fee chart amounts nothing more than a "flat fee for services rendered," divided into 13 time periods that provide no assistance to CEI or this Court in calculating the final award.

FN9. The *Martino* court suggested that a litigant seeking an award of attorney's fees "should present (1) evidence, documentary and oral, of the services actually performed; and (2) expert opinion, by [the applicant] and other lawyers, as to what would be a reasonable fee for such services." Martino, 182 Cal.App.3d at 558, 227 Cal.Rptr. at 357 (internal quotations omitted) (alternation in original) (citation omitted).

Gartner cites Weber v. Langholz, 39 Cal.App.4th 1578, 46 Cal.Rptr.2d 677 (1995) for the proposition that an attorney's fee request "need not be substantiated by time records and billing statements." (*See* Def.'s Reply at 7:3-4). *Weber,* however, actually undermines Gartner's position. In that case the court held that although "a fee request ordinarily should be documented in great detail," the amount of required evidence will depend on the nature of the case. Weber, 39 Cal.App.4th at 1587, 46 Cal.Rptr.2d at 683. The prevailing party's attorney in *Weber* sought only $18,075.00 in fees yet furnished the trial court with critical information Gartner has failed to submit here, including (1) a description of the work performed, (2) the approximate number of hours spent and (3) an hourly rate for the work. *Id.*

***9** This Court cannot locate any California or federal decision with analogous facts that has upheld an award of attorney's fees based on the paucity of information provided by Gartner's fee chart. Given the length and complexity of this litigation and the amount of fees Gartner requests, Gartner must provide significantly more detailed information before the Court can make a proper assessment of the reasonableness of the attorney's fees requested. The Court therefore DENIES Gartner's motion to the extent it seeks to establish the amount of the attorney's fee award and GRANTS Gartner leave to file a fully noticed motion directed solely at the *amount* of a reasonable fee and cost award, which it may file any time before entry of final judgment.

Because the Court and CEI are well-aware of the nature and history of this litigation, however, the Court will not require Gartner to submit extensive documentation identifying every task its attorneys performed; Gartner must simply provide enough information to avoid placing the Court "in the position of simply guessing at the actual value of the attorney's services," *Martino,* 183 Cal.App.3d at 558, 227 Cal.Rptr. at 358, and to permit CEI to meaningfully challenge the reasonableness of the amount requested. At minimum, Gartner should support its motion with (1) a general description of the services performed for each billing cycle (e.g. motion work, discovery, research, settlement negotiations, client contract); (2) an approximate number of hours spent on such services; (3) an identification of the attorney(s) who performed such services; (4) an hourly rate for the attorney(s); and (5) a description of the education and experience of the attorney(s). As for costs, Gartner should provide a general description of items incurred in each billing cycle (e.g. copying, service of process, electronic research, paralegal fees) and their respective amounts. [FN10]

FN10. Gartner's reply brief includes a supplemental declaration that details, in chart form, the number of hours expended by each attorney who worked on the case and the attorney's hourly rates. (*See* Supp. Decl. of David L. Larson, ¶¶ 2, 3). The supplemental declaration also includes a paragraph containing general summaries of the work performed throughout the case. (*Id.* ¶ 5).
The Court notes that a reply brief is an inappropriate vehicle to offer this new evidence. *See, e.g.,* United States v. Bohn, 956 F.2d 208, 209 (9th Cir.1992) (noting that courts generally decline to consider arguments raised for the first time in a reply brief); Golden v. Pacific Maritime Ass'n, 786 F.2d 1425, 1429 (9th Cir.1986) ("appellants cannot raise a new issue ... in their reply briefs."); United States v. Boggi, 74 F.3d 470, 478 (3d Cir.1996) (noting that courts refuse to consider evidence and arguments presented for first time in reply brief

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

because opposing party has no opportunity to respond). Even if the Court were inclined to consider the supplemental declaration and charts, it would nonetheless find that they do not cure the problems described in this order. The declaration provides no support for the specific hourly rate attributed to each attorney or any specificity as to the work performed during each billing cycle.

The Court also finds the declaration facially invalid as to Gartner's claim that it incurred attorney's fees preparing, drafting and "attend[ing][a] hearing on" CEI's motion for leave to amend its Complaint. (*Id.* ¶ 5). The declaration fails to explain (1) how Gartner could have incurred attorney's fees attending a hearing a motion this Court disposed of by written order without a hearing or oral argument, or (2) why expenses incurred defeating CEI's motion for leave to amend relate to the defense of the breach of contract and trade secret misappropriation claims.

V. *CONCLUSION*

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Gartner's motion for costs and attorney's fees. [Doc. No. 152]. Specifically, the Court GRANTS Gartner's motion to the extent it seeks to establish Gartner's entitlement to an award of attorney's fees and costs under Sections 1717 and 3426.4 of the California Civil Code, and DENIES Gartner's motion to the extent it seeks to determine the precise amount of the award.

IT IS SO ORDERED.

1999 WL 33178020 (S.D.Cal.)

**Motions, Pleadings and Filings** (Back to top)

. 3:98CV00312 (Docket) (Feb. 18, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.