**C**
Only the Westlaw citation is currently available.

United States District Court, D. Oregon.
TELEPHONE MANAGEMENT CORPORATION, an Oregon corporation Plaintiff,
v.
Richard R. GILLETTE, Defendant.
**No. CV 99-1338-KI.**

Feb. 20, 2001.

Gary Roberts, Schwabe, Williamson & Wyatt, P.C., Portland, Oregon, for Plaintiff.

Jeffrey M. Edelson, Markowitz, Herbold, Glade & Mehlhaf, P.C., Portland, Oregon, for Defendant.

OPINION and ORDER

KING, J.

***1** This action was commenced by plaintiff Telephone Management Corporation ("TMC") against defendant Richard R. Gillette in August 1999 and removed to this court on September 21, 1999. The Complaint states four claims against Gillette: breach of contract (implied duty of confidentiality and loyalty), breach of contract (breach of duty of good faith), misappropriation of trade secrets (through disclosure without consent) under the Oregon Uniform Trade Secrets Act ("UTSA"), and intentional interference with contract or business expectancies. In his Answer, Gillette included a counterclaim for attorney fees under the Oregon UTSA (ORS 646.467(1)) and pursuant to Or. R. Civ. P. 17 and ORS 20.105.

On August 17, 2000, TMC filed a motion to voluntarily dismiss this action. In a telephone conference on August 18, 2000, I granted the motion to voluntarily dismiss TMC's claims against Gillette, but allowed Gillette's counterclaim for attorney fees to proceed. On November 30, 2000, Gillette filed a motion for attorney fees (# 30). Briefing on that motion is complete and the motion is now before the court. For the reasons set forth below, I grant Gillette's motion for attorney fees and award attorney fees to Gillette in the amount of $20,618.00.

FACTS

TMC helps business clients reduce their telephone bills through various methods. TMC is paid based upon the savings it accomplishes for its customers.

Gillette is a former employee of TMC who currently resides in Pennsylvania. Gillette was fired by TMC in 1994. Following his termination, Gillette sued TMC for wrongful discharge and the parties reached a confidential settlement in the case.

In January 1998, TMC filed a lawsuit against Goodyear Tire & Rubber Co. ("Goodyear") in this court. In that suit, TMC alleged that Goodyear was liable to TMC for $2 million based principally upon an alleged contract in which Goodyear purportedly agreed to pay TMC for negotiating lower telephone rates with AT & T on behalf of Goodyear. Goodyear successfully transferred the case to the Northern District of Ohio, where the court disposed of the case by summary judgment against TMC. The Sixth Circuit Court of Appeals affirmed the grant of summary judgment in February 2000.

During the discovery phase of the *Goodyear* case, Goodyear's attorneys contacted Gillette and convinced him to meet with them to discuss his involvement with the Goodyear account on behalf of TMC. Gillette agreed to sign an affidavit at the attorneys' request (hereinafter referred to as the "Gillette Affidavit"). Goodyear then filed the Gillette Affidavit under seal in support of Goodyear's motion for summary judgment. After the Gillette Affidavit and motion for summary judgment were filed by Goodyear, TMC did not contact Gillette or seek to take his deposition in the *Goodyear* case.

Before the Sixth Circuit issued its ruling in the *Goodyear* case, TMC filed this suit against Gillette. As noted above, TMC alleged that Gillette breached his contractual obligations to TMC (the implied duty of confidentiality and loyalty and the duty of good faith) by divulging TMC's confidential information to Goodyear so that Goodyear could use that confidential information in litigation with TMC. Complaint, ¶¶ 10, 11, 17. Likewise, TMC alleged that Gillette had violated the Oregon UTSA by disclosing TMC trade secrets to Goodyear "without the express or implied consent of TMC, and with knowledge or reason to know

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that he had a duty to maintain secrecy." *Id.,* ¶ 22. Finally, TMC asserted a claim for intentional interference with contract or business expectancies on the theory that, by divulging information to Goodyear, Gillette had interfered with an actual or prospective contractual relationship between TMC and Goodyear. Upon evaluation of the Complaint, counsel for Gillette urged TMC's counsel to dismiss the case. TMC declined to dismiss the case at that juncture.

***2** As noted above, the Sixth Circuit affirmed the district court's summary judgment against TMC in the *Goodyear* case. Upon receipt of the Sixth Circuit opinion, Gillette's counsel again urged TMC's counsel to dismiss this case. This occurred before any depositions were taken in this case. TMC again declined to dismiss the case.

According to TMC's attorney, after the Sixth Circuit affirmed the district court's summary judgment in the *Goodyear* litigation, TMC decided that it wanted to take Gillette's deposition in this case ("TMC wanted to take Mr. Gillette's deposition so that TMC knew at least what Mr. Gillette would admit he told Goodyear's attorneys." (Plaintiff's Opposition Memorandum, p. 10)). As early as March 2000, TMC's attorney made efforts to schedule Gillette's deposition. TMC eventually noticed Gillette's deposition for May 24, 2000, but it actually occurred on July 13, 2000 for the convenience of Gillette and his attorney.

The morning after Gillette's deposition, TMC offered to dismiss the case against Gillette in exchange for a mutual release. Gillette declined those terms and, as noted above, TMC moved to dismiss this case on August 17, 2000. In doing so, TMC represented that its decision to dismiss was based in significant part upon the Sixth Circuit's opinion affirming the district court's summary judgment against it in the *Goodyear* litigation. I granted the motion and dismissed TMC's claims with prejudice, while allowing Gillette's claim for attorney fees to proceed.

DISCUSSION

Although Gillette argues that TMC did not have an adequate basis to bring any of the four claims asserted against him in this case, his primary focus is on TMC's basis for asserting that Gillette violated the Oregon UTSA by disclosing TMC's trade secrets. Under the Oregon UTSA, "[t]he court may award reasonable attorney fees to the prevailing party if ... a claim of misappropriation is made in bad faith." ORS 646.467(1). According to the comments contained in *Uniform Laws Annotated,* this provision allows a court to award reasonable attorney fees to a prevailing party as a deterrent to specious claims of misappropriation. The parties are in agreement that attorney fees should only be awarded in "exceptional" cases and that such an award is in the court's discretion.

Given that the Oregon UTSA provides the only basis for an award of attorney fees to Gillette, I will focus exclusively on that statutory claim and the basis that TMC had for asserting such a claim. As such, I place no weight on TMC's lead argument that, even if the information disclosed by Gillette did not consist of "trade secrets," the disclosure of confidential information violates a common law duty. Plaintiff's Opposition Memorandum, pp. 11-14.

At the outset, I note that the portion of TMC's opposition brief entitled "Gillette Revealed Trade Secrets," fails to address any specific statements made by Gillette in the Gillette Affidavit. Even more telling, the affidavit filed in this action by TMC's Chief Executive Officer, Thomas Morency, does not take issue with any particular statements in the Gillette Affidavit. [FN1] This is especially noteworthy given that the Gillette Affidavit is attached to Morency's affidavit to illustrate how Gillette had revealed TMC's trade secrets. I assume that TMC has not pointed to any particular statements by Gillette because they do not readily fit within the definition of "trade secret." [FN2] At best, the Gillette Affidavit contains general and somewhat vague information about TMC's operations that lacks the specificity or detail necessary to qualify as trade secrets.

FN1. This is in sharp contrast to Morency's affidavit filed in the *Goodyear* litigation in which Morency is critical of specific statements in the Gillette Affidavit, primarily on the basis that they are false (rather than on the basis that they reveal proprietary or confidential information). *See* Defendant's Exhibit N. I note that Morency also states the following in paragraph 16 of that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

affidavit: "Mr. Gillette had no access to TMC's proprietary data base of tariff and contract information and was not permitted to utilize the information contained in that data base."

FN2. *See* ORS 646.461(4):
"Trade secret" means information, including a drawing, cost data, customer list, formula, pattern, compilation, program, device, method, technique or process that:
(a) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

***3** Based on TMC's dismissal of its trade secrets claim, and the fact that it cannot articulate a single trade secret that was disclosed by Gillette, it is clearly appropriate to consider Gillette the prevailing party under the trade secrets claim. Moreover, I find that TMC has not articulated any supportable reasons for believing at the commencement of this lawsuit that Gillette, through the statements included in the Gillette Affidavit or otherwise, had disclosed trade secrets of TMC. As such, I conclude that TMC did not have an objectively reasonable basis to assert its claim against Gillette under the Oregon UTSA. [FN3] Gillette has met his burden of demonstrating that TMC made its misappropriation of trade secrets claim in bad faith and that this is an exceptional case. [FN4]

FN3. Likewise, TMC did not have a reasonable basis to assert its breach of contract claims premised on the allegation of wrongful disclosure of confidential information.

FN4. I acknowledge that TMC argues that the "bad faith" inquiry should focus on its conduct after this lawsuit commenced, rather than its basis for filing the lawsuit. Such an argument is inconsistent with the plain language of ORS 646.467(1). Regardless, TMC's actions during this litigation, particularly after the Sixth Circuit had issued its opinion in the *Goodyear* case, do not weigh against an award of attorney fees to Gillette. Specifically, while it asserts that its decision in July 2000 to dismiss its claims in this case was based on the Sixth Circuit's opinion, that opinion was issued *five* months earlier. Even without this unnecessary delay, TMC's motivation in deposing Gillette ("so that TMC knew at least what Mr. Gillette would admit he told Goodyear's attorneys") makes evident its bad faith.

As of the date of Gillette's reply brief in support of his motion for attorney fees, his attorney's fees totaled $20,618.00. Although I am not persuaded that I should apply the requested multiplier to such amount to arrive at an award of fees, I am otherwise comfortable with the hours and hourly rates used to calculate the amount. Gillette shall file a proposed judgment that awards attorney fees in the amount of $20,618.00 and costs.

## CONCLUSION

For the foregoing reasons, the motion for attorney fees (# 30) by defendant Richard R. Gillette is GRANTED.

2001 WL 210179 (D.Or.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Motions, Pleadings and Filings**

United States District Court, N.D. California.
VSL CORPORATION, Plaintiff,
v.
GENERAL TECHNOLOGIES, INC., Defendant.
**No. C 96-20446 RMW(PVT).**

Jan. 5, 1998.

Mark Haesloop, Haesloop & Associates, San Carlos, Francis J. Pelland, Bell, Boyd & Lloyd, Washington, D.C., Counsel for Plaintiff.

Basil P. Fthenakis, Fthenakis & Colvin, Palo Alto, John S. Eqbert, Harrison & Egbert, Houston, TX, Counsel for Defendant.

ORDER GRANTING DEFENDANT'S MOTION FOR ORDER AWARDING ATTORNEYS' FEES AND COSTS
WHYTE, District J.

***1** Defendant's motion for an order awarding attorneys' fees and costs pursuant to Fed. R. Civ. Proc. 54 and L.R. 54-5 was submitted without oral argument. The court has read the moving and responding papers of counsel. For the reasons set forth below, the court grants defendant's motion.

I. BACKGROUND

VSL Corporation ("VSL") filed its complaint in this action on June 4, 1996 alleging the following claims: (1) misappropriation of trade secrets, (2) misappropriation of confidential and proprietary data, (3) conversion, (4) violation of the Uniform Trade Secrets Act, (5) unfair competition, (6) violation of the California unfair competition statute, (7) unjust enrichment, (8) breach of confidence, (9) breach of contract and (10) breach of implied contract.

Defendant General Technologies, Inc. ("GTI") is engaged in the business of designing and manufacturing products used in the post-tensioning reinforcement of concrete. GTI also manufactures post-tensioning products in accordance with specifications provided to it by others. This action arises out of an alleged oral agreement between VSL and GTI whereby VSL provided information regarding a certain duct ("PT-Plus duct") with the understanding that GTI would manufacture the duct exclusively for VSL. VSL alleged that GTI misused the information provided to design and manufacture a competitive product.

In June 1993, GTI apparently contacted VSL in an attempt to interest VSL in GTI's own plastic post-tension duct product. VSL stated that it had no interest in GTI's duct but expressed interest in having GTI manufacture PT-Plus ducts for VSL. A representative from GTI traveled to VSL in July 1993 to discuss the possibility of GTI manufacturing PT-Plus ducts for VSL. Prior to the meeting, GTI was sent a Confidentiality Agreement, which was never signed by GTI.

In August 1993, Dywidag Systems International ("DSI"), a major competitor of VSL's, contacted GTI about the possibility of manufacturing a duplicate of the PT-Plus duct. DSI provided GTI with several samples of the duct. GTI contends that DSI lawfully obtained samples of PT-Plus duct from job-site dumpsters and engaged GTI to reverse engineer a competitive product using the independently acquired samples.

In September 1993, GTI informed VSL of its discussions with DSI and attempted to work out an agreement whereby GTI would be authorized to manufacture PT-Plus ducts for VSL and use VSL's tooling to manufacture ducts for DSI in return for a royalty to VSL to cover VSL's investment in tooling. VSL requested that GTI execute a Confidentiality Agreement. However, because GTI did not find the terms of the agreement fair and reasonable it refused. [FN1] Thus, negotiations between VSL and GTI disintegrated and GTI contends it returned all materials and information it had been given by VSL.

FN1. VSL attempted to modify the agreement but GTI found the modified agreement even more oppressive than the original and refused to sign it as well.

GTI proceeded to develop a duct product for DSI from samples obtained exclusively from DSI and publicly available information. GTI contends that the PT-Plus duct is a simple product that is easy to duplicate because all of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

necessary information is contained in marketing literature and necessary measurements can be obtained by simply looking at a sample.

***2** Prior to filing its complaint, VSL through counsel wrote GTI a letter of January 16, 1996 to complain that it believed GTI used VSL's design drawings and specifications to manufacture its competing product. The letter asked GTI to explain how it had the right to manufacture a duct system based on VSL information. After some non-responsive communications with GTI, VSL filed suit. During the April 10, 1997 deposition of Mr. Payne, VSL's president, he admitted that VSL had not taken reasonable steps to maintain the secrecy of the information allegedly given to GTI. Mr. Payne's deposition confirmed that VSL had freely given such information to various individuals without any obligation of confidentiality. Further, Mr. Payne also admitted that in early 1994 VSL knew that GTI was manufacturing its competing product. (¶ 15, Declaration of Basil Fthenakis in Support of Motion).

Following Mr. Payne's deposition, counsel for VSL and GTI discussed the elimination of VSL's claims for misappropriation of trade secrets. According to VSL's counsel, several attempts were made to contact this court in order to change the scheduling to allow VSL to withdraw its trade secret claims. No attempted withdrawal of those claims was filed in this court before the deadline for the filing of GTI's motion for summary judgment.

GTI moved for summary judgment on all of VSL's claims including VSL's first (misappropriation of trade secrets) and fourth (violation of the Uniform Trade Secrets Act) claims. Those two claims failed because the duct information given to GTI was not secret. In its opposition, VSL withdrew its claims against GTI for misappropriation of trade secrets.

As to VSL's breach of contract action, VSL submitted with its opposition the declarations of VSL representatives alleging that GTI president Mr. Sorkin had no objection to any of the terms of the proposed confidentiality agreement. The declarations further stated that Mr. Sorkin promised to sign the confidentiality agreement without substantial changes. (¶ 18, Declaration of Basil Fthenakis in Support of Motion). This court granted defendant GTI's summary judgment motion dismissing all causes of action alleged in VSL's complaint.

GTI now moves for an award of attorneys' fees under Cal. Civ.Code § 3426.4, arguing that VSL's misappropriation of trade secret claims were made in bad faith. GTI argues that it is also entitled to recovery of attorneys' fees under Cal. Civ.Code § 1717 since the confidentiality agreement asserted by VSL contained an attorneys' fees provision.

## II. LEGAL STANDARD

A motion for an award of attorneys' fees must specify the judgment and the statute or other grounds entitling the moving party to such an award. Fed. R. Civ. Proc. 54(d)(2)(B).

## III. ANALYSIS

Defendant GTI moves for an award of attorneys' fees on two separate grounds. First, GTI argues that VSL made its misappropriation of trade secrets claims in bad faith. Second, GTI argues that the confidentiality agreement asserted by VSL in its complaint entitles GTI, as the prevailing party, to attorneys' fees.

### A. CALIFORNIA CIVIL CODE § 3426.4

***3** "If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the court may award reasonable attorneys' fees to the prevailing party." Cal. Civ.Code § 3426.4. GTI argues that although "bad faith" finds no definition in § 3426.4, it is settled that this statute was intended to deter specious claims of misappropriation. *Stilwell Development, Inc. v. Chen*, 11 U.S.P.Q.2d 1328, 1330-31 (C.D.Cal.1989).

In *Stilwell Development*, after plaintiffs' presentation of evidence, the trial court granted defendant's motion for a directed verdict on the trade secret count. Defendant moved under Cal. Civ.Code § 3426.4 for attorneys' fees, alleging that plaintiffs' trade secret claim was made in bad faith. The trial court interpreted "made" in bad faith to include both bringing and maintaining a cause of action. *Stilwell Development*, 11 U.S.P.Q.2d at 1330. Next, the trial court held that "bad faith" has a subjective misconduct component

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and an objective speciousness component. Id. at 1331. The court reasoned that "bad faith" was meant to prevent deterrable conduct, requiring recklessness or gross negligence, if not wilfulness. Id. The trial court held that plaintiffs' misappropriation of trade secrets claim was made in bad faith. Id. As to objective speciousness, the trial court noted the complete lack of evidence demonstrating that the distributor lists and product specifications were either confidential or misappropriated. Id. The court also noted a total failure of proof that the alleged trade secrets were the subject of reasonable efforts to maintain their secrecy. Id. As to subjective misconduct, the court inferred subjective misconduct from plaintiffs' total failure of proof. The court reasoned that "plaintiffs had superior, if not exclusive knowledge of whether they undertook any effort to maintain the alleged trade secrets." Id. at 1332. The court also reasoned that plaintiffs must have known they had no claim for trade secret misappropriation at least by the time they retained specialized counsel. Id. at 1332.

GTI argues that the reasoning of *Stilwell Development* should be applied in the instant case. Like *Stilwell,* the evidence in connection with GTI's motion for summary judgment revealed VSL publicly marketed the PT-Plus duct, freely disclosed alleged trade secret information concerning the duct, and failed to take any reasonable steps to maintain the secrecy of such information. As in *Stilwell,* the knowledge that the duct product information was not maintained in secrecy was uniquely in the possession of plaintiff VSL. GTI argues that VSL's conduct went one step beyond that in *Stilwell Development.* GTI contends that VSL ignored the comments of opposing counsel concerning the complete lack of evidence to support its trade secret claims. *See Alamar Biosciences, Inc. v. Difco Laboratories, Inc.,* 40 U.S.P.Q.2d 1437, 1442 (E.D.Cal.1996)(bad faith inferred where opposing counsel identifies specific failures of plaintiffs' case, and decision is made to go forward despite inability to respond to arguments).

*4 VSL argues that *Stilwell* is distinguishable from the instant case. VSL points out that in *Stilwell,* plaintiffs maintained their trade secret cause of action through to the end of the case. VSL submits that it first knew of the deficiencies in the trade secret claims at the deposition of VSL's president, who admitted that VSL took no reasonable steps to protect its alleged trade secrets. VSL further states that it attempted to resolve these issues with opposing counsel and even tried to contact this court prior to the filing of GTI's motion for summary judgment. VSL also points out that it specifically withdrew its trade secret claims in its opposition to GTI's motion for summary judgment. VSL's argument is unavailing. VSL filed its complaint June 4, 1996. Mr. Payne's deposition occurred on April 10, 1997, which gave VSL more than 10 months to investigate whether the allegedly misappropriated information qualified as a trade secret. Although there is evidence that GTI knew of VSL's intent to withdraw the trade secret claims, no formal withdrawal was made until after GTI's motion for summary judgment.

VSL also attempts to distinguish *Stilwell* on other grounds. Specifically, VSL argues that the *Stilwell* plaintiffs had absolutely no proof that the information was confidential or that the defendant misappropriated the information. VSL argues that it had a reasonable belief that the information was given to VSL in confidence and that it was used by GTI to produce its own product. This attempted distinction misses the mark. Specifically, regardless of VSL's belief as to whether the information was disclosed in confidence, VSL had in its possession knowledge establishing that the information could not qualify as a trade secret; i.e. that no reasonable steps had been taken to protect the information, the product was publicly marketed, and information thereon was given to others under no obligations of secrecy. VSL also raises its failed attempts to elicit more information from GTI concerning how GTI came to make its own duct product as an indication that its trade secret action was brought in good faith. Again, this argument is unavailing, since VSL knew that the information could not have qualified as a trade secret regardless of whether any misappropriation occurred.

The court finds the reasoning of *Stilwell Development* persuasive. VSL's misappropriation of trade secret claims were "made in bad faith." VSL brought and maintained its trade secret claims within the meaning of § 3426.4. VSL's failure to timely withdraw these claims necessitated their treatment in defendant GTI's motion for summary judgment.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

VSL's trade secret claims were objectively specious. A trade secret is information that: (1) derives independent economic value from not being generally known to the public or other persons who can obtain economic value from its disclosure; and (2) is the subject of reasonable efforts to maintain its secrecy. Cal. Civ.Code § 3426.1(d). VSL's president at all relevant times had knowledge establishing that the duct product information could not qualify as a trade secret. He knew that the information at issue was distributed without obligations of confidentiality and was not the subject of reasonable secrecy efforts. As in *Stilwell*, from this complete failure of proof, this court infers that VSL must have knowingly prosecuted a specious claim. As in *Stilwell*, this inference is buttressed by the fact that plaintiff was in the best position to assess whether the allegedly misappropriated information was in fact a trade secret. Further, even if VSL did not intentionally pursue a meritless claim, its conduct certainly qualifies as gross negligence or even recklessness. VSL should have conducted a reasonable investigation as to whether the information qualified as a trade secret. Such an investigation would have revealed immediately that the information did not qualify for trade secret status. The ten months between the filing of the complaint and Mr. Payne's deposition was more than sufficient for such an investigation. Accordingly, Cal. Civ.Code § 3426.4 authorizes an award of attorneys' fees in the present case.

B. CALIFORNIA CIVIL CODE § 1717

***5** "In any action on a contract, where the contract specifically provides that attorneys' fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorneys' fees in addition to other costs." Cal. Civ.Code § 1717. When a party sued under an alleged contract containing an attorneys' fees clause prevails by establishing the non-existence of such a contract, that party is nevertheless entitled to an award of attorneys' fees. *Hsu v. Abbara*, 9 Cal.4th 863, 870, 39 Cal.Rptr.2d 824, 891 P.2d 804 (1995); *Care Const. v. Century Convalescent Centers*, 54 Cal.App.3d 701, 705, 126 Cal.Rptr. 761 (1994); *Diamond v. John Martin Co.*, 753 F.2d 1465, 1467 (9th Cir.1985).

According to the California Supreme Court, it is well settled that section 1717 allows the recovery of attorneys' fees "even when the party prevails on grounds the contract is inapplicable, invalid, unenforceable or nonexistent, if the other party had been entitled to attorneys' fees had it prevailed." (citations omitted) *Hsu v. Abbara*, 9 Cal.4th 863, 870, 39 Cal.Rptr.2d 824, 891 P.2d 804 (1995). In *Hsu v. Abbara*, the defendants signed an agreement to list their home with a real estate agent. Using a standard real estate form containing an attorneys' fees clause, the plaintiffs made an offer on the house. Defendants made a counteroffer incorporating all the terms of plaintiffs' offer except for the price. The plaintiffs then orally counteroffered again changing only the price. Defendants felt the plaintiffs' latest offered sale price was still too low and rejected the counteroffer. Subsequently, plaintiffs attempted to accept defendants' initial counteroffer. The trial court held that no contract existed. *Id.* at 868, 39 Cal.Rptr.2d 824, 891 P.2d 804. The Supreme Court nevertheless awarded attorneys' fees to the defendants. *Id.* at 876, 39 Cal.Rptr.2d 824, 891 P.2d 804. The *Hsu* court reasoned that denying defendants attorneys' fees in this case would fail to achieve section 1717's goal of "full mutuality of remedy if its benefits were denied to parties who defeat contract claims by proving they were not parties to the alleged contract or that it was never formed." *Id.* at 870, 39 Cal.Rptr.2d 824, 891 P.2d 804.

In *Care Construction v. Century Convalescent Centers*, plaintiff brought suit alleging breach of a lease agreement containing an attorneys' fees provision. The lease was purportedly transferred to plaintiff by a third party. The court found that defendant had offered a lease to that third party. The trial court, however, found that the lease offer was never accepted by the third party. Accordingly, the trial court entered judgment against plaintiff. *Care Construction*, 54 Cal.App.3d at 702, 126 Cal.Rptr. 761. The appellate court awarded defendant its attorneys' fees despite the non-existence of the lease agreement. *Id.* at 705, 126 Cal.Rptr. 761. Similar to *Hsu v. Abbara, supra*, the court reasoned that such a holding is the only way of effecting the "purpose of mutuality found in Civil Code section 1717." *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at 705, 126 Cal.Rptr. 761.

***6** *Hsu v. Abbara* and *Care Construction* control the present case. In its initial complaint, VSL alleged breach of a confidentiality agreement including an attorneys' fees clause. Specifically, although the confidentiality agreement was unsigned, VSL alleged that GTI agreed to all the terms in the proposed written agreement and promised to execute it. In fact, VSL prayed for attorneys' fees and costs in its initial complaint. In the order of July 21, 1997, this court dismissed VSL's breach of contract claim, reasoning that the two-year statute of limitations applicable to oral agreements had run. The court also notes that VSL would have been entitled to attorneys' fees had it prevailed on its breach of contract claim. In light of the foregoing, section 1717 authorizes an award of attorneys' fees in the present case.

VSL argues that since this court concentrated on the oral agreement as the basis of the contract claims, section 1717 is inapplicable. VSL contends that there was no evidence of an attorneys' fees clause in the oral agreement asserted by VSL. VSL argues that the only term of the alleged oral agreement it sought to enforce was a promise to hold information in confidence, to use it only for limited purposes, and to execute an acceptable confidentiality agreement. VSL argues that had it been successful on its claim for breach of this oral agreement it would *not* have been entitled to attorneys' fees and, therefore, section 1717 has no application.

VSL's argument is unavailing. This court's only finding with respect to the breach of contract claims was that any agreement between the parties was an oral one and, therefore, concluded that the two-year statute of limitations had run. This court did not endeavor to determine what the terms of the alleged oral agreement were. VSL's opposition to GTI's motion states "those simple provisions were the extent of the oral agreement which VSL sought to enforce." However, in fact, VSL alleged that all the terms of a May 1993 draft of a confidentiality agreement were acceptable to GTI and that GTI promised to execute it. (See Exh. F and ¶ 18, Declaration of Basil Fthenakis). That draft included a provision for attorneys' fees.

C. SEGREGATION OF FEES

VSL does not dispute the reasonableness of the fees incurred by defendant GTI. VSL argues, however, that this court should, at most, only award fees attributable to the defense of the trade secret and contract claims.

The apportionment of fees is within the trial court's discretion. *Abdallah v. United States Savings Bank,* 43 Cal.App.4th 1101, 1111, 51 Cal.Rptr.2d 286 (1996), cert. denied, 519 U.S. 1081, 117 S.Ct. 746, 136 L.Ed.2d 684 (1997). When fees and claims are "inextricable intertwined" rendering them impracticable to divide, all fees may be awarded. *Abdallah, supra.* The *Abdallah* court added that attorneys' fees need not be apportioned when the work was performed on an issue common to both a fee-shifting and an "ordinary" cause of action. *Id.*

***7** In the present case, VSL alleged ten causes of action, all of which were factually related and intertwined with the trade secret and breach of contract claims. Accordingly, *Abdallah* controls the present case. As the claims and the fees incurred to defend these claims are inextricably intertwined, segregation or apportionment of fees is not appropriate or necessary.

GTI incurred attorneys' fees in the amount of $62,423.35 for services rendered by Fthenakis & Colvin in the defense of this action, and costs of $8,173.05. Additionally, GTI incurred attorneys' fees in the amount of $8,035.58 for services rendered by its patent counsel, John Egbert. As discussed above, VSL does not object to the reasonableness of these fees totaling $78,631.98.

IV. ORDER

Based on the foregoing, the court grants defendant's motion for an award of attorneys' fees. The court hereby awards General Technologies, Inc. attorneys' fees against VSL Corporation in the sum of $78,631.98.

1998 WL 124208 (N.D.Cal.), 46 U.S.P.Q.2d 1356

**Motions, Pleadings and Filings (Back to top)**

. 5:96CV20446 (Docket) (Jun. 04, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. California.
ALAMAR BIOSCIENCES, INC., Plaintiff,
v.
DIFCO LABORATORIES, INC., et al., Defendants.
MICROSCAN, INC., Intervention-Claimant,
v.
ALAMAR BIOSCIENCES, INC., et al.,
Intervention-Defendants.
**Civ. No. S-94-1856 DFL PAN.**

Feb. 27, 1996.

*ORDER*

LEVI, District Judge.

I.

***1** Cross-defendant Alamar Biosciences, Inc. moves for an award of attorney's fees, claiming that intervenor-claimant MicroScan, Inc. brought its intervention complaint in bad faith. California Civil Code § 3426.4 authorizes an award of attorney's fees when "a claim of misappropriation is made in bad faith." At least one court has interpreted § 3426.4 to require a finding of both "subjective" bad faith and "objective" lack of merit. *Stilwell Development Inc. v. Chen,* 11 U.S.P.Q.2d 1328, 1330-32 (C.D.Cal. 1989)(requiring "subjective misconduct and objective speciousness). Courts from other jurisdictions have applied the same standard to cases under the Uniform Trade Secrets Act. *qad. Inc. v. ALN Assoc., Inc.,* 18 U.S.P.Q.2d 1122 (N.D.Ill. 1990)(under Illinois version of Uniform Trade Secret Act, denying fees where no subjective bad faith found, even though claim was objectively unreasonable); *Research & Trading Corp. v. Pfuhl,* 1992 WL 345465, * 15 (Del.Ch. 1992)(denying fees under Uniform Trade Secret Act where claim was "colorable"); *Optic Graphics, Inc. v. Agee,* 591 A.2d 578, 590 (Ct.Spec.Apls.Md. 1991)(same); *Clinipad Corp. v. Aplicare, Inc.,* 1991 WL 88156, 1991 Conn. Super. LEXIS 1094 (Sup.Ct.Conn. 1991). Although evidence that an action is wholly without merit does not necessarily mean that the action is taken in bad faith, continuing to prosecute a frivolous case may be evidence of such bad faith. *Stilwell,* 11 U.S.P.Q.2d at 1331; *see also* *Dolan v. Buena Engineers, Inc.,* 29 Cal.Rptr.2d 903 (Ct.App. 1994) (same under Cal. Civ. Proc. § 128.5). Bad faith may be inferred where the specific shortcomings of the case are identified by opposing counsel, and the decision is made to go forward despite the inability to respond to the arguments raised. *Cf.* F.R.Civ.P. 11.

If a claim is clearly time-barred, then asserting the claim is frivolous and sanctionable. *Mir v. Little Co. of Mary Hosp.,* 844 F.2d 646, 653 (9th Cir. 1988) (asserting clearly time-barred claim objectively unreasonable; Rule 11 sanctions affirmed); *Fred A. Smith Lumber Co. v. Edidin,* 845 F.2d 750, 753 (7th Cir. 1988)(same). This is true even if the claim might have been meritorious if timely asserted.

II.

MicroScan's legal position that the statute of limitations did not begin to run before April 1991 was insupportable. MicroScan acknowledges that it was suspicious, at least by 1990, that Lancaster had misappropriated the resazurin research. MicroScan Opposition to Alamar Mot. for Summary Judgment, 5. An internal audit was conducted in late 1990 to determine what Lancaster had worked on; the memorandum confirmed that Lancaster had done research on a colorimetric MIC test, using the redox dye resazurin. [FN1] Lancaster's resazurin research was already familiar to many at MicroScan, and some employees of MicroScan believed that Alamar had been formed specifically to exploit the resazurin research. At two trade shows during 1990, MicroScan employees witnessed Alamar demonstrations of a blue-to-red redox dye-based MIC test -- the employees discussed it among themselves and concluded that Alamar was probably using the resazurin research. In light of this evidence, and with no further investigation, MicroScan could have brought suit.

FN1. MicroScan's opposition to this motion raises for the first time the contention that MicroScan elected not to proceed with its investigation of Alamar because "Dr Godsey, who led the investigation, was misled by the report of MicroScan's Judy Johnston who downplayed the

resazurin work at MicroScan, and led Dr. Godsey to the erroneous conclusion that nothing had been misappropriated." Opposition, 9. MicroScan's mistake, if any, as to the legal conclusion of whether Lancaster had misappropriated trade secrets does not change the limitations analysis. Jolly v. Eli Lilly & Co., 245 Cal.Rptr. 658 (1988) (holding that failure to recognize legal significance of facts is irrelevant), *discussed in* MicroScan Opp. to Alamar Mot. for Summary Judgment, 25-26. MicroScan makes no argument as to why Alamar should be charged with its own internal errors in judgment.

***2** MicroScan contended, however, that it was unsure of whether Lancaster was actually using resazurin, the dye he had studied only a few years earlier, instead of some other blue-to-red redox dye suitable for use as an MIC indicator. But even assuming that this state of knowledge were insufficient to begin the limitations period, MicroScan had a duty to investigate its strong suspicions. Plaintiffs are charged with knowledge of matters which would have been revealed by a reasonably diligent investigation. Cal. Civ. Code § 3426.6; Wilshire Westwood v. Atlantic Richfield, 24 Cal.Rptr.2d 562, 566 (Ct.App. 1993). MicroScan opposed summary judgment on two grounds: (1) a reasonably diligent investigation would not have revealed Alamar's use of resazurin, and without that fact, MicroScan could not be certain that Alamar had misappropriated its trade secret; and (2) Alamar fraudulently concealed evidence of the misappropriation by using the trade name "alamarBlue" to refer to the redox dye resazurin (mixed with some stabilizers to aid in MIC determination). Neither ground had merit.

First, MicroScan utterly failed to explain why it did not contact Lancaster or have its attorneys do so. Badal was the only MicroScan employee to talk to Lancaster about the subject, and he decided not to "press further" upon receiving an oblique response because he felt certain that Alamar was using resazurin. MicroScan did not argue that Badal's question constituted a reasonable investigation, nor could it.

MicroScan also conceded that the "critical fact" -- Alamar's use of resazurin -- was publicly available in 1990 through a database search for international patents. MicroScan admitted that it commonly does such searches, and indeed retains an independent consultant for just this purpose. Alamar submitted a declaration establishing that the information was in fact publicly available, and could be discovered within ten minutes. First, MicroScan contended that the PCT application was outside the scope of a reasonable investigation because MicroScan did not consider Alamar a competitor. Whether Alamar was considered a "competitor" is completely irrelevant to whether MicroScan failed to reasonably investigate its potential misappropriation claim. Order dated October 12, 1995, 13. Next MicroScan argued that the PCT application was outside the scope of reasonable investigation because it was "in Geneva, Switzerland." Surreply to Alamar Motion for Summary Judgment, 5. This argument can only be called frivolous: MicroScan did not contest that it would search for the document through an electronic database search, not a physical visit to Europe. Finally, MicroScan contended that it was unreasonable to require repeated database searches. MicroScan admitted, however, that it regularly searches the databases when it considers the company a competitor. In light of MicroScan's own showing that such database searches were regularly performed, this argument had no prospect of success.

***3** MicroScan next claimed that it had been tricked by Alamar's use of the trade name "alamarBlue." This contention is specious for the reasons stated in the order granting summary judgment. Order dated October 12, 1995, 14-15. The name would not mislead any diligent plaintiff, nor was any MicroScan employee actually misled.

MicroScan's initial complaint also included a cause of action for breach of implied contract. Order dated October 12, 1995, 7, fn.4. MicroScan admitted that Alamar's use of resazurin was disclosed by Alamar at a 1992 meeting between Alamar and MicroScan. *See* MicroScan Opp. to Alamar Mot. for Summary Judgment, 28, lines 24-26. This claim was thus clearly barred even under the facts as MicroScan argued them.

III.

MicroScan claims that it initiated the action in good faith because "Evidence of the time bar which the Court ultimately found could not have been established under [the]

state of the record as it existed at the time of MicroScan's intervention." Opposition, 11. Whatever the state of MicroScan's counsel's knowledge was, MicroScan was aware of all the facts. Indeed, MicroScan had considered litigation against Lancaster and Alamar back in 1991, but decided not to proceed. Moreover, all the facts which made MicroScan's action frivolous were known to MicroScan at the time the complaint was filed. The statute of limitations bar was explained in detail in letters from Alamar's counsel to MicroScan's. [FN2] *See* Exhibits in Support of Opp. to Alamar Mot. for Fees and Costs, Exh. C, 20-22 (Decl. of Carl Kustin); Furniss Decl., Exh. A (letter informing Kustin of significance of PCT application).

FN2. MicroScan made no response to the letters pointing out the action's lack of merit.

In these circumstances, MicroScan's decision to file the complaint, with only make-weight arguments as to the statute of limitations, was in bad faith under § 3426.4. Its legal position was objectively unreasonable, and through Alamar's advocacy, it knew that its legal position was untenable.

IV.

MicroScan does not contest the amount of Alamar's fees. Alamar claims it incurred attorney's fees of $116,586.25 in fees and $3,321.60 in costs. Alamar's fees appear reasonable and shall be awarded.

V.

The motion for attorney's fees under California Civil Code § 3426.4 is GRANTED.

IT IS SO ORDERED.

1996 WL 784495 (E.D.Cal.)

**Motions, Pleadings and Filings** **(Back to top)**

. 2:94CV01856 (Docket) (Nov. 14, 1994)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Attached Printing Summary Report for INTEGRATION SOLU 4701970**

| | |
|---|---|
| Date/Time of Request: | Tuesday, March 29, 2005 14:06:00 Central |
| Client Identifier: | 888888-8888-8888/88 |
| Database: | DCT |
| Citation Text: | Not Reported in F.Supp.2d |
| Lines: | 575 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

Court of Appeal, Second District, Division 7, California.
HARDIE'S KORN KETTLE, INC., Plaintiff and Appellant,
v.
METROVOX SNACKS, et al., Defendants and Respondents.
**No. B158352.**
**(Los Angeles County Super. Ct. No. VC032092).**

July 14, 2003.

Gourmet popcorn manufacturer sued defendant popcorn manufacturer for restraint of trade, statutory and common law misappropriation of trade secrets, interference with economic relationships, trade libel, and breach of contract. Plaintiff alleged that defendant stole its popcorn recipes, then stole its clients by providing them with a product that replicated plaintiff's popcorn. Defendant filed motions for nonsuit and directed verdict. The Superior Court, Los Angeles County, No. VC032092, William J. Birney, Jr., J., entered judgment for defendant, having granted nonsuit as to all causes of action other than the contract and trade secrets claims, which were resolved in defendant's favor by jury verdict, and awarded defendant attorney fees. Plaintiff appealed. The Court of Appeal, Woods, J., held that: (1) plaintiff failed to prove damages as required for intentional interference with economic relationships claim; (2) apportionment of award of attorney fees to work expended on single cause of action for misappropriation was not required; and (3) plaintiff's misappropriation action was prosecuted in bad faith, and thus defendant was entitled to statutory award of attorney fees.

Affirmed.

West Headnotes

**[1] Torts 10(1)**
379k10(1) Most Cited Cases

**[1] Torts 12**
379k12 Most Cited Cases
The elements of a cause of action for interference with economic relationships are: (1) a valid contract between the plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) damages to the plaintiff proximately caused by the acts of the defendant.

**[2] Torts 10(3)**
379k10(3) Most Cited Cases
Failure of either plaintiff popcorn manufacturer or defendant manufacturer to realize any profit from their joint venture precluded plaintiff from establishing damages as required to recover for defendant's alleged intentional interference with economic relationships, notwithstanding evidence as to how much profit defendant hoped to generate for plaintiff at outset of joint venture.

**[3] Damages 190**
115k190 Most Cited Cases
Recovery for intentional interference with economic relationships may be based on proof of the actual profits received by the defendant tortfeasor, where the plaintiff is unable to establish his lost profits with certainty.

**[4] Damages 114**
115k114 Most Cited Cases
In computing damages caused by intentional interference with economic relationships, "lost profits" means a loss of net profits, further defined as the gains made from sales after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed, and not just a loss of gross revenue.

**[5] Damages 40(1)**
115k40(1) Most Cited Cases
Lost anticipated profits cannot be recovered as damages

caused by intentional interference with business relationships if it is uncertain whether any profit would have been derived at all from the proposed undertaking.

**[6] Torts 10(3)**
379k10(3) Most Cited Cases
Plaintiff manufacturer's failure to show lost profits would preclude recovery on claim for negligent interference with economic relationships, if such a cause of action even exists in California, since showing of damages would be required as element of that cause of action.

**[7] Costs 194.44**
102k194.44 Most Cited Cases
Statutory attorney fees award to party against whom trade secret misappropriation action is brought in bad faith is discretionary; otherwise, Legislature would not have used words "may" and "reasonable" in authorizing such award under statute. West's Ann.Cal.Civ.Code, § 3426.4.

**[8] Costs 194.44**
102k194.44 Most Cited Cases
Trade secret misappropriation action is brought in "bad faith," and party against whom action is maintained is entitled to statutory award of attorney fees, where claim is objectively specious and there is a showing of subjective bad faith on the part of party who brought the claim. West's Ann.Cal.Civ.Code, § 3426.4.

**[9] Costs 194.44**
102k194.44 Most Cited Cases
Apportionment of attorney fees award to work expended on single cause of action for trade secret misappropriation was not required, even though statutory award was based on plaintiff's bad faith in prosecuting misappropriation action, where the liability issues were so interrelated among the other causes of action that it would have been impossible to separate them. West's Ann.Cal.Civ.Code, § 3426.4.

**[10] Costs 194.44**
102k194.44 Most Cited Cases
Popcorn manufacturer's trade secret misappropriation action against defendant manufacturer was objectively and subjectively specious, and thus brought in "bad faith," entitling defendant to statutory award of attorney fees, where plaintiff alleged that defendant stole its popcorn recipes, then stole its clients by providing them with a product that replicated plaintiff's popcorn, but failed utterly to establish the requisite element of damages in lost profits as a result of defendant's actions. West's Ann.Cal.Civ.Code, § 3426.4.

**[11] Costs 194.44**
102k194.44 Most Cited Cases
A "specious" claim, for purposes of the statute providing for award of attorney fees to party against whom trade secret misappropriation action is brought in "bad faith," is one in which the allegations are seemingly just or fair, but not so in reality. West's Ann.Cal.Civ.Code, § 3426.4.
APPEAL from a judgment of the Superior Court of Los Angeles County. William J. Birney, Jr., Judge. Affirmed.

Greenberg Traurig, Diana P. Scott and Michelle Lee Flores for Plaintiff and Appellant.

Kulik, Gottesman & Mouton, Glen L. Kulik and Philip M.W. Pailey, Jr. for Defendants and Respondents.

INTRODUCTION

WOODS, J.

Parties

*1 Plaintiff/appellant, Hardie's Korn Kettle, Inc. ("HKK"), is a California corporation whose business activities include the manufacturing, distribution, and sale of coated food products including "premier gourmet popcorn."

Defendant, George Compton ("Compton"), worked for HKK as a salesman. Compton is not a party to this appeal nor a participating defendant in the trial before Judge Birney. Compton was dismissed from the action prior to commencement of the trial.

Defendant/respondent Metrovox Snacks is a California limited liability company ("Metrovox"). Metrovox does business as "Snack Works."

Defendant/respondent Metropolitan Provisions is a California limited liability company ("Metropolitan"). Metropolitan does business as "Metropolitan Concessions."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendant/respondent Paul Voxland ("Voxland") is the chairman of Metrovox. Voxland has been engaged in the business of manufacturing candy coated popcorn since 1987, which includes approximately 60 different flavors of gourmet popcorn.

Defendant/respondent Rory Ritts ("Ritts") is a person experienced in sales and marketing of specialty food products. For the time frames pertinent to this litigation, Ritts was employed by Metrovox as a sales employee.

For convenience, respondents will be hereafter referred to collectively as "Metrovox" unless context requires otherwise.

Dispute Summarized

HKK maintains that it was "lured" by Metrovox "into handing over its client list" which Metrovox then used as the basis for introducing Metrovox as a joint venturer with HKK as HKK's new marketing arm focusing on customer service and product development. HKK alleges that a course of conduct by Metrovox then ensued which resulted in a complete usurpation of HKK's loyal client base to the advantage of Metrovox and the detriment of HKK. HKK further maintains that it was compelled to protect its interests and did so by filing a complaint containing causes of action for restraint of trade, statutory and common law misappropriation of trade secrets, interference with economic relationships, trade libel and breach of contract.

Judgment in the trial court favored Metrovox, following the grant of a motion for nonsuit on certain causes of action and special verdicts by the jury on questions submitted to it for decision. A post judgment motion for attorneys' fees resulted in an award of $133,811 to Metrovox. HKK complains on appeal that both the judgment and the award of attorneys' fees constituted reversible error.

Issues Presented

In urging reversible error by the trial court, HKK presents six issues on appeal in the form of interrogatories and contends that each question must be affirmatively answered in its favor. The six questions are repeated *verbatim* from HKK's opening brief as follows:

"1. Did the Superior Court err in granting a nonsuit as to the intentional interference with economic relationships ('intentional interference') where the evidence presented by Plaintiff was sufficient as a matter of law to establish a *prima facie* case of intentional interference against Defendants?

***2** "2. Did the Superior Court err in granting a nonsuit as to the negligent interference with economic relationships ('negligent interference') where the evidence presented by Plaintiff was sufficient as a matter of law to establish a *prima facie* case of negligent interference against Defendants?

"3. Did the Superior Court exceed the bounds of reason in awarding attorneys' fees when it considered all of Plaintiff's claims in evaluating its purported bad faith?

"4. Did the Superior Court exceed the bounds of reason in awarding attorneys' fees when it failed to find subjective bad faith by Plaintiff?

"5. Did the Superior Court exceed the bounds of reason in awarding attorneys' fees when it assertedly found objective speciousness in light of submission of Plaintiff's claim to the jury?

"6. Did the Superior Court exceed the bounds of reason in awarding attorneys' fees when its award of fees was based on an arbitrary calculation that did not apportion the fees for the misappropriation claim?" (Original italics.)

FACTUAL AND PROCEDURAL SYNOPSIS

**Business history of HKK.**

In 1990, HKK's president, George Hardie ("Hardie"), purchased an ongoing business from a partnership originally called Nut Kettle. The purchase included recipes for premium popcorn and client lists of the seller. Hardie maintains that the client lists and recipes are confidential, proprietary and constitute trade secrets. From 1990 to mid 1997, HKK cultivated the existing client base by manufacturing and selling its premium popcorn under its own label and also for customers who wanted the popcorn sold under their own private labels. Hardie admits that over the years it has proved challenging to turn a profit but

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Hardie believed in his "exemplary product" and continued to explore ways to make HKK a profitable enterprise.

**Joint venture relationship with Metrovox.**

Ritts approached Hardie in the summer or early fall of 1997 with a proposal to handle HKK's marketing and sales. Ritts was successful in obtaining the agreement of Hardie to a six-month trial period during which the client lists of HKK would be utilized by Metrovox to increase sales to existing clients, reestablish business with former clients and develop new clients. The agreement was memorialized in a Letter of Understanding on October 29, 1997, which Ritts signed as national sales manager of Metrovox Snacks utilizing its letterhead. Hardie hoped to secure additional sales from existing private label accounts, improve marketing, and increase sales volume by reestablishing old private label clients as current business acquaintances. At trial, Hardie testified to his aspirations by stating: "We thought this was an opportunity to, you know, have a lot of the problems that we had had in selling handled for [Hardie's]."

HKK provided Metrovox with contact information about HKK's existing clients for implementation of the letter of understanding. An additional reason for providing contact information was Hardie's understanding that HKK would be supplying Metrovox with popcorn products for Metrovox to sell under its own label.

**Implementation of joint venture agreement by HKK.**

***3** After the letter of understanding was signed [FN1] HKK took the following measures: sent letters to its private label customers dated November 1, 1997, apprising customers of the details of the joint venture arrangement utilizing the letterhead "Hardie's Korn Kettle" and generally expressing optimism and the mutual benefits that were expected from the venture; provided Metrovox with HKK's entire customer list, including private label clients which revealed the identities of 30 to 40 accounts, including the accounts of Jacobson's and Harris Teeter; and provided all of HKK's client information.

FN1. The letter agreement was apparently initialed by Hardie as evidenced by certain delineations on the letter in evidence as exhibit 5; the initials appear in two places and legibility presents a problem but we infer them to be "G.G.H." standing for the initials of "George G. Hardie."

**Purported unfair competition by Metrovox.**

HKK maintains that Metrovox began to engage in unfair competition within a few months of receipt of HKK's customer lists by the following conduct: secretly hired one Steven Turner, a popcorn engineer, in an attempt to duplicate HKK's recipes for premium gourmet popcorn varieties, including its three top sellers, i.e., Kettle Korn Krunch, Chocolate Pecan and Golden Butter Nut; Voxland represented to Steven Turner that HKK was going out of business and thus the need to copy HKK's recipes so that Metrovox could continue to sell HKK's product after HKK went out of business; provided Steven Turner with packaged samples of HKK's three top varieties containing labels reflecting ingredients; upon the engineer's encountering difficulty in recreating the recipes, Metrovox somehow acquired the specific brands and types of ingredients for HKK's three top sellers and provided the information to Steven Turner which HKK alleges could only be found in its confidential recipes; received orders from HKK's private label customers, notably Harris Teeter and Jacobson's; unilaterally terminated HKK's business relationship with Harris Teeter by contacting food broker Gennie Tull and stating that Metrovox would no longer accept orders from Harris Teeter resulting in the elimination of a longstanding business relationship with HKK by reason of Harris Teeter's inability to purchase HKK's gourmet popcorn since Metrovox was HKK's contact and product supplier; and initiated the phasing out of HKK's product and simultaneously packaging and selling Metrovox's product to Jacobson's as though the product was that of HKK, without informing HKK or Jacobson's.

**HKK's efforts to cover its losses.**

In late 1998 HKK attempted to cover its losses by reacquiring the business of Jacobson's and Harris Teeter. Pertaining to *Jacobson's*, the following occurred: attempts were made to recapture lost business but Jacobson's took the position that it could not reaffiliate with HKK until the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contract with its current vendor and supplier expired. Being unsuccessful in acquiring the name of the current vendor and supplier for Jacobson's, HKK eventually discovered that the exclusive vendor and supplier for Jacobson's was Metrovox (Metrovox Snacks.) The discovery was made by HKK in January 2002 through HKK's then food broker, Peter Wykoff, who so advised HKK. HKK then acquired the current food pricing of Metrovox and provided limited product to Jacobson's in 2002. As to *Harris Teeter,* a momentary reacquisition of the account by HKK occurred but HKK was never able to recapture the account as an ongoing business client. HKK further maintains: it never stopped producing popcorn from 1997 to the present time, nor did HKK suffer any production problems; HKK never closed nor intended to close its business of manufacturing premium glazed popcorn.

**Respondents' case.**

***4** HKK was a struggling business; manufacture and sale of expensive gourmet popcorn had a very limited market; HKK lost money every year since its founding in 1990; by 1997 HKK was insolvent and never turned a profit; HKK remained in operation by reason of the infusion of personal funds from Hardie; HKK hired and fired a large number of employees who failed to sell its product in significant quantities; by 1997 HKK fired its entire sales staff except for one employee who was also gone by the end of 1997; HKK decided to outsource it sales efforts to sell to certain customers; a contract with Metrovox was entered into on a trial basis to sell HKK's popcorn for a six month period to HKK's two remaining private label customers; Metrovox is a small company which is also engaged in the manufacture and sale of gourmet food products; Metrovox salesman, Ritts, made extensive efforts to find new private label customers for HKK but was not successful just as the sales staff at HKK was never successful because no real market for expensive gourmet popcorn ever existed; HKK presented additional problems in that financial problems prevented the timely manufacture and delivery of product; in July 1998 HKK ceased communicating with Metrovox and no one at HKK was able to be reached; Metrovox believed that HKK had stopped production and was out of business; Metrovox was surprised by the commencement of HKK's lawsuit two years later because there was never any indication that HKK was unhappy with the arrangement; no evidence existed that products sold by Metrovox after 1998 were identical or even similar to HKK's recipes or that such recipes were in its possession or that the formulas were used in any way; no evidence indicated when or how Magnavox acquired such formulas; with relative ease the formulas could be reverse engineered by accessing the labels on HKK's products displaying the ingredients or by consulting popular books at the library or book stores; Metrovox and other competitors had previously sold the same basic products; in this relatively small industry, location and compilation of potential lists of customers was readily available at trade shows; and no evidence existed demonstrating that HKK ever made a profit on its product or that Metrovox ever made a profit under the joint venture agreement, thus leading to the conclusion that no damages were ever suffered by HKK.

**Proceedings in the trial court.**

At the completion of HKK's case in chief, Metrovox filed its written motion for nonsuit pursuant to Code of Civil Procedure [FN2] section 581c seeking dismissal of all defendants and all causes of action. HKK responded with written opposition. The trial court heard oral argument and by minute order dated February 20, 2002, granted the motion as to Metropolitan and on the first and sixth causes of action (Restraint of Trade and Trade Libel) but denied as to Voxland and the second, third, fourth and fifth causes of action. The court also denied HKK's motion to amend the complaint to add a cause of action for fraud.

FN2. Unless otherwise indicated, all statutory references are to the Code of Civil Procedure.
Section 581c provides in relevant part: "(a) ***Only after, and not before,*** the plaintiff has completed his or her opening statement, or ***after*** the presentation of his or her evidence in a trial by jury, the defendant, without waiving his or her right to offer evidence in the event the motion is not granted, may move for a judgment of nonsuit." (Emphasis added.)

***5** After Metrovox completed its case in chief and rested,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Metrovox filed a written motion for directed verdict pursuant to section 630. [FN3] HKK filed written opposition. The court heard the matter and declared that it believed it was in error in denying the prior motion of Metrovox for non-suit and now granted the motion. The judgment of nonsuit filed April 8, 2002, reflects the court's change of ruling on the prior motion for nonsuit. The court's reconsideration occurred during the hearing on the motion for directed verdict by Metrovox with the court declaring on the record that it was applying the nonsuit standard [FN4]. Judgment of nonsuit was subsequently filed on April 8, 2002 as follows:

FN3. Section 630 provides in pertinent part: "(a) ... after all parties have completed the presentation of all of their evidence in a trial by jury, any party may, without waiving his or her right to trial by jury in the event the motion is not granted, move for an order directing entry of a verdict in its favor. [¶] (b) If it appears that the evidence presented supports the granting of the motion as to some, but not all, of the issues involved in the action, the court shall grant the motion as to those issues and the action shall proceed on any remaining issues. Despite the granting of such a motion, no final judgment shall be entered prior to the termination of the action, but the final judgment, in addition to any matter determined in the trial, shall reflect the verdict ordered by the court as determined by the motion for directed verdict."

FN4. HKK expresses frustration with the court's change of its prior ruling, but does not challenge the right of the court to thus change its mind. In its change of prior ruling the court stated, on its own volition and without detailed analysis in its explanation, that it "believed[d] [it was] in error in denying the motion." The court further stated that "... I have reviewed and thought over and pondered what I formerly done, [sic] so I am re-opening relative--the motion for nonsuit relative to negligent interference with economic relations and intentional interference with economic relations. [¶] I have gone over and over the evidence as carefully as I can and listened to the arguments on both sides, which are extensive, and I find that I was I believe in error in denying the motion for nonsuit on those two causes of action. I hereby grant the motion for nonsuit on those two causes of action. [¶] Furthermore, I again reviewed the arguments relative to holding in the individual defendant Paul Voxland, and I conclude I was in error in denying the motion for nonsuit in connection with Voxland, and I do so now." (See *Darling, Hall & Rae v. Kritt* (1999) 75 Cal.App.4th 1148, 1155-1157, 89 Cal.Rptr.2d 676.)

"After reviewing the papers filed by the parties and considering the oral argument of counsel, and good cause appearing, it is hereby ordered, adjudged, and decreed as follows:

"1. Judgment is hereby entered in favor of Metropolitan as to each cause of action and said defendant is hereby dismissed from the action;

"2. Judgment is hereby entered in favor of Voxland as to each cause of action and said defendant is hereby dismissed from the action;

"3. Judgment is hereby entered in favor of defendants and each of them on the first cause of action in the complaint for restraint of trade, violation of Section 16720 of the Business and Professions Code;

"4. Judgment is hereby entered in favor of defendants and each of them on the fourth cause of action for intentional interference with economic relationship;

"5. Judgment is hereby entered in favor of defendants and each of them on the fifth cause of action for negligent interference with economic relationship;

"6. Judgment is hereby entered in favor of defendants and each of them on the sixth cause of action in the complaint for trade libel;

"7. Paragraph 2 of the prayer, for exemplary and punitive damages, is stricken; and

"8. Metropolitan and Voxland shall recover their costs of suit in the sum of $."

The trade secrets and contract claims were then submitted to the jury which returned a unanimous verdict in favor of Metrovox and Ritts. A statutory award for attorneys' fees on the trade secrets claim was subsequently entered by the court on the grounds that the claim was specious and maintained in bad faith by HHK after a certain date.

HKK filed a timely notice of appeal.

DISCUSSION

**Nonsuit rulings; standard of appellate review.**

The first two issues raised by HKK on appeal deal with the propriety of the trial court's judgment granting Metrovox's motions for nonsuit on HKK's causes of action for intentional interference and negligent interference with economic relationships. We first examine the standard of review to be applied in determining whether reversible error was committed by the trial court. The law is well settled and the litigants are not in dispute as to the legal principles to be applied. The legal principles and citations to decisions set forth in HKK's opening brief are accurate, objective and without challenge from Metrovox. We adopt the principles and citations in full as reflective of the standard of review to be employed by this court in reaching a decision on the first two issues raised by HKK. Those principles and citations are as follows:

***6** "On appeal from a judgment of nonsuit, a reviewing court is governed by the same standard as the trial court, thereby 'requiring evaluation of the evidence in the light most favorable to the plaintiff[.' (*Carson v. Facilities Develop. Co.* (1984) 36 Cal.3d 830, 839, 206 Cal.Rptr. 136, 686 P.2d 656.) ] [E]vidence most favorable to the plaintiff must be accepted as true and conflicting evidence must be disregarded.' [ (*Id.* at p. 838, 206 Cal.Rptr. 136, 686 P.2d 656.) ] '[T]he court may not weigh the evidence or consider the credibility of witnesses.' [ (*Ibid.;* see also, *Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1065, 80 Cal.Rptr.2d 704; *CC-California Plaza Assocs. v. Paller & Goldstein* (1996) 51 Cal.App.4th 1042, 1050, 59 Cal.Rptr.2d 382.) ]

" 'A nonsuit in a jury case or a directed verdict may be granted only when disregarding conflicting evidence, giving the plaintiffs' evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in their favor.' [ (*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 583, 75 Cal.Rptr. 652, 451 P.2d 84; *Alpert v. Villa Romano Homeowners Assn.* (2000) 81 Cal.App.4th 1320, 1328, 96 Cal.Rptr.2d 364.) ] Put another way, a nonsuit as to a cause of action is proper only where plaintiff fails to prove a *prima facie* case as to the cause of action. [ (*Abreau v. Svenhards's Swedish Bakery* (1989) 208 Cal.App.3d 1446, 1456-1457, 257 Cal.Rptr. 26.) ]

"The reasonable inferences to support plaintiff's *prima facie* case need not be the only possible inferences, need not be the strongest nor the most believable, as long as there is enough to provide 'some substance to plaintiff's evidence upon which reasonable minds could differ.' [ (*Carson, supra,* 36 Cal.3d at p. 838, 206 Cal.Rptr. 136, 686 P.2d 656.) ] Thus, an appeals court shall sustain a nonsuit on appeal only where 'interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.' [ (*Carson, supra,* 36 Cal.3d at p. 839, 206 Cal.Rptr. 136, 686 P.2d 656; *Galanek v. Wismar* (1999) 68 Cal.App.4th 1417, 1424, 81 Cal.Rptr.2d 236.) ]

"A nonsuit will be reversed if there is 'some substance to plaintiff's evidence upon which reasonable minds could differ[,'] but will 'not be reversed if plaintiff's proof raises nothing more than speculation, suspicion, or conjecture.' [ (*Carson, supra,* 36 Cal.3d at p. 839, 206 Cal.Rptr. 136, 686 P.2d 656.) ]

"Since the jury will not have the opportunity to consider a cause of action when a nonsuit is granted, 'courts traditionally have take[n] a very restrictive view of the circumstances under which nonsuit is proper.' [ (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 118, 184 Cal.Rptr. 891, 649 P.2d 224.) ]"

**Nonsuit on the "intentional interference with economic**

**relationships" cause of action was proper.**

[1] Metrovox adopts the elements set forth by HKK in HKK's opening brief as being an accurate statement of the law on the cause of action for "intentional interference with economic relationships." The elements of such a claim are:

***7** (1) a valid contract between the plaintiff and a third party;

(2) defendant's knowledge of this contract;

(3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship;

(4) actual breach or disruption of the contractual relationship; and

(5) damages to the plaintiff proximately caused by the acts of the defendant. (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126, 270 Cal.Rptr. 1, 791 P.2d 587.)

[2][3] The Achille's Heel of HKK's cause of action for "intentional interference" is failure of proof of damages as required by the fifth element set forth *supra.* It is clear that the damages element in this context is a claim to lost profits. (*Ramona Manor Convalescent Hosp. v. Care Enterprises* (1986) 177 Cal.App.3d 1120, 1138, 225 Cal.Rptr. 120.) As explained by noted writer B.E. Witkin, "If a wrongful act causes the loss of a business, its value may be determine by capitalizing the past profits. Thus, in *Elsbach v. Mulligan* (1943) 58 [Cal.App.2d 354, 365,] defendant, by misrepresentations and threats, procured the cancellation of plaintiff's sales agencies and obtained them for himself. The court awarded damages consisting of plaintiff's average yearly profits ($6,000), capitalized on the basis of a 5-year purchase, or a total of $30,000. (Citation.) [¶] Where the plaintiff is unable to establish his lost profits with certainty, recovery may be based on proof of the actual profits received by the defendant tortfeasor. (See *Ramona Manor Convalescent Hosp. v. Care Enterprise* [, *supra,*] 177 [Cal.App.3d 1120, 1140].)" (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1440, p. 914.)

[4][5] We now focus our attention on the meaning of "profits" and find the term to mean a loss of *net* profits and not just a loss of gross revenue. (See *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 884, 116 Cal.Rptr.2d 158; *Gerwin v. Southeastern Cal. Assn. of Seventh Day Adventists* (1971) 14 Cal.App.3d 209, 222-223, 92 Cal.Rptr. 111.) The courts have further defined net profits as "the gains made from sales 'after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed.' " (*Ibid.; Kids' Universe v. In2Labs, supra,* 95 Cal.App.4th at p. 884, 116 Cal.Rptr.2d 158; *Resort Video, Ltd. v. Laser Video, Inc.* (1995) 35 Cal.App.4th 1679, 1700, 42 Cal.Rptr.2d 136.) Further, "[l]ost anticipated profits cannot be recovered if it is uncertain whether any profit would have been derived at all from the proposed undertaking." (*S.C. Anderson, Inc. v. Bank of America* (1994) 24 Cal.App.4th 529, 535, 30 Cal.Rptr.2d 286.)

The sufficiency of HKK's proof as to damages is to be examined in the light of the testimony of its expert, Ted Vavoulis. We note that the testimony of this expert constituted the only evidence presented by HKK on the subject. Vavoulis testified as to his method of calculating lost profits as follows:

"What I did was to look at the memo of understanding, the agreement between the defendants in this case and Hardie's, to determine what the sales would have been based on what the defendants represented as what they could do for Hardie's. [¶] I looked at those sales and determined from those sales how much of that money would have been a gross profit to Hardie's." But a careful reading of page 2 of the letter of understanding clearly indicates that the representations of Ritts on behalf of Metrovox are cast in terms of "goals" and not guarantees or some other concrete and specific method of calculating damages. Page 2 of the letter of understanding contains the following statement by Ritts: "My immediate *goal* is to develop $20,000/month for November and December '97, and at least $60,000/month for all of 1998." (Emphasis added.)

***8** Thus, the record on appeal is devoid of any profit being realized by either HKK or Metrovox on the subject enterprise constituting the joint venture. The cause of action for "intentional interference" must fail for this reason alone

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and the ruling on the motion for nonsuit is found to be error free.

We find it unnecessary to address HKK's remaining contentions on the issue of intentional interference in view of our holding that the cause of action fails as a matter of law for failure of proof of the fifth element, i.e., "damages."

**Nonsuit on the "negligent interference" cause of action was proper.**

[6] After expressing skepticism concerning the legal viability of HKK's cause of action for negligent interference with economic relationships in California, [FN5] Metrovox seems to assume for the sake of argument that even if such a controversial claim were to be recognized, the elements set forth by HHK in its opening brief must fail for want of proof. Metrovox repeats those element, six in number, as follows:

FN5. Metrovox spars with HKK in its opening brief concerning the exact nature of the cause of action being asserted by HKK. Metrovox maintains that there is no recognized cause of action for negligent interference with the performance of existing contracts in California, citing *Fifield Manor v. Finston* (1960) 54 Cal.2d 632, 636, 7 Cal.Rptr. 377, 354 P.2d 1073 in support of its position but concedes the existence of a cause of action for the tort of negligent interference with prospective business advantage and relies on *J'aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60in support of its conclusion. Metrovox contends that if this court considers the tort of negligent interference with prospective economic advantage, it should have leave to file additional "papers" to fully brief an issue not raised by HKK in its opening brief. This court sees no necessity to involve itself to referee this sparing match in view of our holding that the element of *damages* would have to be proved in any event, and as held in this opinion, *no* damages by way of evidence are extant in this case. Accordingly, Metrovox's request to file further "papers" is denied.

(1) A valid contract between plaintiff and a third party;
(2) [d]efendant knew or should have known of the relationship;
(3) defendant was negligent, in that it failed to exercise due care;
(4) defendant owes plaintiff a duty of care;
(5) actual breach or disruption of the contractual relationship; and
(6) resulting damage.

We gravitate to element number six pertaining to the existence of resulting damage. No reason appears to repeat our holding as to lack of evidence to prove lost profits in finding that the cause of action for intentional interference with economic relationships must fail as a matter of law. Whether the cause of action for negligent interference with economic relationships exists or doesn't exist is overshadowed by the fact that "loss of profits" would have to be proved as an essential element. As stated *supra,* the record is devoid of evidence of lost profits. For the reasons previously stated, the cause of action must similarly fail as a matter of law for failure of proof of resultant damages. The trial court was correct in granting Metrovox's motion for nonsuit on HHK's cause of action for negligent interference with economic relationships.

**The attorneys' fees award.**

Following the jury verdict and the judgment entered thereon, Metrovox filed a written motion for attorneys' fees pursuant to Civil Code section 3426.4. HKK filed written opposition. A written reply was filed by Metrovox, followed by further written, supplemental opposition by HKK. The matter was heard on April 25, 2002, wherein the trial court granted the motion for attorneys' fees in the amount of $133,811. [FN6]

FN6. HKK's motion to tax costs was also heard and denied on April 25, 2002. Total costs in the sum of $15,502 were allowed to Metrovox. The propriety and/or the amount of the "costs" award are not issues raised in the appeal.

***Standard of review.***

[7] Civil Code section 3426.4 provides: "If a claim of misappropriation is made in bad faith, a motion to terminate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the court may award reasonable attorneys' fees to the prevailing party." From the face of the statute it is conspicuous that the trial court is to exercise its *discretion* in awarding such fees. Otherwise the legislature would not have used the words "may" and "reasonable" in authorizing such an award under the statute. As stated in West Coast Development v. Reed (1992) 2 Cal.App.4th 693, 697-698, 3 Cal.Rptr.2d 790, in the context of sanctions imposed under section 128.5 for bad faith tactics: "This is, then, principally a review of the evidence supporting the trial judge's determination. Thus, we search for 'substantial' evidence in support of the court's implied findings. Assuming some evidence exists in support of the factual findings, the trial court's exercise of discretion will not be disturbed unless it exceeds the bounds of reason." (Citations omitted.)

***9** We note that there is a dearth of authority on the interpretation of Civil Code section 3426.4. as it pertains to an award of attorneys' fees. Both Counsel have directed our attention to the only case on the subject, i.e. *Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249, 116 Cal.Rptr.2d 358. The court noted that the Uniform Trades Secrets Act ("UTSA") does not define "bad faith" as used in Civil Code section 3426.4 and the appellate court was unable to locate any California decisions interpreting the term. The *Gemini* court relied on a federal decision entitled *Stilwell Development v. Chen* (C.D.Cal.1989) 11 U.S.P.Q.2d 1328 in coming to the conclusion that "bad faith" under Civil Code section 3426.4 required the presence of objective speciousness of the plaintiff's claim and plaintiff's subjective misconduct in bringing or maintaining a claim for misappropriation of trade secrets. The *Gemini* court rejected the argument that the standard set forth in section 128.5 as to "bad faith" should apply in interpreting Civil Code section 3426.4, for the reason that, unlike section 128.5, Civil Code section 3426.4 contains no reference to the word "frivolous." The reasoning of the *Gemini* court was as follows:

"Gemini challenges the propriety of the attorney fees award to CCS. The court relied on section 3426.4, a provision of the Uniform Trade Secrets Act (UTSA) (§ 3426 et seq.), which provides: 'If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party.'

"The UTSA does not define 'bad faith' as used in section 3426.4, and apparently there is no reported California case interpreting the term. In *Stilwell Development, Inc. v. Chen* (C.D.Cal. Apr. 25, 1989, No. CV86 4487 GHK) 1989 U.S. Dist. Lexis 5971 (*Stilwell* ), a federal court noted the legislative history of section 3426.4 shows it is intended to ' "allow[ ] a court to award reasonable attorney fees to a prevailing party in specified circumstances as a *deterrent* to *specious* claims of misappropriation...." [Citation.]' (*Stilwell, supra,* 1989 U.S. Dist. Lexis 5971 at p. 9, italics added.) The court concluded that '[a]s to deterrence, ... it requires conduct more culpable than mere negligence. To be deterrable, conduct must be at least reckless or grossly negligent, if not intentional and willful. Webster's defines specious as, among other things, "apparently right or proper: superficially fair, just, or correct but not so in reality...." [Citation.] Thus, the claim must have been without substance in reality, if not frivolous.' (*Ibid.*, citing Webster's 3d New Internat. Dict. (1986) p. 1287.)

"The *Stilwell* court interpreted 'bad faith' under section 3426.4 to require objective speciousness of the plaintiff's claim and its subjective misconduct in bringing or maintaining a claim for misappropriation of trade secrets. (*Stilwell, supra,* 1989 U.S. Dist. Lexis 5971, accord, *Alamar Biosciences, Inc. v. Difco Laboratories, Inc.* (E.D.Cal. Feb. 23, 1996, No. CIV S 94 1856 DFL PAN) 1996 U.S. Dist. Lexis 18239 (*Alamar* ); *VSL Corporation v. General Technologies, Inc.* (N.D.Cal. Jan. 5, 1998, No. C 96 20446 RMW(PVT)) 1998 U.S. Dist. Lexis 7377.) The court awarded attorney fees in *Stilwell,* finding that as to the objective component, the plaintiffs produced no evidence of confidentiality of the information or misappropriation. As to the subjective component, the court inferred from the complete failure of proof that the plaintiffs must have knowingly and intentionally prosecuted a specious claim. (*Stilwell, supra,* 1989 U.S. Dist. Lexis 5971.)

***10** "Gemini contends that in interpreting section 3426.4,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

we should apply the standard of Code of Civil Procedure section 128.5, subdivision (a), which provides: 'Every trial court may order a party, the party's attorney or both to pay any reasonable expenses, including attorney's fees, incurred by another party as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay.' Whether an action is 'frivolous' under Code of Civil Procedure section 128.5 'is governed by an objective standard: Any reasonable attorney would agree it is totally and completely without merit. [Citation.] But there must also be a showing of an improper purpose, i.e., *subjective* bad faith on the part of the attorney or party to be sanctioned. [Citation.]' (*In re Marriage of Reese & Guy* (1999) 73 Cal.App.4th 1214, 1220-1221 [87 Cal.Rptr.2d 339].)

[8] "Unlike Code of Civil Procedure section 128.5, subdivision (a), however, section 3426.4 does not contain the word 'frivolous.' Moreover, in enacting section 3426.4 the Legislature was concerned with curbing 'specious' actions for misappropriation of trade secrets, and such actions may superficially appear to have merit. We find *Stilwell* persuasive and conclude that 'bad faith' for purposes of section 3426.4 requires objective speciousness of the plaintiff's claim, as opposed to frivolousness, and its subjective bad faith in bringing or maintaining the claim." (*Gemini Aluminum Corp. v. California Custom Shapes, Inc., supra,* 95 Cal.App.4th at pp. 1261- 1262, 116 Cal.Rptr.2d 358.)

We find the reasoning of the *Gemini* court to be persuasive on the point and we accordingly adopt the standard set forth in *Gemini* that "bad faith" for purposes of Civil Code section 3426.4 requires objective *speciousness* of the plaintiff's claim and the plaintiff's subjective bad faith in bringing or maintaining the claim. The judgment of the trial court in awarding attorneys' fees under Civil Code section 3426.4 is supported by substantial evidence and the law and we find that the trial court was free from error in considering and awarding such fees.

***Refusal to apportion was not error.***

The claim of Metrovox for attorneys' fees totaled $220,385. The court awarded fees in the amount of $133,811 derived from the period November 2001 through February 2002. HKK maintains it was arbitrary and unreasonable for the court to award all fees requested for this period of time because the fees incurred by defense counsel occurred during the last four months in which litigation costs were the heaviest and included litigating all seven causes of action instead of a single cause of action for misappropriation. HKK opines that only one-seventh of the sum requested should have been allowed or the sum of $31,483.57. Failure to apportion, argues HKK, was an act exceeding the bounds of reason. [FN7]

FN7. HKK does not challenge the legitimacy of the amount of fees requested by Metrovox, but only the trial court's refusal to apportion the fee request to a single cause of action arising from the "misappropriation" claim.

[9] Metrovox responds by relying on the recent California decision in *Akins v. Enterprise Rent-a-Car* (2000) 79 Cal.App.4th 1127, 94 Cal.Rptr.2d 448, where the court states at page 1133: "When a cause of action for which attorney fees are provided by statute is joined with other causes of action for which attorney fees are not permitted, the prevailing party may recover only on the statutory cause of action. However, the joinder of causes of action should not dilute the right to attorney fees. Such fees need not be apportioned when incurred for representation of an issue common to both a cause of action for which fees are permitted and for which they are not. All expenses incurred on the common issues qualify for an award. [Citation.] *When the liability issues are so interrelated that it would have been impossible to separate them into claims for which attorney fees are properly awarded and claims for which they are not, then allocation is not required.*" (Emphasis added.) Metrovox also relies on the California Supreme Court decision in *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129-130, 158 Cal.Rptr. 1, 599 P.2d 83 teaching that "[A]ttorneys fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which the fees are proper and one in which they are not allowed."

***11** We are persuaded that the allowance of attorneys' fees in this instance was well within reason and no abuse of discretion occurred. The core theme of all causes of actions

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contained in HKK's complaint as analyzed by Metrovox is that Metrovox "stole HKK's trade secrets, used the trade secrets to copy HKK's popcorn, and stole HKK's customer accounts by selling them what they thought was HKK popcorn." The award of $133,811 was not erroneous.

***Misappropriation claim was objectively and subjectively specious.***

[10] We now address HKK's contentions that the cause of action for misappropriation was free of speciousness, both objectively and subjectively.

[11] For the meaning of "specious" we look to the definition provided by the *Gemini* court, i.e., "... that the claim was seemingly just or fair, but not so in reality." (Gemini, supra, 95 Cal.App.4th at p. 1261, 116 Cal.Rptr.2d 358.)

We once again gravitate to the complete failure of HKK's proof with respect to the elements of damages in finding that HKK was objectively and subjectively in bad faith for pursuing the misappropriation claim against Metrovox. The court focused its analysis on two letters in reaching its determination that HKK's claims were specious and in bad faith. In looking at two letters from Magnavox, the court stated that the letters are "... very strong in attempting in a straightforward way [to] bring it to the attention of the plaintiffs['] counsel that you do not have ... a case here."

The letter of attorney Glen L. Kulik states in relevant part: "... I see very little evidence of any potential liability in this case. I see even less evidence of any appreciable damage.... In the final analysis, HKK was a financially losing venture before the Metrovox relationship, during the brief duration of that relationship, and in the nearly three and a half years since the relationship ended. No matter how good the product, there does not appear to be much profit in selling gourmet popcorn products. We recognize Mr. Hardie has ample resources with which to pursue this action whether or not it has any merit. We certainly hope, however, upon further reflection, he will conclude there are better things to do with his time and money...."

In a follow up letter dated January 28, 2002, attorney Kulik stated in relevant portions thereof as follows: "I am disappointed you (and your client) did not show the courtesy of responding to our settlement offer. As I stated then, and repeat now, I see very little evidence of any potential wrongdoing and I see absolutely *no evidence of damage.* Your client has not made one dime of profit in this business in nearly 12 years, either before, during, or after its relationship with Metrovox ... I can only surmise Mr. Hardie is trying to recoup from my client 12 years of consistent losses in this failed business endeavor. This case is, in my view, so *specious* that I am telling you and Mr. Hardie flat out that if the defendants prevail in this case, they will be filing an action for malicious prosecution given the serious damage that has been caused to them...." (Emphasis added.)

***12** The court revealed its thinking on the speciousness of HKK's action by stating that at least a few months before trial, "I feel the plaintiffs should have done the analysis that told them what the jury told them and what I told them in dismissing five causes of action and individuals."

The court did not err in finding HKK's claim for misappropriation under the UTSA to be objectively and subjectively specious and in bad faith.

DISPOSITION

The judgment is affirmed. Respondents to recover costs on appeal.

We concur: PERLUSS, P.J. and JOHNSON, J.

2003 WL 21640642 (Cal.App. 2 Dist.) Not Officially Published, (Cal. Rules of Court, Rules 976, 977)

**Briefs and Other Related Documents** (Back to top)

. 2003 WL 21756171 (Appellate Brief) Appellant's Reply Brief (Apr. 16, 2003)Original Image of this Document (PDF)

. 2003 WL 21977323 (Appellate Brief) Respondents' Brief (Mar. 06, 2003)Original Image of this Document (PDF)

. 2002 WL 32146259 (Appellate Brief) Appellant's Opening Brief (Dec. 02, 2002)Original Image of this Document (PDF)

. B158352 (Docket) (Apr. 25, 2002)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.