Anderson Aff. Ex. 00035

Westlaw.

141 F.3d 1159 (Table)
141 F.3d 1159 (Table), 1998 WL 141211 (4th Cir.(S.C.))
**Unpublished Disposition**
**(Cite as: 141 F.3d 1159, 1998 WL 141211 (4th Cir.(S.C.)))**



**Briefs and Other Related Documents**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.
Carol O. LUCAS, Jr., Plaintiff-Appellant,
v.
AVERY DENNISON CORPORATION,
Defendant-Appellee.
**No. 97-1806.**

Submitted: Feb. 27, 1998.
Decided: March 27, 1998.

Appeal from the United States District Court for the District of South Carolina, at Columbia, (CA-96-1445-3-19); Dennis W. Shedd, District Judge.

S. Jahue Moore, KIRKLAND, WILSON, MOORE, ALLEN, TAYLOR & O'DAY, P.A., West Columbia, South Carolina, for Appellant.

Clarke W. DuBose, SINKLER & BOYD, P.A., Columbia, South Carolina, for Appellee.

Before WILKINSON, Chief Judge, ERVIN, Circuit Judge, and HALL, Senior Circuit Judge.

OPINION

PER CURIAM:

****1** This case arises out of a diversity action by Carol O. Lucas, Jr., against Avery Dennison Corporation ("Avery"), in which Lucas asserted claims of misappropriation of a trade secret and breach of contract. [FN1] The claims are based on Lucas's assertion that he contacted Avery with an idea for a time-saving product that Avery ultimately stole, developed, and marketed as the "Letter N' Label," a form of stationary with a removable address label. Lucas appeals from the district court's order granting summary judgment and the order awarding attorney's fees in the amount of $5197 in favor of Avery. We dismiss in part and affirm in part.

FN1. The misappropriation of trade secrets claim was brought pursuant to the South Carolina Uniform Trade Secrets Act, ("SCUTSA"), S.C.Code Ann. §§ 39-8-1 through 39-8-9 (Law.Co-op.Supp.1997) (repealed May 21, 1997).

Lucas filed an untimely notice of appeal from the district court's order granting summary judgment. The order awarding summary judgment is the final judgment on the merits, and the subsequent order awarding attorney's fees did not affect the running of the period for filing a notice of appeal. *See Budinich v. Becton Dickinson & Co.,* 486 U.S. 196, 202-03, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988). The time periods for filing notices of appeal are governed by Fed. R.App. P. 4. These periods are " 'mandatory and jurisdictional.' " *Browder v. Director, Dep't of Corrections,* 434 U.S. 257, 264, 98 S.Ct. 556, 54 L.Ed.2d 521 (1978) (quoting *United States v. Robinson,* 361 U.S. 220, 229, 80 S.Ct. 282, 4 L.Ed.2d 259 (1960)). Parties to civil actions have thirty days within which to file in the district court notices of appeal from judgments or final orders. *See* Fed. R.App. P. 4(a)(1). The only exceptions to the appeal period are when the district court extends the time to appeal under Fed. R.App. P. 4(a)(5) or reopens the appeal period under Fed. R.App. P. 4(a)(6).

The district court entered its order on April 25, 1997; Lucas's notice of appeal was filed on June 12, 1997, which is beyond the thirty-day appeal period. Lucas's failure to note a timely appeal or obtain an extension of the appeal period leaves this court without jurisdiction to consider the merits of Lucas's appeal from the district court's grant of summary judgment. We therefore dismiss the appeal as to that order. *See Budinich,* 486 U.S. at 203.

Lucas's notice of appeal was timely as to the order awarding attorney's fees in the amount of $5197 in favor of Avery. The district court found that Avery was entitled to attorney's fees under SCUTSA because Lucas pursued his claims in bad faith. *See* S.C.Code Ann. § 39-8-4 (Law.Co-op.Supp.1997) (repealed May 21, 1997). Even

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

though no reported South Carolina case had interpreted the meaning of bad faith under SCUTSA, the court applied the note that accompanies § 39-8-4 and inferred that the pursuit of a specious claim constituted bad faith. The district court found that Lucas should have known at the end of the discovery period that his claims were baseless. [FN2] Accordingly, because Lucas continued to pursue his claims even after it became clear that he had no cause of action, the court ordered him to pay attorney's fees that Avery incurred after the close of the discovery period.

FN2. Avery produced documents during discovery that proved that an Avery employee conceived the idea for the "Letter N' Label" before Lucas's first contact with the company. The documents also established that Avery had begun developing the product and researching whether a patent for this type of product existed before Lucas revealed any meaningful information about his product idea.

****2** This court reviews an award of attorney's fees for an abuse of discretion. *See Plyler v. Evatt,* 902 F.2d 273, 277-78 (4th Cir.1990). As the district court properly found, Lucas failed to present even a scintilla of evidence to contradict the documentation presented by Avery that proved that Avery had begun development of the"Letter N' Label" before Lucas's first contact with the company or that Avery's evidence was not genuine. Further, in determining the amount of attorney's fees to award under South Carolina law, the district court properly considered the factors enumerated in *Dedes v. Strickland,* 307 S.C. 155, 414 S.E.2d 134, 137 (S.C.1992). Accordingly, we find that the award of attorney's fees in the amount of $5197 was not an abuse of discretion.

We dismiss the appeal as to the district court's grant of summary judgment and affirm as to the court's award of attorney's fees in the amount of $5197.

*AFFIRMED IN PART, DISMISSED IN PART*

141 F.3d 1159 (Table), 1998 WL 141211 (4th Cir.(S.C.))
Unpublished Disposition

**Briefs and Other Related Documents (Back to top)**

. 1997 WL 33492197 (Appellate Brief) Brief of Appellee (Oct. 03, 1997)Original Image of this Document (PDF)

. 1997 WL 33492196 (Appellate Brief) Appellant's Brief (Sep. 04, 1997)Original Image of this Document (PDF)

. 97-1806 (Docket) (Jun. 19, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**H**

**Motions, Pleadings and Filings**

United States District Court, S.D. Florida.
DICTIOMATIC, INC., a Florida corporation and Domingo Linale, an individual,
Plaintiffs,
v.
UNITED STATES FIDELITY & GUARANTY COMPANY, a Maryland corporation, Defendant.
**No. 93-2123-CIV-PAINE, 94-1692-CIV-PAINE.**

May 2, 2000.

Wampler, Buchanan & Breen, Joseph Randolph Buchanan, Esq., James Breen, Esq., Miami, Counsel for Wampler, Buchanan & Breen.

Mesa, Rodriguez & Machado, P.A., Albert J. Ziques, Esq., Miami, Counsel for Dictiomatic and Domingo Linale.

Butler Burnette Pappas, John J. Pappas, Esq., Matthew L. Litsky, Esq., Tampa, Counsel for Defendant USF & G.

AMENDED REPORT AND RECOMMENDATION [FN1]

FN1. The within Report and Recommendation is being amended solely to correct the following scrivener's errors: on page 2 the correct hearing date of March 2, 2000 has been substituted for March 3, 2000; and, at the first full paragraph on page 3 the party USF & G has been substituted for the incorrectly identified party of Dictiomatic. In all other respects the Report and Recommendation remains the same, with no substantive changes having been made.

PAINE.

***1** THIS CAUSE is before the Court pursuant to an order of reference entered by the Honorable James C. Paine, United States District Judge for the Southern District of Florida in which he directed the undersigned United States Magistrate Judge to hold an evidentiary hearing and issue a Report and Recommendation as to the reasonable amount of attorneys fees and costs incurred by the Defendant United States Fidelity & Guaranty Company ("USF & G") in defense of this case. Pursuant to Judge Paine's Order the undersigned conducted an evidentiary hearing on this matter on February 24 and March 3, 2000. Having reviewed Judge Paine's Order granting Defendant's Motion for Attorney's Fees and Costs against Plaintiffs and their counsel, memoranda of the parties, the Verified Complaint, various pleadings of record, affidavits, discovery responses, billing statements and other matters of record and having heard arguments of counsel and taken oral testimony from witnesses at the hearing held February 24 and March 3, 2000, the undersigned issues the following recommendation.

BACKGROUND

USF & G initiated the underlying action on August 17, 1993, by filing a Declaratory Judgment Complaint in the United States District Court for the Middle District of Florida. Dictiomatic, Inc. ("Dictiomatic") subsequently filed its own Complaint in the United States District Court for the Southern District of Florida on October 23, 1993, consisting of seven counts (two counts for breach of insurance contract; two counts for breach of good faith under Florida Statutes § 624.155; two counts for fraud; and one count for violation of provisions of Florida Statutes § 772.11, Florida Civil Remedies for Criminal Practices). Pursuant to a motion filed by Dictiomatic in the Declaratory Judgment case, Judge Merryday found no basis for venue in the Middle District and, on August 11, 1994, entered an order transferring the Declaratory Judgment action filed by USF & G to the Southern District of Florida. Prior to trial, the District Court bifurcated the bad faith and fraud claims from the breach of contract claims. After a 10 day trial during which Dictiomatic was permitted ample opportunity to prove the factual allegations of its breach of contract claims (Counts I and II), the District Court dismissed the action with prejudice. USF & G did not present any witnesses at trial, nor did Mr. Wright or Mr. Winsky testify as experts and, as such, were not court appointed experts. Subsequently, Judge Paine granted Dictiomatic's Motion to Dismiss Counts V, VI and VII and on March 24, 1997, entered an Order dismissing those Counts without prejudice.

Thereafter, USF & G filed a Motion for Attorney's Fees and costs against Plaintiffs and Their Counsel. In said Motion USF & G argued that the Plaintiffs were liable for attorney's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fees and costs pursuant to various Florida laws, namely, the offer of judgment rule, the civil theft statute and the frivolous claim bar provided for in Fla. Stat. § 57.105. USF & G further contended that Plaintiffs' counsel was personally liable pursuant to the bad-faith exception contained in 28 U.S.C. § 1927. By Order dated June 15, 1999, Judge Paine granted USF & G's Motion in its entirety, specifically finding that the claims of Plaintiffs were frivolous and the conduct of Plaintiffs' counsel, Wampler, Buchanan & Breen, P.A. ("WBB"), was vexatious as a matter of law. The District Court then referred the matter to the undersigned United States Magistrate Judge to hold an evidentiary hearing and issue a Report and Recommendation "as to the reasonable amount of attorneys fees and costs incurred by the Defendant USF & G in defense of this case." Order of June 15, 1999, p .27.

*2 Pursuant to Judge Paine's Order the attorneys' fee judgment runs against Plaintiffs and Plaintiffs' counsel, WBB, jointly and severally [FN2]. WBB has submitted written pleadings, has conducted discovery and has participated in the hearing set by this Court in connection with the undersigned's job of assessing the reasonable amount of attorney's fees. Counsel for Plaintiffs have received notice of all proceedings within USF & G's fee claim, including the depositions conducted and the February 24, 2000, hearing but have not participated whatsoever in such proceedings. [FN3] Accordingly, the within determination as to the reasonable amount of attorney's fees and costs incurred by USF & G in defense of this case shall apply with equal force to Plaintiffs by default.

FN2. Whether the judgment against WBB shall extend only to the law firm or shall also extend to the individual partners or to the partners who handled and were responsible for the case is an issue for Judge Paine to decide.

FN3. The undersigned notes that Dictiomatic is out of business and its principal Domingo Linale is deceased.

LEGAL ANALYSIS

By Order dated June 15, 1999, Judge Paine determined the conduct of Plaintiffs' counsel, WBB, to be vexatious as a matter of law and on that basis held that WBB was personally liable for the attorney's fees and costs incurred by USF & G in defense of the case pursuant to the bad-faith exception contained in 28 U.S.C. § 1927. Title 28 U.S.C. § 1927 provides:

> Any Attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct.

The statute allows district courts to "assess attorney's fees against litigants, counsel, and law firms who willfully abuse the judicial process by conduct tantamount to bad faith." *Avirgan v. Hull*, 932 F.2d 1572, 1582 (11th Cir.1991); *Roadway Express Inc. v. Piper*, 447 U.S. 752 (1980). The matter is now before the undersigned for purposes of issuing a Report and Recommendation as to the reasonable amount of attorney's fees and costs that should be assessed.

ATTORNEY'S FEES

Where, as here, the award of attorney's fees and costs is pursuant to a federal statute, federal law applies. *Hinkle v. Chicago St. Paul Minneapolis and Omaha Railway Company*, 284 U.S. 444 (1932). The starting point in any "reasonable fee" determination is the number of hours reasonably expended on the litigation multiplied by the reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424 (1983); *Popham v. Kennesaw*, 820 F.2d 1570, 1578 (11th Cir.1987). The resulting figure, known as the "Lodestar", may thereafter be enhanced or reduced based on the results obtained or the risk of non-payment. *Pennsylvania v. Delaware Valley Citizens Council II*, ("Delaware II") 483 U.S. 711, 745 (1987); *Pennsylvania v. Delaware Valley Citizens Council I*, ("Delaware I") 478 U.S. 546 (1986).

We now move to a determination of the reasonable hourly rate. The burden is on the moving party to establish the prevailing market rate, which is the rate charged in the community by lawyers of reasonably comparable skill, experience and reputation for similar services. *Blum v. Stenson*, 465 U.S. 886, 895 and 896 n. 11 (1984); *NAACP v. City of Evergreen*, 812 F.2d 1332, 1338 (11th cir.1987);

Gaines v. Dougherty Co. Bd. of Education, 775 F.2d 1565, 1571 (11th Cir.1985). "The decision regarding the appropriate hourly rate may be made either by analyzing the affidavits submitted by counsel or, if this documentation is insufficient, by relying upon the court's expertise." *Avirgan v. Hull*, 705 F.Supp. 1544, 1549 (S.D.Fla.1989) (J. King) (citing Norman v. Housing Authority of City of Montgomery, 836 F.2d 1292, 1303 (11th Cir.1988)). Satisfactory evidence of the market rate requires more than the mere affidavit of the attorney performing the work. *Blum*, 465 U.S. at 896 n. 11. Also insufficient is testimony that a given fee is reasonable; evidence must be of rates actually billed and paid. *Hensley*, 461 U.S. at 439 n. 15. Such evidence may be adduced from charges of lawyers under similar circumstances or by opinion evidence. *Norman*, 836 F.2d at 1299. When analyzing the market rates being attested to, the district court may wish to consider any of the twelve factors enumerated in Johnson v. Georgia Highway Express, Inc. 488 F.2d 714 (5th Cir.1974). [FN4] Delaware Valley I, 478 U.S. at 564-569. One of those factors, the hourly rate normally charged by the applicant's counsel, has been deemed the logical starting place in any rate determination. Vaughns v. Board of Education, 598 F.Supp. 1262 (D.Md.1984), *aff'd*, 770 F.2d 1245 (4th Cir.1985); *Zeffiro v. First Pennsylvania Bank, N.A.*, 574 F.Supp. 443, 447 (E.D.Pa.1983), *aff'd without opinion*, 746 F.2d 1469 (3d Cir.1984); *see also* Florida Pawnbrokers v. Fort Lauderdale, 711 F.Supp. 1084, 1086-87 (S.D.Fla.1989). Also considered probative are the rates billed in similar lawsuits and the relative skill of the attorneys involved. *Norman*, 836 F.2d at 1299.

FN4. The 12 factors enumerated in Johnson are as follows: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See* Johnson, 488 F.2d at 717-719. These factors were taken from the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2-106 (1980).

***3** In the instant case there exists a fee agreement between Butler, Burnette and Pappas ("BBP"),counsel for USF & G, and USF & G which sets an hourly rate for counsel far lower than the community market rate. [FN5] All parties agree that under these circumstances the rate to apply is the lower contract rate and not the higher rate which would customarily be charged. *See* WBB Response to USF & G's Memorandum of Law for February 24, 2000 Evidentiary Hearing on USF & G's Attorney Fee and Cost Claim filed February 23, 2000, p. 3 and USF & G's Proposed Report and Recommendations in Connection with USF & G's Fees and Costs Claim filed March 22, 2000, pp. 6-7. The contract rates charged by BBP to USF & G are set forth in Def. Exh.9, Evidentiary Hearing (essentially the contract rates for attorney's fees range from $95.00 to $150.00 and the contract rate for paralegal's services range from $49.00 to $65.00). The Court notes that while it is bound to apply the contract rate charged by BBP to USF & G, it shall take into consideration that the contract rate charged by BBP was essentially a "bargain" for USF & G. For example, the Court agrees with the testimony of USF & G's witness, Mr. Hugh Smith, when he testified at the hearing that regardless of whether USF & G should recover fees for travel, USF & G saved money by having BBP and not a West Palm Beach law firm or a Miami law firm with higher rates to represent them. Mr. Smith credibly testified that the rates for highend insurance defense, such as this first party practice matter, are higher in Miami/Dade County than those charged by BBP.

FN5. Mr. Smith determined that the reasonable hourly rate for all of the BBP attorneys that worked on the case for USF & G was consistently higher than the contract rate charged by BBP to USF & G for the particular attorney. For example, Mr. Pappas, with 17 years experience and an expert in first party property and business interruption claims, was billed at $100, $115 and $150 during

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the seven year life of this matter. A Miami or West Palm Beach attorney with Mr. Pappas' extensive experience in the field of first-party property and business interruption claims would have easily justified a rate of $175--$225 an hour. *See* Def. Exh. 9, Evidentiary Hearing.

We next move to a determination of the reasonable amount of hours incurred by USF & G in defense of this case. In ascertaining the amount of reasonable hours "excessive, redundant, or otherwise unnecessary" hours should be excluded from the amount claimed. *Hensley*, 461 U.S. at 434. In addition to deducting excessive, redundant and unnecessary hours, the district court must also deduct for time spent on unsuccessful claims. *Id.* at 435. The fee applicant' s failure to prevail on every contention raised in the lawsuit is not a justification for reduction of the fee award. *Lattimore v. Oman Construction*, 868 F.2d 437, 440 (11th Cir.1989). Unless the fee applicant obtained only limited success, where the successful and unsuccessful claims involved related legal theories, no fees should be deducted. *Hensley*, 461 U.S. at 242; *Avila v. Coca-Cola Co.*, 849 F.2d 511, 514 (11th Cir.1988); *Popham v. City of Kennesaw*, 820 F.2d 1570, 1579 (11th Cir.1987). "A plaintiff obtains only limited success when the substantive relief granted is something less than that which he would have been granted had he succeeded on the unsuccessful claim." *Avila*, 849 F.2d at 514; *see also* Erkins v. Bryan, 785 F.2d 1538, 1545-46 (11th Cir.), *cert. denied*, 479 U.S. 960 (11th Cir.1986). In determining whether to exclude hours on claims for which plaintiff did not obtain relief, the "court must consider the relationship of the claims that resulted in judgment with the claims that [did not] and the contribution, if any, made to success by the investigation and prosecution of the entire case." *Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir.), *cert. dismissed*, 453 U.S. 950 (1981).

*4 In connection with their fee claim USF & G seek $551,181.30 [FN6] they incurred in attorney's fees and paralegal fees from September 9, 1993 [FN7] through January 31, 2000, an additional $28,463.00 in attorney's fees for a fee bill dated March 14, 2000, for services rendered through February 29, 2000, and $22,610.00 for in-house counsel fees for USF & G's in-house counsel, James Kelly. WWB contests USF & G's entitlement to fees incurred for paralegals and for in-house counsel. They also seek to reduce the amount of fees for what they describe as excessive or otherwise unreasonable billing and for time spent on non-sanctioned claims. Each of these arguments shall be addressed in turn.

FN6. BBP billed USF & G $640,240.10 for attorney's fees and paralegal fees from September 9, 1993 through January 31, 2000. USF & G's expert, however, Mr. Hugh Smith, Esq. testified at his deposition and at the hearing in connection with this matter that in his review of the billing statements he had to make "some rather sharp cuts in the time as recorded by some of the attorneys for the firm." Smith Deposition, p. 130; February 24, 2000, Hearing Transcript, pp. 78-79, 130-132. These cuts resulted in Mr. Smith reducing BBP's claim for attorney's fees by approximately $87,000.00, to $551.181.30. Mr. Smith did not cut any paralegal time. While USF & G initially sought full recovery of the fees in question they have now agreed, in light of Mr. Smith's testimony, that the reasonable amount of attorney's fees and paralegal fees for the time period September 9, 1993, through January 31, 2000, is $551.181.30. *See* USF & G's Proposed Report and Recommendation, p. 22.

FN7. USF & G contends that the June 15, 1999, Order of Judge Paine is unclear as to when the attorney's fees and cost award commences to run. According to BBP, the Order could be read to mean that fees and costs should commence at the latest when WBB filed the Verified Complaint on behalf of Dictiomatic on October 26, 1993, when USF & G filed their declaratory judgment action in the Middle District of Florida on August 17, 1993, or when WBB first took action on receiving notice of the declaratory judgment action by correspondence from WBB to counsel for USF & G on September 9, 1993. At page 22 of the Proposed Report and Recommendation submitted by USF & G, Defendant sets September 9, 1993, as

the date fees and costs should begin to run. This Court disagrees. Judge Paine's Order of June 15, 1999, could not be any clearer on the issue of when fees and costs should begin to run. The last sentence of the Order provides that the "matter is hereby referred to Magistrate Judge Johnson to hold an evidentiary hearing and to issue a Recommendation as to the reasonable amount of attorneys fees and costs incurred by the defendant USF & G in defense of this matter." USF & G initiated the underlying litigation on August 17, 1993 by filing a declaratory judgment complaint in the United States District Court for the Middle District of Florida. Subsequently, Judge Merryday found no basis for venue in the Middle District and on August 11, 1994, entered an order transferring the declaratory judgment action filed by USF & G to the Southern District of Florida. In view of the foregoing the undersigned finds the date fees and costs begin to run is October 26, 1993, the date WBB filed the Verified Complaint on behalf of Dictiomatic. That is when USF & G was first forced to incur fees and costs in defense of this matter. The undersigned further concludes that USF & G should not recover any fees and costs incurred in connection with the declaratory judgment action in the Middle District.

Paralegal time may be included in the setting of attorney's fees where the work performed is that normally performed by an attorney. *Jean v. Nelson*, 863 F.2d 759, 778 (11th Cir.1988); *Maltzer v. Provident Life and Accident Insurance Company*, 843 F.Supp. 692 (M.D.Fla.1993). USF & G's expert, Mr. Hugh Smith, testified that the paralegal hours spent on this case for which USF & G was billed $133,999.70, were reasonable under the circumstances and fully recoverable. Ms. Lyons summarily opined that BBP had paralegals doing secretarial work. However, Mr. Pappas, lead attorney on the case for USF & G testified that at no time did that happen. Given the complexity of the case, given the exposure ($45 million demand from WBB), given the allegations of "bad faith," given the number of documents (over 100,000), Mr. Pappas credibly testified that indexing, tabbing and organization was crucial to presenting a competent defense for USF & G and that he would not trust that to a secretary. As for Ms. Lyons' opinion that BBP had attorneys do paralegal work, such as reviewing the production of documents by non-parties and parties, the same holds true--plus it would have been redundant to have paralegals do what attorneys would eventually have to do anyway. Moreover, it is undisputed testimony that approximately 17% of the total hours were that of Mr. Pappas, 34% that of associates that sometimes billed at a lower rate, and 49% that of paralegals that billed at a significantly lower rate. Thus, this Court finds that BBP diligently kept fees at a minimum by delegating the work down to be performed by an attorney or paralegal who was billed at a lower rate. Accordingly, this Court recommends USF & G be awarded fees for paralegal services rendered from October 26, 1993 to January 31, 2000 at the rates requested. [FN8] To the extent any of the aforementioned paralegal hours relate to work performed in connection with the declaratory judgment action said hours should be deducted from the amount awarded.

FN8. It is this Court's understanding that BBP's supplemental bill dated March 14, 2000, for services rendered through February 29, 2000, did not contain any paralegal hours.

Attorney's fees for services of in-house counsel who act primarily as liaisons between the client and outside counsel are not recoverable under 28 U.S.C. § 1927. As noted by the Eleventh Circuit in *Burger King Corporation v. Mason*, 710 F.2d 1480 (11th Cir.1983):

> *5 Attorneys fees for the services of in-house counsel are not recoverable. There is no precedent in Florida law for an award of attorneys fees for the services of in-house counsel. Cases from other jurisdictions awarding fees for the services of in-house counsel who actively tried the case are not factually similar to this case when in-house counsel acted primarily as a liaison between the client and outside counsel who had complete responsibility for the conduct of the case.

*Id.* at 1498. The courts are generally in agreement with the Eleventh Circuit's approach. *See, e.g., Federal Deposit Insurance Corporation v. Bender*, 182 F.3d 1, 5 (D.C.Cir.1999)(Where in-house counsel acts primarily as a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

liaison between the client and outside counsel, the party may not recover attorney's fees for the in-house counsel's actions); *Revlon, Inc. v. Carson Products Co.*, 622 F.Supp. 362, 365 (S.D.N.Y.1985)(reasonable fees do not include the hours in-house counsel spent acting as a liaison between the client and outside counsel), *aff'd in part and rev'd in part on other grounds,* 803 F.2d 676 (Fed.Cir.1986). Accordingly, the undersigned recommends no award be made for the $22,610.00 in fees and $4,418.26 in costs incurred by USF & G for services of in-house counsel.

The next areas of reductions WBB seeks fall into two general categories: the first category involves several items of billing which WBB claims to be excessive or otherwise unreasonable: the second category is divided into two sub-categories involving (a) a $200,000 reduction based on an early estimate by Mr. Pappas as to how much the case would cost which she classified as fees that "would have been spent anyway" regardless of the vexatious actions of WBB; and (b) as an alternative to the "$200,000 estimate reduction," a reduction of $252,033 based on what Ms. Lyons' described as the "unresolved fraud" claims. In this regard the undersigned turns to the testimony presented at the hearing. [FN9]

FN9. The Court conducted an evidentiary hearing on February 24 and March 2, 2000. USF & G called six witness in their case-in chief and one in rebuttal. Wampler Buchanan & Breen, P.A. ("WBB") called one witness in their case.

John Pappas of BBP, USF & G's counsel, testified on behalf of USF & G. Mr. Pappas was lead counsel throughout USF & G's investigation of the insurance claim, the litigation, the trial and USF & G's motion for fees and costs. The Court finds Mr. Pappas to be a specialist and expert in the area of first party property claims under insurance contracts, including business interruption claims. The Court further finds that BBP as a firm specializes in such work in and outside the State of Florida including the Southeast United States and the Carribean. There was no evidence presented at the evidentiary hearing that any "local" attorney within the Southern District or elsewhere in the State of Florida (or anywhere for that matter) shared the same expertise as BBP or Mr. Pappas necessary for this first-party property and business interruption claim.

The Court finds that the supervision of and delegation of work by Mr. Pappas to associates, paralegals and secretaries was efficient, reasonable and effective. The Court likewise finds the billing procedures employed by BBP to be reasonable and consistent with acceptable billing customs in the legal community. The Court notes that BBP is used to the extremely stringent "eye" of the legal services auditing arm of the insurance industry which provides greater incentive for such billing procedures to be reliable. Apparently, the billing descriptions were adequate for USF & G to be willing to pay such fees as reasonable and necessary, without any expectation that it would ever obtain restitution or reimbursement for such expenses.

*6 Hugh Smith testified as an expert witness on behalf of USF & G and opined that the reasonable amount of fees for USF & G's services was $551,181.30. Def. Exh. 9, Evidentiary Hearing. Mr. Smith did not review USF & G's March 14, 2000 fee bill in the amount of $28,463.00. The Court gives much weight to Mr. Smith's substantial background in Federal Court litigation and insurance matters and specifically first-party property insurance claims. The Court finds that Mr. Smith was more than conservative in his analysis of BBP's time.

Mr. Smith undertook a laborious process by creating a "timekeeper's grid" to determine the reasonable amount of hours and the reasonable rate for BBP attorneys. Def. Exh. 9, Evidentiary Hearing. Mr. Smith determined the reasonable amount of attorney hours to be 3,785.32; the reasonable amount of attorneys fees to be $416,181.60; the reasonable amount of paralegal hours to be $2,062.80; the reasonable amount of paralegal fees to be $133,999.70; and the reasonable hourly rate for all of the BBP attorneys who worked on the case for USF & G to have been consistently higher than the contract rate charged by BBP to USF & G for the particular attorney.

The Court agrees with Mr. Smith's opinion that this litigation was akin to complex commercial litigation. The Court also agrees with Mr. Smith that fees for travel time, for two attorneys to attend depositions, for attorneys to review non-party and party production of documents is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

recoverable and that such use of attorneys was reasonable given the circumstances of this case. There is further discussion on these points later in this Report and Recommendation.

Mr. Charles Murray testified on behalf USF & G. He is an Executive General Adjuster with 29 years of experience in the adjustment and litigation of first party property and business interruption claims. He has worked frequently with attorneys and experts in litigation. Mr. Murray was intimately involved in the case from the beginning of the adjustment process through the trial. He was familiar with the course of the litigation from the filing of the complaint through the trial which he attended and at which he testified. He was involved in every aspect of the claim and litigation. For example, he read all of BBP's reports, all of the depositions, the motions, the documents filed by WBB, all of the correspondence in the case, he attended the hearings and had responsibility for overseeing the payment of BBP's fees and the fees of the two experts retained by USF & G, Mr. Winsky and Mr. Wright.

Mr. Murray reviewed all of the billing statements from BBP and approved payment for all fees as reasonable and necessary based on his experience and familiarity with the claim and litigation. The only reduction in fees billed was for $10,000 based on an internal USF & G audit. All of the costs incurred in this matter by USF & G were approved by Mr. Murray, whether it was taxable costs, airfare, expert witness fees, etc. He approved payment for travel time, for two attorneys attending depositions, for attorneys reviewing non-party and party production of documents and other items that WBB has challenged because they were reasonable and absolutely necessary in his experience and based on his familiarity with the claim and litigation.

*7 The Court found Mr. Murray to be extremely credible despite his obvious interest in the outcome and also found Mr. Murray to have significant experience--29 years dealing with similar litigation and attorneys billing statements. Thus, the Court gives much weight to Mr. Murray's decision to pay all of BBP's fees (without expectation of reimbursement) and his testimony that he found BBP's work to be timely, efficient and their fees to be reasonable and absolutely necessary.

Also testifying on behalf of USF & G was James Kelly, Esq., Group Counsel with USF & G/St. Paul. Mr. Kelly has substantial experience in insurance defense matters, both first and third party, including specifically extra-contractual or "bad faith" claims, which were asserted by WBB on behalf of Dictiomatic in this litigation.

Mr. Kelly is responsible for deciding which counsel throughout the country defends USF & G when such "bad faith" claims are asserted. Given Mr. Kelly's experience, the Court gives much weight to Mr. Kelly's testimony that BBP was only one of a handful of firms in the country with whom he and USF & G would have trusted this case given the significant exposure faced by USF & G--*i.e.,* $45 million demands from WBB, claims for "bad faith," fraud in the marketing of insurance policies by USF & G, civil theft, attorneys fees, etc. The Court also accepts Mr. Kelly's testimony that BBP was in essence a "local" firm despite being located in Tampa given BBP's experience and the type of litigation involved.

Marsha Lyons testified as an expert on behalf of WBB. Although Ms. Lyons has substantial experience in Federal Court litigation, the Court gives reduced weight to her testimony given her admission that she has virtually no experience in insurance defense including first party property and business interruption claims. WBB Exhibit 2 contains Ms. Lyons' reductions of fees sought by USF & G (the "Lyons Chart"). In the Lyons Chart, Ms. Lyons made the following reductions:(a) $244,436.90 for such items as travel time, excessive work, attorneys time reduced to paralegal time and paralegal time reduced to secretarial functions (the "General Reduction"); (b) a $200,000 reduction based on an early estimate by Mr. Pappas as to how much the case would cost which she classified as fees that "would have been spent anyway" regardless of the vexatious actions of WBB; and (3) as an alternative to the "$200,000 estimate reduction," a reduction of $252,033 based on what Ms. Lyons' described as the "unresolved fraud" claims. The Court will consider each of the three categories of reductions in turn.

First, Ms. Lyons' reduction for $244,436.90--the "General Reduction"for bills WBB contends are excessive or otherwise unreasonable. Plaintiff's Exhibit 2 to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Evidentiary Hearing, which summarizes these reductions, is actually broken down into two parts regarding the $244,436.90--the first and second page identify specific bills and specific time periods for fees eliminated by Ms. Lyons. These reductions start with a "bill/time period" for February 23, 1993 on page 1 and end with September 14, 1998 on page two. The total reductions made for that "subpart" is $85,018.65.

***8** The next "subpart" within the $244,436.90 reduction reads as follows:

| Entire Period Time | | |
|---|---|---|
| | 37,043.50 | Excessive document organization, etc. |
| | 85,661.50 | Excessive time Davis |
| | 195.50 | Stronkis time eliminated |
| | 80.50 | Frank time eliminated |
| | 46 | Reynolds time eliminated |
| | 28 | Nissen time--reduce to paralegal |
| | 204.75 | Nisberg time eliminated |
| | 34,991 | Additional time expense Middle District |
| | 4,197.50 | Malkowski time eliminated |

Ms. Lyons admitted in her testimony that nothing was submitted into evidence, through testimony or documents, that "backs up" the above general reductions. She testified "it could be done, but I don't have anything like that". Hearing Transcript of March 2, 2000, p. 120. Thus, there is *no* evidence whatsoever; no specific entries, no specific bill, no specific time period identified by Ms. Lyons for the abovementioned $159,448.25 of reductions made by Ms. Lyons.

The Court finds that such general summary reduction by category, without the necessary "back up," is insufficient as a matter of law to be considered by the Court. [FN10] There simply is no evidence in the record of anything other than the general categories identified by Ms. Lyons. Thus, the only reductions that this Court will consider that were made by Ms. Lyons with respect to the first of the three separate items identified above are the $85,018.65 of specified reductions and not the general un-backed up reductions noted above.

FN10. If WBB does not identify for the Court the hours that should be disallowed, the Court is unable to develop a basis for reducing BBP's fees. *See* Fitzpatrick v. IRS, 665 F.2d 327, 332 (11th Cir.1982)

Turning to the reductions Ms. Lyons did identify by fee bill, the Court will examine certain items within this category identified by Ms. Lyons. First, travel time "cut" by Ms. Lyons. The Court finds that such time was reasonable and necessary and is recoverable. Ms. Lyons' testified that "local" counsel could have been used, thus eliminating the need for a Tampa firm such as BBP to handle the matter. However, neither she nor WBB presented any evidence whatsoever of what "other" Miami firm could have handled this first party property and business interruption claim that also involved counts for alleged "bad faith." In fact, Mr. Kelly's testimony that BBP is one of only a handful of firms in the country that USF & G would even trust with this case, was unrebutted.

Ms. Lyons also admitted that she would not have cut any travel time for a firm in West Palm Beach because such firm would have been within the Southern District. This

admission essentially "guts" Ms. Lyon's "cut" of travel time for the following reasons. It takes at least 1 and 1/2 hours if not more (*i.e.,* rush hour traffic on I-95) to drive from West Palm Beach to downtown Miami (the location of WBB's office) for a deposition and no work can be done during that drive. In contrast, attorneys can work on the plane and in airports while waiting for the plane. In fact, Mr. Pappas testified in USF & G's case in chief and in USF & G's rebuttal case that he and the attorneys in the firm make it a practice to always work on the case for which they are traveling when they travel. Further, Mr. Pappas testified that for the continued evidentiary hearing on March 2, 2000, he left his office at 8:00 a.m. and was in this Court's courtroom by 10:00 a.m. and worked while he was on the plane and while he waited for the plane. Further, Ms. Lyons admitted she would not have cut the travel time of a Miami firm in this case to drive over 3 hours to Ft. Pierce for the many hearings there before Magistrate Judge Lynch--it takes the same amount of time to drive from Tampa to Ft. Pierce.

***9** The Court accepts Mr. Pappas' testimony that his firm handles travel time efficiently for USF & G and other clients--in addition to working on the plane and in the airport, if a hearing, deposition or other matter can be handled by phone without prejudicing the client, it is done. The Court also accepts Mr. Pappas' testimony that some of the time billed as "travel time" could have easily been described as "preparation for hearing" or "preparation for deposition" given Mr. Pappas' testimony that he and other BBP attorneys work on the plane and in the airport when they travel. [FN11]

> FN11. The Court rejects Ms. Lyons' testimony that at least USF & G should have employed "local" counsel because "local" counsel would "get everything I get and know everything that I know about the case so they are ready to step in and handle whatever is necessary" because that would mean that USF & G's fee and cost bills would be doubled. Hearing Transcript of March 2, 2000, p. 50.

Turning to Ms. Lyons' alternative reduction of Mr. Pappas' $200,000 estimate, the Court rejects this opinion as nonsensical. By The Order itself and as Ms. Lyons admitted, WBB should have never responded to USF & G's Declaratory Judgment Action and should have never filed a Verified Complaint on behalf of Dictiomatic (verified by WBB). It simply does not matter how much USF & G "*expected*" to spend in anticipation of litigation--the issue is how much in reasonable fees did USF & G *actually spend* because of the vexatious actions of WBB. Ms. Lyons' erroneously presumes that Mr. Pappas' $200,000 estimate was an admission that such fees and costs would be incurred to defend against a non-frivolous claim. Not only is the record devoid of any factual support for this presumption, but Mr. Pappas testified in rebuttal that such a presumption is false and actually contradictory to the truth.

Turning next to Ms. Lyons' opinion that as an alternative to the "$200,000 estimate reduction," a reduction of $252,033 based on what Ms. Lyons' described as the "unresolved fraud" claims should be made. The Court indicated its skepticism at this theory early on the first day of the hearing. Hearing Transcript of February 2, 2000, p. 96-98. Nothing has changed and WBB has not won the "uphill battle." The assumed factual predicate underlying Ms. Lyons' opinion that the seven causes of action were factually and legally unrelated is missing.

The Verified Complaint admitted into evidence contains seven causes of action. Def. Exh. 12, Evidentiary Hearing. The first two for "breach of contract," the next two for "bad faith"; the fifth for "fraud in the marketing of the policy," the sixth for "fraud in the processing of the claim," and the seventh for Statutory Civil Theft for not paying the insurance claim.

The Verified Complaint is 57 pages long and contains 224 separate paragraphs many of which have subsections and all of which contain multiple factual allegations. The first 147 paragraphs contain multiple factual allegations and then the seven causes of action are asserted. Before each of the seven causes of action the following allegation appears:

> The Plaintiff, Dictiomatic, realleges Paragraphs 1 through 147 above as though fully set forth herein.

Ms. Lyons opined that the fraud counts dealt with "separate issues" but admitted that: (1) she did no analysis whatsoever on how much time BBP spent on the overall case defending

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the other five counts because it was not possible to break down BBP's bills although she did not find the "failure" of BBP to do so unreasonable; (2) that paragraphs 1-147 were alleged to support all seven counts; and (3) she was unable to distinguish between the "bad faith" processing of the claim counts (Counts III and IV) from Count VI for fraud in the processing of the claim.

***10** Mr. Pappas, credibly testified without any *factual* rebuttal, how USF & G through BBP defended the litigation in light of the multiple counts. The Court accepts Mr. Pappas testimony that the "bad faith" and "fraud" counts were totally dependent upon the success or not of the breach of contract counts. WBB's argument that there can still be "bad faith" even whether there is no coverage ignores the point that the best defense to the entire litigation was to prove there was no coverage. Further, WBB's argument is quite suspect when one considers that not only was there no coverage but the claim was frivolous as a matter of law pursuant to Judge Paine's Order. Surely, there is no "bad faith" when the underlying claim violates Florida Statute § 57.105 and Rule 11 as set forth in The Order.

Further, the Court accepts Mr. Pappas' unrebutted factual testimony that it would be difficult to come up with $10,000 worth of activity that could be described as specifically *only* related to these "non-adjudicated" counts and that 95% to 98% of the work performed by BBP on behalf of USF & G would *still* have been incurred if the only counts were the first two breach of contract counts that were tried and dismissed by Judge Paine.

Essentially, all of the seven counts were inextricably intertwined and the Court finds no reason to simply deduct 3/5ths of BBP's fees ($252,033) as opined by Ms. Lyons. [FN12] Further, the Court finds WBB's position somewhat disingenuous given that it was WBB who asserted these causes of action, vigorously prosecuted the causes of action, and forced USF & G through BBP to defend them and given that Judge Paine expressly found that all of the actions by WBB were vexatious as a matter of law including for example, Mr. Buchanan's $45 million demand to USF & G's counsel without regard to any specific count.

FN12. If the issues are intertwined such that the lawsuit cannot be viewed as a series of discrete claims, the attorneys should be compensated for their work on the case as a whole. *Hensely v. Eckherhart*, 461 U.S. 424, 435 (1983); *Haitian Refugee Center v. Meese*, 791 F.2d 1489, 1500 (11th Cir.1986).

The Court also finds that much of the factual predicate upon which Ms. Lyons' testimony was based was inaccurate as evidenced by Mr. Pappas' rebuttal testimony. Ms. Lyons was without the benefit of any explanation from Mr. Pappas or any BBP attorney who worked on this matter because no such inquiry was made of Mr. Pappas during his deposition in the discovery process nor at the evidentiary hearing. Mr. Pappas testified and the Court accepts that 99% of the questions asked of him at his deposition had nothing to do with any time entries. Without such factual predicate, Ms. Lyons testimony is factually unsound speculation.

For example, Ms. Lyons commented that she found it unusual that BBP had multiple copies in the approximately 140 boxes of documents related to this matter. However, Mr. Pappas testified, quite understandably, that Federal Court requires multiple copies and at trial BBP provided copies for Judge Paine, his clerk and opposing counsel of all exhibits. The Court finds this process to be reasonable and efficient.

Ms. Lyons commented that she found it unusual that BBP had put every document in chronological order. However, Mr. Pappas testified that given that it was an extremely document intensive insurance fraud case spread out of a number of years, and based on his experience, he believed the best way to prepare for trial was to put all the documents in chronological order and then review all those documents a few weeks before trial to be prepared to try this case and to conduct efficient and effective cross-examination of Plaintiff and its many fact and expert witnesses. This Court finds this procedure to be reasonable, necessary, efficient and apparently highly effective.

***11** Ms. Lyons' reduction of BBP's fees in connection with preparing USF & G's motion for fees and costs against Dictiomatic and WBB by approximately 50% is likewise rejected by the Court. Putting aside the obvious fact that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

result "speaks for itself", the record is clear that essentially USF & G had to educate Judge Paine as to all of the evidence that was never presented during the two week bench trial that saw Dictiomatic put on its case for the two weeks and then have it dismissed. USF & G had to submit virtually "everything". Pltf. Exh. 4, Evidentiary Hearing. [FN13] For example, Judge Paine did not know about the evidence in support of USF & G's "Concealment/Fraud" defense and other evidence such as Mr. Buchanan vouching for the claim, Mr. Buchanan being the only witness who could testify in support of the claim, Mr. Buchanan's demands of $21 million and $45 million and other similar evidence. USF & G had to try a case through papers on the fee motion. Accordingly, as Mr. Pappas testified, it took an enormous amount of time to prove through papers how egregious and vexatious was WBB's conduct in this matter. [FN14]

FN13. At the March 2, 2000 hearing, WBB moved into evidence USF & G's Motion for Fees and Costs without the underlying appendices. Counsel for USF & G requested that the Exhibit include the entire motion, memorandum of law and appendices, which request was granted.

FN14. It is unclear whether WBB is contesting USF & G's right to collect fees for the time spent litigating the issue of fees. To the extent WBB contests such right, this argument is rejected. This matter is before the Court on a sanction meted out by the District Court pursuant to a Federal Statute. As such we look to federal law. Unlike the law in Florida which distinguishes between time spent litigating entitlement to fees, which is recoverable, and time spent litigating amount, which is not *State Farm Fire & Casualty Co. v. Palma*, 629 So.2d 830, 832-33 (Fla.1993), federal courts make no such distinction and allow recovery of fees for litigating fees as a matter of course. *Johnson v. University College of the University of Alabama in Birmingham*, 706 F.2d 1205, 1207 (11th Cir.1983).

As for the few specific entries that Ms. Lyons did present to the Court and which were submitted into evidence, again, her opinion fails because of an incorrect factual predicate. For example, Ms. Lyons found fault with Mr. Pappas' visits to Baltimore on March 16, 1994, but Mr. Pappas testified that he met with Mr. Murray and Mr. Kelly (and USF & G's experts) to review their files and talk about the case--one where USF & G was being sued for millions of dollars, for fraud, and for "bad faith" by a Brickell Avenue law firm composed of former Assistant U.S. Attorneys. Give those circumstances, the Court finds it more than reasonable for Mr. Pappas to have traveled to Baltimore to meet with his clients and with USF & G's experts face to face. Anyway, Ms. Lyons admitted that she did not even know the "real reason" why Mr. Pappas went to Baltimore--this is the missing factual predicate from Ms. Lyons' opinions.

Another example is Ms. Lyons' finding that Mr. Pappas had no reason to travel to Los Angeles to meet with Pat Ormsby. First, Ms. Lyons did not know what role Mr. Ormsby played in the claim. Second, Mr. Pappas testified that Mr. Ormsby, who was the independent "Cat" (catastrophe adjuster) for USF & G, was a key witness because it was Mr. Ormsby who payed Plaintiffs' $50,000 property claim right away and it was Mr. Ormsby who Dictiomatic and their counsel were telling USF & G--in the Verified Complaint--that he was almost incompetent and had no understanding of Dictiomatic's multimillion dollar business interruption claim as evidenced by his offer of only a few thousand dollars for such claim. Mr. Pappas rightfully decided that given Mr. Ormsby's role, given that Mr. Ormsby was not a USF & G employee, given that Mr. Murray did not know him personally, he needed to meet Mr. Ormsby face to face to judge his credibility and since Mr. Ormsby was on "Cat" duty for a California earthquake, Mr. Pappas went to California (and USF & G paid the fees and costs associated with the trip). As stated above, the Court notes that WBB and Ms. Lyons never inquired of BBP about the specific time entries in order to determine if Ms. Lyons' opinions were based on accurate factual predicates.

***12** The final issue to address is that of interest rates--pre- and postjudgment. For the following reasons the undersigned finds USF & G is entitled to neither. In support of their position that they are entitled to pre-judgment interest on the award, USF & G relies, at once, on Florida law, federal court decisions which take into account delay in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

payment and the Court's inherent authority. [FN15] First, as we are here pursuant to a federal statute, 28 U.S.C. § 1927, for vexatious conduct which took place in federal court, state law does not apply. Second, while the undersigned recognizes that, in certain instances, the court may compensate for delay in payment by either basing the award on current rates or by adjusting the fees based on historical rates to reflect its present value, *Missouri v. Jenkins*, 491 U.S. 274 (1989); *Johnson v. University College of the University of Alabama in Birmingham*, 706 F.2d 1205, 1210-1211 (11th Cir.1983), there is no need for such adjustment here as, by BBP's own admission, they have been paid on a regular and timely basis throughout the duration of this litigation. Finally, although this Court may have equitable powers which would permit it to determine the portion of time for which interest should be allowed, *see, e.g.*, *Gibbs v. Hawaiian Eugenia Corp.*, 966 F.2d 101, 109 (2d Cir.1992), the undersigned has not been persuaded that such equitable powers should be exercised under the circumstances herein. As for post-judgment interest, this Court agrees with WBB that until Judge Paine's Sanction Order becomes a "judgment" as contemplated by Rule 54(a), no interest may accrue. *See* *Bank Atlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045 (11th Cir.1984); *Georgia Association of Retarded Citizens v. McDaniel*, 855 F.2d 794 (11th Cir.1988).

FN15. *See* USF & G's Memorandum of Law for the February 24, 2000 Evidentiary Hearing on USF & G's Attorney Fee and Cost Claim, pp. 6-8.

COSTS

We now turn to the issue of what costs can appropriately be assessed against WBB in this matter. It is undisputed that USF & G incurred and paid directly or reimbursed their counsel for payment $48,221.56 from October 26, 1993 through February 29, 2000 [FN16] in taxable costs pursuant to 28 U.S.C. § 1920. [FN17] WBB does not dispute USF & G's entitlement to these § 1920 costs. What WBB does take issue with is the award of any costs outside the scope of § 1920. There is no dispute that USF & G incurred and paid directly or reimbursed their counsel for payment of costs *in addition* to 28 U.S.C. § 1920 (excluding expert witness fees) $86,090.54 from October 26, 1993 through February 29, 2000. Def. Exh. 6, Evidentiary Hearing. It is also undisputed that USF & G incurred and paid directly the following expert witness fees:

FN16. For the reasons mentioned previously the undersigned finds the date fees and costs begin to run is October 26, 1993, the date WBB filed the Verified Complaint on behalf of Dictiomatic.

FN17. Def. Exhs. 5 & 6, Evidentiary Hearing.

a. For Greg Winsky, $39,201.03 from October 26, 1993 through January 31, 2000;
b. For Dan Wright, $68,809.67 from October 26, 1993 through January 31, 2000.

Def. Exhs. 6, 10 & 11, Evidentiary Hearing. And, finally It is undisputed that USF & G incurred $15,785.75 in fees and $48.25 in costs for USF & G's expert, Hugh Smith, who was retained as a fee expert on behalf of USF & G. Def. Exh. 8, Evidentiary Hearing.

***13** This Court agrees with WBB that the term "costs" in this instance should be limited to "taxable costs" as defined in 28 U.S .C. § 1920. The determination as to the reasonable amount of costs incurred by USF & G in the defense of this case as sanctions against WBB under 28 U.S.C. § 1927 is governed by federal law. In *Henkel v. Chicago St. Paul Minneapolis and Omaha Railway Company*, 284 U.S. 444, 447 (1932), the court held that congressional "legislation must be deemed controlling, and excludes the application in the federal courts of any state practice." Any suggestion that federal courts should look to state law as to costs in deference to the doctrine *Erie Railroad Company v. Thompkins*, 304 U.S. 64 (1938), particularly those costs mentioned in § 1920 of Title 28, is clearly unsound. *Brown v. Consolidated Fisheries Company*, 18 F.R.D. 433 (D.Del.1955). To the extent that fees are authorized by federal statute, the same analysis that pertained to the other cost provisions would apply and federal law should govern. *Exxon Corp. v. Burglin*, 42 F.3d 948, 950 (5th Cir.1995) (Federal Rules of Appellate Procedure rather than state statutes governed in determining the right to and calculation of attorneys' fees in diversity action).

The recovery of costs under 28 U.S.C § 1927 is limited to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"taxable costs" as defined in 28 U.S.C § 1920. As amended in 1980, 28 U.S.C. § 1927 provides, in part, that: "[a]ny attorney... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

"In construing 'costs,' however, we may look to the contemporaneous understanding of the term... This history suggests that § 1920 and § 1927 should be read together as part of the integrated statute approved in 1853." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 761--762 (1980). Within the meaning of this section (§ 1927) permitting a district court to require an attorney to personally satisfy costs when he "so multiplies the proceedings in any case as to increase costs unnecessarily and vexatiously," the term "costs" should be limited to taxable costs. *U.S. v. Ross*, 535 F.2d 346, 350 (6th Cir.1976). In *Ross*, the 6th Circuit determined that, because attorneys' fees are not considered "taxable costs," attorneys' fees could not be awarded as a sanction under § 1927. In response, Congress amended § 1927 in 1980 to include the term "attorneys' fees"; however, Congress did not add a definition of the term "costs" to § 1927. Hence, the definition of "costs" contained in § 1920 remains applicable. *See* Roadway Express, 447 U.S. 752.

Taxable costs under Section 1920 include fees of the clerk and marshall, fees of the court reporter for stenographic transcripts "necessarily obtained", fees for printing, fees for exemplification and copies of papers necessarily obtained for use in the case, docket fees under Section 1923, and compensation for "court appointed experts" and interpreters. Costs not specifically enumerated are not recoverable. For instance, costs incurred in mailing and sending documents by mail; express mail; facsimiles; travel expenses; and expert witness fees are not recoverable. *See Tang How v. Edward J. Gerris, Inc.*, 756 F.Supp. 1540, 1545 (S.D.Fla.1991), *aff'd*, 961 F.2d 174 (11th Cir.1992). Additionally, "general copying, computerized legal research, postage (and) courthouse parking fees...are clearly not recoverable." *Duckworth v. Whisenant*, 97 F.3d 1393, 1399 (11th Cir.1996). Likewise, costs incurred in enlarging exhibits are not recoverable. *Charter Medical Corporation v. Cardin*, 127 F.R.D. 111, 114 ( D. Maryland 1989). The costs incurred for equipment rental and fees to a videographer for playback of video depositions at trial are not taxable costs. *Morrison v. Reichhold Chemicals, Inc.*, 97 F.3d 460,465 (11th Cir.1996).

***14** This Court likewise agrees with WBB that expert witness fees may not be taxed as costs under 28 U.S.C § 1927 in excess of the limits set out in 28 U.S.C. § 1821. In the absence of any other explicit statutory authority for taxing expert witness fees as costs, the costs which the court may tax pursuant to federal rule are governed by the general statute on taxing costs. 28 U.S.C. § 1920. *Crawford Fitting Co. V. J.T. Gibbons, Inc.* 482 U.S. 437, 439 (1987); *In re: Philadelphia Mortgage Trust*, 930 F.2d 306, 307 (3d Circuit 1991). In *Crawford Fitting Company v. J.T. Gibbons, Inc.*, 482 U.S. 437, 439 (1987), the Supreme Court held that when a party who seeks reimbursement for fees paid to its own expert witness, a federal court is bound by the limits of § 1821(b). The Court went on to state that:

> We think that it is clear that in §§ 1920 and 1821, Congress comprehensively addressed the taxation of fees for litigants' witnesses. This conclusion is all the more compelling when we consider that § 1920(6) allows the taxation, as a cost, of the compensation of court-appointed expert witnesses. There is no provision that sets a limit on the compensation for court-appointed expert witnesses in the way that § 1821(b) sets a limit for litigants' witnesses. It is therefore clear that when Congress meant to set a limit on fees, it knew how to do so. We think that the inescapable effect of these sections in combination is that a federal court may tax expert witness fees in excess of $30-per-day limit set out in § 1821(b) only when the witness is court appointed.

482 U.S. at 442.

In *Morrison v. Reichhold Chemicals, Inc.*, 97 F.3d 460, 462 (11th Cir.1996) the Eleventh Circuit adopted the *Crawford* analysis in holding that the District Court erred in taxing fees in excess of the statutorily prescribed limits of § 1821 and 1920 regarding expert witnesses. *See also Glenn v. General Motors Corp.*, 841 F.2d 1567, 1575 (11th Cir.1988) (reversing the district's court award of expert witness fees pursuant to 28 U.S.C. § 216(b) stating that the district court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

had erred in awarding expert witness fees in excess of the amount permitted by 28 U.S.C. § 1920; In so ruling the court held that the broad language in *Crawford Fitting* does not permit a distinction whether or not the award is made under a fee-shifting statute or under the Federal Rules of Civil Procedure). [FN18] In their Memorandum, USF & G mistakenly relies on the Eleventh Circuit's decision in *Barnes v. Dalton*, 158 F3d 1212 (11th Cir.1998). In *Barnes*, the District Court recognized that it could not award expert witness fees as a sanction under 28 U.S.C. § 1927 and, thus, chose to award the fees under the Court's "inherent powers." Unlike *Barnes*, however, Judge Paine in this case specifically held that the award of attorney's fees and costs were made pursuant to 28 U.S.C. § 1927 and referred the matter to the undersigned United States Magistrate Judge for a determination of the reasonable amount of attorney's fees and costs properly awardable under that section. Accordingly this Court finds that neither costs beyond those contemplated by § 1920 nor expert witness fees in excess of the limits set out in 28 U.S.C. § 1821 are properly awardable herein.

FN18. This interpretation was later adopted by the Supreme Court in *West Va. Univ. Hospitals v. Casey*, 499 U.S. 83 (1991).

CONCLUSION

***15** USF & G bears the burden of documenting the appropriate hours and hourly rates. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). USF & G has more than met its burden. Given that a contract for fees is involved, USF & G is limited to its contract rate and cannot recover a higher "reasonable hourly rate"--although the Court does take into consideration that USF & G received a "bargain" with respect to the hourly rate charged by BBP.

This Court must determine the reasonable amount of hours. *Norman v. Housing Authority*, 836 F.2d 1292, 1301 (11th Cir.1988). Excessive, redundant or otherwise unnecessary hours should be excluded. *Id.* Generalized statements that time spent was unreasonable is not entitled to much weight. *Hensley v. Eckerhart*, 461 U.S. 424, 439 n. 15 (1983); *Norman*, 836 F.2d at 1301. As the Court must be reasonably precise in excluding hours thought to be unreasonable or unnecessary, so should be the objections and proof from fee opponents. *Id.*

This was essentially an insurance fraud case where, as The Order makes clear, the uncooperative effort of Plaintiff and its counsel, WBB, who had all the knowledge underlying the frivolous insurance business interruption claim, forced USF & G and its counsel to uncover the truth, which was a substantial task given the complexity of the issues and the more than 100,000 relevant documents. One cannot fault USF & G or its counsel, BBP, for its defense of this case given the Verified Complaint sought as much as $45 million in compensatory, consequential, or punitive damages, and attorneys fees.

This Court finds that the quality and the results of the legal services for USF & G paid were of the highest caliber. Not only was BBP able to get Plaintiffs' $45 million claim dismissed with prejudice before having to put on its case, but Judge Paine's written decision 958 F.Supp. 594 (S.D.Fla.1997) stands as the leading published decision in the country on the topic of a business interruption claim. A reading of this case is factual evidence of its complexity and the need for USF & G's counsel to be thoroughly prepared.

The fees and costs incurred by USF & G were subject to rigorous internal review through BBP's billing procedures and to rigorous review and audit by one of the nations biggest and most sophisticated property and casualty insurers. Knowing the Plaintiff was "judgment proof," and USF & G would have slight chance of recovering any of these expenses, USF & G, as a sophisticated litigant, willingly incurred and paid them as was reasonable and necessary. In accordance with the above and foregoing, it is hereby,

RECOMMENDED as follows:

1. The time period for which USF & G may recover fees and costs should be October 26, 1993, the date WBB filed the Verified Complaint on behalf of Dictiomatic, through the present;
2. The reasonable amount of fees incurred by USF & G as a result of the vexatious actions of WBB should be $579,644.30, [FN19] deducting therefrom any fees incurred prior to October 26, 1993, the date WBB filed the Verified Complaint on behalf of Dictiomatic, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

deducting therefrom any fees incurred in connection with the declaratory judgment action in the Middle District. In this regard, the parties shall have twenty (20) days from the date of any order that may be entered by Judge Paine affirming the within Report and Recommendation within which to confer and come to an agreement as to the amount which should be deducted in accordance with this recommendation. Should the parties be unable to reach agreement in this regard within the twenty (20) day time period, notice thereof shall be filed with the Court, whereupon the undersigned shall issue a scheduling order and conduct a hearing on the matter;

FN19. This figure is arrived at by adding together $551,181.30, the reasonable amount of fees incurred by USF & G as a result of the vexatious actions of WBB, as testified to by Mr. Smith, and $28,463.00 for USF & G's March 14, 2000 fee bill.

***16** 3. The reasonable amount of taxable costs pursuant to 28 U.S.C. § 1920 incurred by USF & G as a result of the vexatious actions of WBB should be $46,564,56;

4. No costs incurred by USF & G in addition to 28 U.S..C. § 1920 and no expert witness fees in excess of the limits set out in 28 U.S.C. § 1821 should be recovered by USF & G;

5. No in-house counsel fees and no in-house counsel costs should be recovered by USF & G; and,

6. USF & G should not be awarded pre-judgment interest on the award and post-judgment interest should not accrue until Judge Paine's Sanction Order becomes a "judgment" as contemplated by Rule 54(a).

The parties have ten (10) days from the date of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable James C. Paine, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745 (11th Cir.1988), *cert. denied*, 488 U.S. 958 (1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir.1993).

2000 WL 33115333 (S.D.Fla.), 14 Fla. L. Weekly Fed. D 159

**Motions, Pleadings and Filings (Back to top)**

. 1:94CV01692 (Docket) (Aug. 17, 1994)

. 1:93CV02123 (Docket) (Oct. 26, 1993)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
BRISTOL-MYERS SQUIBB COMPANY, Plaintiff,
v.
RHONE-POULENC RORER, INC., Centre National De La Recherche Scientifique, and Rhone-Poulenc Rorer, S.A., Defendants.
**No. 95 CIV.8833 RPP.**

July 26, 2002.

Plaintiff in patent case submitted an application for attorney fees based on the court's determination that case was an exceptional case. The District Court, Patterson, J., held that based on findings of bad faith, fraud, and vexatious conduct by defendant in patent case, defendant would be sanctioned by requiring it to pay plaintiff's expert witness fees in an amount in excess of statutory cap, and prejudgment interest.

Order in accordance with opinion.

West Headnotes

**[1] Federal Civil Procedure 2791**
170Ak2791 Most Cited Cases

**[1] Federal Civil Procedure 2795**
170Ak2795 Most Cited Cases

**[1] Federal Civil Procedure 2814**
170Ak2814 Most Cited Cases
Due to its misconduct in patent case, defendant would be sanctioned by requiring it to pay plaintiff's expert witness fees in an amount in excess of statutory cap; defendant committed fraud on the Patent and Trademark Office in obtaining its patents, obstructed deposition of witness, made improper claims of privilege based on its misrepresentation of the nature of its communications and interactions with witness during the prosecution of patent application, made improper claims that its French in-house patent agents' communications were privileged by French secrecy laws when its own expert witness testified that French secrecy laws did not apply to in-house patent agents, "lost" key documents, and redacted an identifier number on key experimental lab results without notice to plaintiff. 28 U.S.C.A. § 1821.

**[2] Interest 39(2.20)**
219k39(2.20) Most Cited Cases
Based on findings of bad faith, fraud, and vexatious conduct by defendant in patent case, court, pursuant to its inherent authority, would sanction defendant to pay plaintiff prejudgment interest.

**[3] Patents 325.11(1)**
291k325.11(1) Most Cited Cases
Computer research charges from counsel were recoverable expenses in patent case.
Fitzpatrick, Cella, Harper & Scinto, New York, By Thomas H. Beck, Esq., Counsel for Plaintiff.

Finnegan, Henderson, Farabow, Garrett & Dunner LLP, Washington, DC, By Donald R. Dunner, Esq., Doris Johnson Hines, Esq., Clifford Chance Rogers & Wells LLP, New York, By Philip E. Roux, Esq., Counsel for Defendants.

OPINION AND ORDER

PATTERSON, D.J.

*1 Plaintiff Bristol-Myers Squibb Company ("Bristol") has submitted an application for attorney fees based on the Court's determination that this case is an exceptional case under 35 U.S.C. § 285. [FN1] *See* Final Judgment dated January 25, 2002. Defendants Rhone-Poulenc Rorer, Inc., Centre National De La Recherche Scientifique, and Rhone-Poulenc Rorer, S.A. (collectively, "RPR") object to Bristol's requests for expert witness fees, prejudgment interest, and computer research fees.

FN1. 35 U.S.C. § 285 states: "The court in exceptional cases may award reasonable attorney fees to the prevailing party."

I. Overview of Bristol's Application for Attorney Fees

Bristol's application for attorney fees includes a request for attorney and paralegal fees in the amount of $20,736,194; a request for disbursements paid in the amount of $6,177,876; a request for expert

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

witness fees in the amount of $2,578,159; and a request for prejudgment interest in the amount of $3,128,450.

II. Expert Witness Fees

[1] Both parties recognize that 35 U.S.C. § 285 does not provide the explicit statutory authority necessary to award expert witness fees to the prevailing party beyond the statutory amounts provided in 28 U.S.C. § 1821. [FN2] Bristol asks this Court, however, to exercise its "inherent power to impose sanctions for bad faith and vexatious conduct" to award Bristol the full amount of its expert witness fees. *Amsted Indus., Inc. v. Buckeye Steel Castings Co.,* 23 F.3d 374, 378 (Fed.Cir.1994); *see also* Mathis v. Spears, 857 F.2d 749 (Fed.Cir.1988). Under *Amsted,* "a finding of fraud or abuse of the judicial process" is required "before a trial court can invoke its inherent sanctioning power to impose expert witness fees in excess of the section 1821(b) cap." *Id.*

FN2. Pursuant to 28 U.S.C. § 1821, Bristol would be entitled to expert witness fees in the amount of $48,069. (Solander Declaration in Support of Bristol's Accounting for Attorney Fees at Ex. 8.)

A. RPR's Intentional Fraud on the U.S. Patent and Trademark Office

The Court has previously determined that RPR intentionally obtained its '011 and '277 patents by fraud by taking advantage of the *ex parte* patent application process established in 1870 by Congress, which manifested Congress' confidence that the patent bar and their clients would act with integrity. *See* Opinion and Order dated January 15, 2002. Specifically, the Court found that RPR intentionally withheld the JACS article [FN3] from the U.S. Patent and Trademark Office ("PTO")--throughout the entirety of the prosecution of the ' 011 patent and until very late in the prosecution of the '277 reissue patent, at a point where its significance to the validity of the underlying '011 patent would not be readily apparent to an examiner--in a successful effort to mislead the patent examiner into granting the inventors a patent, assigned to RPR, containing broader claims than were warranted by the inventors' experimental results. (Id.) RPR had sought to obtain a patent with as broad a scope as possible because, as shown by its own documents, it intended to use the patent not to develop taxol, but to block other pharmaceutical companies from developing products competitive to Taxotere, RPR's taxane analog. (Id. at 5- 6.)

FN3. The JACS article is a scientific article written by the named inventors of the '011 and '277 patents entitled "A Highly Efficient, Practical Approach to Natural Taxol." The article, which was published in the Journal of the American Chemical Society in August 1988, describes the inventors' results of their semi-synthesis of taxol from 10- deacetylbaccatin III or baccatin III. Several of the article's statements, and in particular footnotes 13 and 16, are clearly inconsistent with the claims drafted by RPR's in-house patent agent, Mr. Pilard.

***2** The evidence of RPR's intent to commit fraud on the PTO was clear and convincing. Jacques Pilard, the RPR patent agent responsible for (i) drafting the patent claims in the French patent application; (ii) maintaining RPR's file on patent and scientific developments relating to taxol; (iii) the prosecution of the '011 patent; (iv) the prosecution of the '277 reissue patent; and (v) the prosecution of the related European patent, was instructed by corporate officers at RPR to draft a patent broad enough to block competitors from bringing semi-synthetic Taxol to market so that RPR's semi-synthetic taxane derivative, Taxotere, would benefit. In a letter sent to Mr. Pilard dated January 29, 1988, P.E. Simon of the Grants and Licenses Section of RPR's Health Department wrote:

> Mr. Guenard has informed us of the development of a new process of Taxol synthesis, in collaboration with the Grenoble team.
>
> Although we are not interested in exploitation of Taxol, our Research Management would not consider it appropriate to leave this process without industrial protection.
>
> For if a source of Taxol should become available by reason of this process, that would facilitate pursuit of [ ]clinical studies and, hence, the marketing of this anti-cancer agent before that of the derivatives we are now investigating. We are quite aware that a patent on this process would not constitute an absolute bar to third parties.
>
> We therefore suggest, if C.N.R.S. is in agreement, filing applications in the C.N.R.S. name and at our expense in France and then in the principal countries in consideration for an exclusive license of the patents to RP SANTE.

(PX 130.) Having received these instructions, Pilard proceeded to draft the claims of the French priority patent, of which the '011 patent is a translation, very

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

broadly so as to maximize RPR's ability to block competitors from developing and marketing semi-synthetic Taxol.

The documents and testimony in this case have revealed that Pilard had no scientific or other basis for drafting the claims of the '011 and '277 reissue patent in such a broad manner. The breadth of the claims was not supported, and in fact was contradicted by, the inventors' statements in the invention disclosure ("Modes Operatoires"), the document Mr. Pilard acknowledged he relied upon in drafting the claims of the '011 and '277 patents. (Opinion and Order dated January 15, 2002 at 14-15.) The breadth of the claims was further contradicted by the draft of the JACS article, authored by the inventors, which Mr. Pilard had read and had in his possession at the time he drafted the French patent application in March 1988. (Id. at 15-16.) Mr. Pilard's files contained no scientific tests, no notes, no memoranda or any other documents which supported the breadth of the claims. (Id. at 16.) In addition, none of the inventors could remember having provided Mr. Pilard with any information which would have supported the breadth of the claims drawn in the '011 and '277 reissue patents. (Id. at 16-19.)

***3** At his deposition in January 1998, Mr. Pilard's explanation of his reasons for not providing the JACS article to Mr. Ellsworth Mosher, RPR's U.S. patent counsel during the prosecution of the '011 patent application, for filing with the PTO was inconsistent, floundering, and marked by long delays. [FN4] For example, Mr. Pilard initially claimed that he believed that the JACS article was not material to the patent examiner's review of the '011 patent because the JACS article only applied to an 'efficient approach' to making taxol, but later took the position that he could not remember what his intellectual approach had been in deciding not to submit the JACS article to U.S. patent counsel for the prosecution of the '011 patent application. [FN5] (Opinion and Order dated January 15, 2002 at 24-25.)

FN4. Mr. Pilard, who refused to appear at the November 2001 hearing on inequitable conduct, was deposed in January 1998 and September 1999. Mr. Pilard's long delays in responding to questions during the deposition were significant because the evidence showed that he speaks and writes English with some fluency. Mr. Pilard has never contended that the failure to cite the JACS article to the PTO was the result of an oversight or failure to remember the JACS publication at the time of the filing of the '011 patent application.

FN5. Mr. Pilard could not recall having asked the inventors whether the statements in the JACS article only applied to 'efficient' syntheses of taxol. (Opinion and Order dated January 15, 2002 at n. 23.) "The two independent experts that testified at the [inequitable conduct] hearing, Dr. Martin and Dr. Corey, both indicated that a person of ordinary skill in the art (a "POSA") in 1988 reading footnote 16 [of the JACS article] would have concluded that MOM was an unsuitable protecting group at any yield. Dr. Corey also testified that a POSA would read footnote 13 to state that TMS was not a suitable protecting group at any yield, while Dr. Martin testified that a POSA would find footnote 13 unclear as to whether TMS yielded any taxol." (Id. at 26-27.) Under either interpretation, the JACS article should have been provided to the patent examiner.

During his deposition, Mr. Pilard also gave numerous unbelievable answers, which demonstrated a willingness to give false testimony. For example, despite having been prepared for the January 1998 deposition by attorneys for RPR for three days, and despite the fact that the deposition took place over two years after this heavily litigated patent action had commenced and after Bristol had requested document discovery of his files, Mr. Pilard gave dissembling testimony, feigning lack of awareness of the litigation and lack of recall, during the morning of January 8, 1998. Mr. Pilard even feigned lack of recollection of the patent in suit:

Q: Do you recall there came a time when you prepared a patent application on behalf of CNRS scientists, Dr. Greene, Dr. Denis, Dr. Guenard, Dr. Gueritte?

A: Yes.

Q: What do you recall about your activities with respect to that patent application?

A: I prepared a patent application.

Q: What was the substance or the subject of the patent application?

A: I don't recall.

* * *

Q: I would like you to look at the cover page and to the end of the exhibit. And my question is going to be, sir, do you recall the substance of this patent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

application?
A: Now that you show it to me, it does bring some memories back, but nothing as to the substance.
Q: Well, do you -
A: I see the document and that's it.
Q: Do you recall that the patent application concerns a convergent synthesis of taxol in which the side chain is reacted with the taxane core?
A: As you show it to me now, I could say yes, but if I hadn't seen the document, I couldn't say.

(Pilard Dep. dated Jan. 8, 1998 at 40-41, 52-53.) These answers, like numerous "I don't recall" answers given that morning, were unbelievable and demonstrate a willingness to give false testimony.

During the '277 reissue patent application process, Mr. Pilard's conduct exacerbated, rather than mitigated, his fraudulent conduct in obtaining the ' 011 patent. In the '277 reissue patent, RPR claimed several "intermediates" which had not been claimed in the '011 patent. RPR claimed these intermediates specifically to block, by use of the '011 patent's priority date in France, a newly patented process of Dr. Holton, licensed by Bristol, which provided for the development of semi-synthetic taxol from a beta-lactam side chain. (PX 138, transcript of 11/16/01 at 475-479.)

*4 During the prosecution of the '277 reissue patent, Mr. Pilard used a different law firm to act as RPR's U.S. patent counsel, which avoided scrutiny of the reissue patent by attorneys knowledgeable about the prosecution of the ' 011 patent. In his initial correspondence regarding the reissue patent application, Mr. Pilard sent Frederick F. Calvetti, RPR's new U.S. patent counsel, a copy of the JACS article, calling to Calvetti's attention that the article, which was being provided for his information, was published after the priority date. (PX 61.) Thereafter, Mr. Pilard informed Mr. Calvetti that persons at RPR had evaluated the JACS article and determined it to be irrelevant. (Opinion and Order dated January 15, 2002 at 35.) Mr. Pilard was clearly aware that numerous statements contained in the JACS article were inconsistent with the '011 patent, [FN6] but he did not inform Mr. Calvetti about the significance of the JACS article or instruct him to turn over the JACS article to the patent examiner until over one year after the reissue patent application was filed and allowance was imminent. Mr. Calvetti, unaware of the significance of the JACS article, did not inform the patent examiner of the article's significance and the patent examiner did not review the JACS article until after he had already informed Mr. Calvetti that the reissue patent would be allowed.

FN6. Mr. Pilard's awareness of the significance of the JACS article is evidenced by (a) the fact that the copy of the JACS article provided to Mr. Calvetti had footnote 16 circled (the circle is shown on the fax copy bearing Pilard's sending fax number), (b) Mr. Pilard's remarks in a July 25, 1991 letter to Mr. Calvetti, and (c) Mr. Pilard's letter to the European Patent Office in January 1991. (*See* Opinion and Order dated January 15, 2002 at 34 & n. 29, Hearing Transcript dated 11/16/01 at 470.)

B. The Abuse of Judicial Process

Once the '277 reissue patent had issued, RPR demanded royalties of Bristol for its sales of semi-synthetic Taxol. When negotiations broke down, Bristol was forced to commence this declaratory judgment action, which was filed almost contemporaneously with an action for patent infringement commenced by RPR. (Opinion 2/15/96.) Though Bristol was nominally the plaintiff in this suit, it was RPR who forced the ensuing litigation over the validity of the patents it had obtained by Pilard's abuse of the *ex parte* patent office process enacted by the Congress of the United States.

During the ensuing litigation, RPR abused the judicial process by obstructing discovery of evidence of its fraudulent conduct before the PTO. RPR's obstruction principally took five forms: (1) RPR's instructions to Mr. Mosher not to answer questions on the materiality of the JACS article to the prosecution of the '011 patent application in violation of Rule 30(d)(1) of the Federal Rules of Civil Procedure; (2) RPR's baseless claims that the attorney-client privilege applied to communications between Pilard/Savina and Mosher because Pilard/Savina were employees of RPR, a client of Mosher; (3) RPR's baseless claims that all communications between the inventors and RPR's in-house patent agents relating to the prosecution of the '011 patent application were privileged because the patent agents were acting under the direction and control of Mosher; (4) RPR's baseless claims that communications between the inventors and Pilard/Savina concerning the filing of patent applications in France should be privileged, as a matter of comity, because such communications are privileged in France under French secrecy law; and (5) RPR's delay in producing key documents and other "vexatious conduct." *Amsted,* 23 F.3d at 378.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1) RPR's Instructions to Mr. Mosher Not to Answer Questions on the Materiality of the JACS Article to the Prosecution of the '011 Patent Application

*5 On November 17, 1997, Bristol deposed Mr. Mosher, RPR's U.S. patent counsel for the prosecution of the '011 patent application. During the deposition, RPR instructed Mr. Mosher not to answer questions pertaining primarily to the question of whether the footnotes about failed experiments contained in the JACS article, constituted adverse "material information" that U.S. regulations required to be disclosed to the PTO during the prosecution of the '011 patent application in 1989. *See* Opinion and Order dated January 6, 1998 at 2.

Four days later, Bristol brought the matter of RPR's obstruction of the Mosher deposition to the attention of the Court. Bristol argued that RPR's obstruction was particularly egregious because Mr. Mosher was not subject to subpoena, was elderly, and lived in Alberta, Canada and his deposition had been arranged to take place in Washington, D.C. for his convenience.

After hearing argument from both parties and having reviewed the transcript of the Mosher deposition, the Court found that RPR had violated Rule 30 of the Federal Rules of Civil Procedure by instructing Mr. Mosher not to answer the questions at issue. RPR's contention that its instructions not to answer were justified by the distinction between an expert witness and fact witness was baseless because Rule 30(d)(1) only authorizes a party to instruct a deponent not to answer a question only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to make a motion pursuant to Rule 30(d)(4). The Court also found that RPR's claim that Bristol's questions would necessarily require Mosher to disclose privileged information had not been "substantially justified" by RPR. (Opinion and Order dated January 6, 1998 at 13.) RPR was unable to "identif[y] specific privileged communications that would be revealed by having Mosher answer the questions which were posed to him by Bristol's counsel, nor establish[ ] that Mosher's work on the '011 patent was in anticipation of litigation." (Id. at 12.) The Court therefore ordered RPR to make Mosher available, at its expense, for a resumption of his deposition and sanctioned RPR, ordering it to reimburse Bristol for the cost of bringing the motion. (Id. at 14.)

In the weeks that followed the Court's order of January 6, 1998, RPR delayed scheduling the resumption of Mr. Mosher's deposition. In a letter dated February 12, 1998, counsel for Bristol wrote counsel for RPR stating that "we are awaiting dates" for the resumption of the Mosher deposition. (RPR's letter to the Court dated February 24, 1998 at tab D.) On March 5, 1998, RPR and Bristol scheduled Mr. Mosher's deposition for April 3, 1998 in Washington, D.C., subject to Mr. Mosher's health. (RPR's letter to the Court dated October 29, 1999 at tab 3.) On March 20, 1998, Dale Gibson, an attorney for Mr. Mosher in Alberta, Canada, informed counsel for RPR that Mr. Mosher was now unable to testify. (Id. at tab 6.) By improperly obstructing Mr. Mosher's deposition in November 1997, RPR successfully precluded Bristol from obtaining key testimony from Mr. Mosher on the subject of RPR's conduct before the PTO.

(2) RPR's Baseless Claims of Attorney/Client Privilege

*6 RPR obstructed the production of key documents demonstrating RPR's intentional fraud on the PTO by making various claims that the documents were privileged. RPR claimed that (1) all communications between RPR's in-house patent agents and Mosher with regard to the prosecution of the '011 patent application were subject to attorney-client privilege; (2) all communications between the inventors and RPR's in-house patent agents relating to the prosecution of the '011 patent application were privileged because the patent agents were acting under the direction and control of Mosher; and (3) all communications between RPR's in-house patent agents and the inventors were entitled to attorney-client privilege as a matter of comity because such communications are entitled to an equivalent privilege under French secrecy laws.

Although the Court initially believed RPR's claims of privilege to be meritorious, as discovery progressed, the Court found that (a) the inventors had waived claimed privileges in documents filed with the patent office; (b) RPR had mischaracterized the nature of its communications with Mosher during the prosecution of the '011 patent application, that the documents for which privilege was claimed did not request or give legal advice or reflect legal advice, and that RPR's in-house patent agents had not performed any tasks under the direction and control of Mosher; and (c) that French secrecy laws were not applicable to in-house patent agents such as Pilard and Savina. A more detailed look at RPR's baseless claims of privilege follows.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(a) The Inventors' Waiver of AttorneyClient Privilege By Statements to the PTO

In February 1998, while still unaware that RPR's claims of privilege with regard to the prosecution of the '011 patent application were improper, the Court found (over baseless objections by RPR) that the named inventors of the ' 011 and '277 patents had waived their attorney-client privilege by virtue of their statements made to the PTO in connection with the '277 reissue patent.

> The inventors of the '001 [sic] patent and the '277 reissue patent have waived their attorney-client privilege by their statements to the patent office on September 28, 1992 explaining why they had not previously made claims covering the intermediates, e.g. "applicants do not have even a basic knowledge of United States or French patent laws," "applicants were never advised to the contrary and applicants were and are unfamiliar with French patent law," "it was believed by applicants that all of what was disclosed would be protected and applicants were never advised to the contrary" and, "As noted above applicants were and are unfamiliar with United States patent law." Under these circumstances plaintiff is entitled to determine what legal advice the inventors had received concerning the French and United States patent laws and the scope of the patents applied for.

(Order dated February 6, 1998 at ¶ 4.) In accordance with this decision, the Court ordered RPR to produce the "invention disclosure and any communications regarding the scope of the '277 patent reissue application, including RPR's French priority application or regarding French or United States patent laws, between any of the inventors and the RPR patent agents or other attorneys prior to September 28, 1992, as requested by Bristol's letter of November 12, 1997."

*7 As a result of the Court's Order dated February 6, 1998, RPR produced the Modes Operatoires invention disclosure to Bristol for the first time. The Modes Operatoires was a key document. It did not support the breadth of the claims in the '011 and '277 patents, but to the contrary, was consistent with statements made in the JACS article. In March 1998, Bristol used the Modes Operatoires, *inter alia,* to show that there was prima facie proof of fraud on the PTO sufficient to invoke the crime-fraud exception to the attorney-client privilege.

In April 1998, the Court found that Bristol had presented sufficient evidence to establish a prima facie case of fraud in the procurement of the '011 patent, thereby dispelling RPR's claims of attorney-client privilege for documents and testimony relevant to that issue. *See* Opinion and Order dated April 14, 1998. The Court found that:

> In view of the motivation of Savina and Pilard, disclosed in the memorandum of the June 26, 1991 meeting, to oppose the Holton patent (Bristol Letter 2/2/98 at Tab 22), in view of Pilard's knowledge of the inventors' disclosure statement, in view of the publication of the JACS article in August 1988, and in view of Pilard's evident failure to forward the JACS article to U.S. patent counsel prosecuting the '011 patent for disclosure as a reference publication, there is a clear inference that Pilard knew or should have known that the withheld reference would be material to the patent examiner's review of the operability of all the patent's claims. Pilard was on clear notice from the inventors' disclosure statement that the TMS group was too fragile to survive the esterification process. This circumstantial evidence of fraudulent intent is sufficient proof.

(Id. at 13-14 (internal citations omitted).) The Court ordered RPR to produce "all of Mr. Pilard's files and the inventors' files, including the drafts of the JACS article as well as correspondence in the patent prosecution process." *See* Order dated April 14, 1998 at 15. The documents produced were corroborative of Pilard's lacking any scientific basis for the breadth of the claims in the French patent and the '011 patent. [FN7]

FN7. RPR subsequently sought a writ of mandamus enjoining the Court's April 14, 1998 order dispelling RPR's attorney-client privilege based on the crime-fraud exception. On June 5, 1998, the Court of Appeals for the Federal Circuit granted RPR's petition for a writ of mandamus. *In re Rhone-Poulenc Rorer, Inc.,* 155 F.3d 569 (Fed.Cir.1998).

On August 11, 1998, the Court issued an order restating and clarifying its April 14, 1998 order finding a prima facie case of fraud and ordering RPR to produce "all of the French patent agent's files and the inventors' files, including drafts of the JACS article and correspondence in the prosecution process." (Order dated August 11, 1998 at 4.) In so doing, the Court noted that it "is of the opinion that the Federal Circuit misconstrued its April 14, 1998 opinion." (Id. at 1.) RPR's motion for reconsideration of this order was denied.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

RPR subsequently petitioned the Court of Appeals for the Federal Circuit for a writ of mandamus directing this Court to vacate its crime-fraud ruling. On December 2, 1998, the Federal Circuit denied this petition. In re Rhone-Poulenc Rorer, Inc., 178 F.3d 1309 (Fed.Cir.1998).

(b) RPR's Misrepresentation of the Nature of its Communications and Interactions with Mr. Mosher During the Prosecution of the '011 Patent

RPR obstructed the production of key documents, including Mr. Pilard's correspondence with Mr. Mosher, on the grounds that the communications would reveal information privileged by the attorney-client relationship because (1) Pilard/Savina were employees of RPR, a client of Mr. Mosher during the prosecution of the '011 patent application and (2) Pilard/Savina had performed duties such as the gathering, analysis and transmission of relevant factual and technical information under the direction and with the authority of its outside patent attorneys. (*See, e.g.,* RPR's Letter to the Court dated January 30, 1998 at 11-12.) The Court's *in camera* review of the documents for which RPR claimed a privilege showed that these claims of privilege were wholly unsupported by the content of the documents, all of which were solely in RPR's possession at the time it made these claims of privilege.

*8 On June 5, 1998, the Court ordered RPR "to produce to the Court for in camera inspection all documents in the in-house French patent agents' files for which it is claiming a privilege, together with a copy of its privilege log pertaining to the documents produced for inspection." [FN8] The Court's *in camera* inspection of these documents revealed that RPR had misrepresented the nature of RPR's communications and interactions with Mr. Mosher during the prosecution of the '011 patent and that its claims of privilege based on the patent agents working under the direction and authority of Mr. Mosher were baseless. *See* Order dated August 11, 1998. The Court found that:

FN8. The Court's *in camera* review was conducted in response to RPR's motion for reconsideration of its March 31, 1998 ruling that the attorney-client privilege under French law does not confer the equivalent attorney-client immunity on French patent agents as is enjoyed by patent attorneys in the United States. RPR then pointed to its alternate ground that the patent agents acted under Mosher's direction and with his authority. RPR's claims of attorney-client privilege under French law are discussed *infra* in subsection (3).

the correspondence reveals that Mosher was merely instructed to file a patent application translated into English by British patent agent, J.A. Kemp & Co. ("Kemp") acting at the direction of in-house French patent agent, Pilard. All the documents provided to Mosher had been drafted by Pilard and Kemp. Neither Pilard nor Kemp sought legal advice from Mosher or were acting under his authority or control. Clearly, Pilard's communications involve a U.S. patent application. Accordingly, U.S. privilege law applies. Since Pilard and Kemp were not acting under Mosher's authority or control and were not entitled to practice law in the United States, and Mosher was not asked to render legal services to RPR S.A. France, Pilard's file on '011 and his communications, written or oral, with the inventors, Kemp and Mosher, as well as the Mosher file must be disclosed to opposing counsel.

(Order dated August 11, 1998 at 3 (citations omitted)); *cf.* 8 Wigmore, Evidence § 2292 (McNaughton rev.1961) (discussing the general principle of the attorney-client privilege). [FN9] Thus, this claim of privilege by RPR was unmasked and it became clear that Mosher had not been asked to render legal advice but only to file a translation of the French patent application, leaving the finger of responsibility for any failure to disclose the JACS article pointed solely at Mr. Pilard.

FN9. The Court expressed its displeasure with RPR's conduct, stating:
It is very troubling for the Court to find that the attorney/client privilege has been invoked by counsel to RPR when the documents clearly do not warrant the privilege. As a result of the non-disclosure, a request will undoubtedly be made to take [sic--retake] discovery from several witnesses involved. It is also troubling to note that the privilege log entries in several instances have been drafted so as to mask the use of J.A. Kemp & Co. to translate patent applications and supporting documents into English for filing in the United States by suggesting that Kemp's services related to filings in other countries whereas the documents also expressly refer to filings in the United States. The Court also deplores the presentation of a privilege

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

log arranged neither chronologically nor by subject matter, suggesting that the discovery documents, or the log, may have been arranged as a litigation tactic to inconvenience opposing counsel which, in this case, has had the added result of making the Court's review more difficult and more time-consuming.
(Order dated August 11, 1998 at 4-5 (citations omitted)).

(c) RPR's Baseless Claims of Privilege Based on French Secrecy Law

RPR's obstruction in the production of key documents relating to RPR's fraud in obtaining the '011 patent also included claiming that communications between the inventors and RPR's in-house patent agents, Pilard and Savina, were privileged by French secrecy law which the Court should recognize as a matter of comity.

Initially, the Court accepted RPR's position. *See* Opinion and Order dated February 6, 1998 at 2-3. The Court based its decision on several provisions of French law cited by RPR--Article 378 of the French Penal Code, Article 422-54 of the French Intellectual Property Code, and the Declaration of Ledoux. *See* Opinion and Order dated March 31, 1998 at 3.

In March 1998, Bristol asked this Court to reconsider its ruling, citing for the first time French regulations concerning the professional secrecy obligations of patent agents, and relying in particular on Article 12, Section 12.3. *See* Opinion and Order dated March 31, 1998 at 3. Based on these regulations, Bristol argued that French patent agents did not have a privilege under French law, akin to the attorney-client privilege in the United States, to resist compelled discovery during civil and criminal judicial proceedings.

*9 On March 31, 1998, having reviewed the French regulations concerning the professional secrecy obligations of patent agents, the Court found that RPR had not demonstrated that French patent agents' communications with a client are protected from the court's compulsory discovery in civil and criminal proceedings under French law. *See* Opinion and Order dated March 31, 1998. Accordingly, the Court ordered RPR to "produce all communications or memoranda prepared by the French patent agents which were not prepared pursuant to the authority of a U.S. patent agent." (Id. at 6-7.) [FN10]

FN10. The Court would not discover that communications between Pilard and Mr. Mosher with regard to the prosecution of the '011 patent application were not privileged until August 1998.

RPR moved for reconsideration of the Court's order dated March 31, 1998, and the Court stayed its decision pending an evidentiary hearing with testimony from experts on French law. *See* Opinion and Order dated April 27, 1999 at 1. On December 2-3 1998, the Court held the evidentiary hearing on RPR's motion for reconsideration of the Court's order dated March 31, 1998. After hearing the testimony from French experts on French law, the Court found that (1) under French law, RPR's in-house patent agents' files were not afforded a privilege equivalent to the attorney-client privilege in the United States and (2) that RPR's claims of privilege based on French secrecy law were baseless because the secrecy laws do not apply to in-house patent agents such as Pilard and Savina. *See* Opinion and Order dated April 27, 1999.

In this case, the submissions of the experts on French law do establish that a French industrial property counsel, like an attorney in the United States, has an obligation to keep secret confidential communications entrusted to him by his client. However, these submissions do not establish that the French industrial property counsel enjoys an evidentiary privilege comparable to that afforded attorneys in the United States.

* * *

[I]n a French patent infringement case, the patentee may obtain an ex parte order from the judge to have a plaintiff search for and view confidential communications between an alleged infringer and the infringer's industrial property counsel, and the bailiff is typically accompanied by the patentee's industrial property counsel, who identifies the evidence of infringement. Documents containing evidence of infringement and confidential matters will be seized and held for court review. The patent agent must respond to a judge who inquires into professional secrets, while the French avocat can decline to answer. Furthermore, judges or agencies investigating criminal, customs or tax offenses may seize confidential matters in the possession of a French industrial property counsel, whereas the United States attorney-client privilege is not similarly qualified.

* * *

RPR has failed to establish that there exists under

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

French law a patent agent privilege comparable to the United States attorney-client privilege, or that Pilard and Savina are entitled under French law to any secrecy protection due to their status as industrial property agents. RPR has stipulated that Pilard and Savina are salaried employees of RPR who do not offer their services to the public on a confidential basis, and has not shown that Pilard and Savina take inventions other than in the course of their employment. *As recognized by RPR's own witness, Judge Dragne, Pilard and Savina are not afforded the title of industrial property counsel under French law and are not covered by French secrecy laws.*

***10** (Id. at 23-25 (emphasis added).) In light of Judge Dragne's testimony that in-house patent agents such as Pilard and Savina were not covered by French secrecy laws, RPR clearly had no basis in fact for claiming that the communications of its in-house patent agents were privileged under French secrecy law. [FN11] Accordingly, the deposition of the inventors and the in-house patent agents had to be retaken.

FN11. Judge Dragne also testified that a person qualified as an avocat (lawyer) does not have the rights, powers and authority of an avocat if he or she is solely employed by one company. (Id. at n. 8) Nonetheless, RPR subsequently refused to produce documents to Bristol that it contended were covered by an "in-house avocat privilege." *See* Memo-Endorsed Order dated June 22, 1999. RPR offered no support for its contention in its correspondence with Bristol. (Id. at tab 1.) After Bristol brought the matter to the Court's attention, RPR failed to offer any response. Accordingly, the Court ordered production of these documents, stating:

In view of the failure of RPR to respond to this letter and Judge Dragne's testimony, there is no "in-house avocat privilege" in France. Therefore any documents withheld on that basis or refusal to answer on that basis is not warranted.

(Id. at 1.)

(3) RPR's Delay in Producing Key Documents and Other Efforts to Obstruct Discovery

In addition to seeking to obfuscate its fraudulent conduct before the PTO by obstructing Mosher's deposition and obstructing the production of documents by invoking claims of privilege which, based on its knowledge of the facts, RPR must have known to be unfounded, RPR obstructed the production of key documents by "losing" or "misplacing" documents, as well as through other misconduct.

From March 1998, when the Court ordered its production, to March 1999, RPR claimed that it was unable to locate the draft JACS article, a key document subsequently relied on by this Court in finding that Pilard had knowledge of the contents of the JACS article when he drafted the French priority patent application. During the time that RPR was claiming that it couldn't locate the draft JACS article, it relied on the draft JACS article in its appeal to the Federal Circuit of this Court's finding of prima facie fraud as evidence that Mr. Pilard did not intend to commit fraud upon the PTO. When RPR finally produced the JACS article in 1999, it claimed that it was found in the archives. RPR did not explain why it did not look in the archives previously since Mr. Pilard's note on the cover letter (which had been produced by RPR) stated "Publication 265" and Mr. Pilard testified that the note referred to the archive list. RPR's failure to produce the draft of the JACS article smacks of abuse of judicial process.

Similarly, RPR claimed that it could not locate the Mosher '011 prosecution file, which corroborated that Mosher had not brought the JACS article to the attention of the PTO. When Bristol requested the file from Mr. Mosher's successor law firm in conjunction with this litigation, the firm sent the file to RPR in 1996. Although ordered to produce this file in August 1998, RPR failed to produce this document, claiming that the document was lost until it was found by in-house counsel Martin Savitzky during a happenstance visit in 1999.

RPR's conduct of losing or misplacing key documents is particularly suspicious in light of the absence of key documents from Mr. Pilard's files. As previously discussed in this opinion, Mr. Pilard's files contained no scientific tests, no notes, no memoranda or any other documents supporting the breadth of the claims in the French patent or the '011 patent. The absence of any documents in Mr. Pilard's files relating to the inventors' experiments other than the withheld Modes Operatoires is troubling to the Court because (a) Dr. Guenard, one of the inventors, testified that he had provided experimental data to Mr. Pilard and (b) Jacques Savina, Mr. Pilard's supervisor at RPR, testified that it was standard procedure at RPR in 1988 for in-house patent agents to collect the scientific tests and other documentation supporting the claims in a patent application.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Opinion and Order dated January 15, 2002 at 16 & n. 12.) Mr. Pilard's files were also missing documents that were either authored by or addressed or distributed to Pilard. *See* Order dated June 10, 1999. Though Bristol introduced no direct evidence to show that the file had been stripped, in view of the absence of such key documents as well as copies of correspondence, there is a clear inference that Mr. Pilard or some other person at RPR intentionally discarded all documents which could be used to challenge the '011 patent application.

***11** RPR also obstructed discovery of a key document by redacting, without notice to Bristol, the experiment identifier numbers from Experiment FG 1457 when it produced that experimental data to Bristol in February 1998.

> The basis for Bristol's claim is that in response to its February 8, 1998 request for Dr. Francoise Gueritte-Voegelein's NMR Spectra Data for experiment FG 1457, RPR's counsel, by letter dated February 11, 1998, wrote that it was enclosing that data. Two pages of the enclosure contained identifier numbers of other experiments FG 1453 and FG 1456, but all the rest of the pages of the enclosure contained no experiment identifier numbers and no notice of any redaction. On July 27, 1999, during the deposition of Dr. Guenard, RPR, in response to Bristol's request, produced the original NMR Spectra Data of Dr. Gueritte for experiment FG 1457, and they were marked as Exhibits DG 9, 9-A, 9- B, and 9-C. Those exhibits all bore the experiment identifier number FG 1457 or FGV 1457. Bristol also asked to mark as an exhibit the February 1998 cover letter from CNRS [Dr. Gueritte] to Tom Douros, enclosing copies of Ex.'s DG 9- 9C which he had seen earlier, and RPR's counsel refused to provide the documents for marking. On August 5, 1999, in response to Bristol's letter request of August 2, 1999, the Court ordered that RPR's counsel turn over to Bristol RPR's letter to RPR's counsel and the enclosed FG 1457 NMR data that had been produced and examined by Bristol's counsel on July 27, 1999, during Dr. Guenard's deposition. On August 10, 1999, RPR's counsel complied and acknowledged that, on the copies produced in February 1998, the identifier numbers had been redacted.

(Order dated September 24, 1999 at 1-2.) The data for experiment FG 1457, withheld for a year and a half, showed destruction of the oxetane ring during Dr. Gueritte's MOM deprotection experiment and demonstrated that RPR's argument that MOM was a preferred protecting group for making taxol as claimed in the '011 and '277 patents had no scientific support. RPR offered no explanation for its redaction of the identifying information or its failure to inform Bristol of the redaction. (Id. at 3.) The Court expressed its dissatisfaction with the conduct of RPR's counsel, stating that "[t]his is the second instance of serious misconduct by RPR counsel," and noted that RPR's redactions "came at a time when the parties were engaged in motion practice over Bristol's right to discovery of additional documents based on evidence of *prima facie* fraud by RPR in obtaining its '011 patent which Bristol claimed was not supported by the inventors' experiments." (Id. at 2.)

C. Other Vexatious Conduct by RPR

(1) Unnecessarily Broad Discovery by RPR

Throughout the discovery process of the litigation, RPR pressed for broad discovery along unpromising avenues causing unnecessary discovery expenses. For example, although RPR could not seek any monetary damages for Bristol's allegedly infringing taxane research activities, RPR demanded the production of approximately ninety thousand pages of documents, including laboratory notebooks containing all experimental test results, as well as internal memoranda and Bristol's highly confidential next generation taxane derivative patent applications, and took 17 depositions of Bristol taxane research scientists for 22 days in support of its unsuccessful claim that Bristol's research on Taxol was not protected by 35 U.S.C. § 271(e). (Bristol's Mem. in Support of its Accounting for Attorney Fees at 12; *see also* Opinion and Order dated November 27, 2001.)

***12** Other examples of unnecessarily broad discovery include RPR's demand for samples of each batch of paclitaxel shipped by Bristol from Swords, Ireland to Mayaguez, Puerto Rico for packaging in order to test those samples for the existence of intermediates covered by claim 14 of the '277 patent in an unsuccessful effort to prove Bristol's use of the intermediates in the U.S., *see* RPR's letter to the Court dated June 18, 1999; RPR's request in November 1998 for production of all of Bristol's routine FDA and clinical trial records for various oncology agents, *see* Opinion and Order dated June 14, 1999 at 4; RPR's requests for all documents produced or used in the New Jersey litigation, *see* Opinion and Order dated April 27, 2000; and RPR's broad discovery of the activities of Bristol's U.S.-based personnel, Ireland-based personnel and Italy-based personnel in relation to Bristol's shipments of 10-DAB from Italy to Bristol's facility in Ireland and

shipments of a beta-lactam precursor from the United States to Ireland in unsuccessful efforts to prove infringement under 35 U.S.C. § 271(f), *see* Opinion and Order dated October 18, 2001.

RPR also increased costs during the discovery process by retaining 49 medical oncology experts to give expert testimony on lost profits relating to three different tumor types (breast, ovarian, and lung cancer) in six different countries (Germany, France, Italy, England, United States, and Spain). RPR justifies the retention of all of these experts on the grounds that "in order to accommodate the potential difficulties in scheduling the medical oncologists when a trial would be set, RPR sought testimony, in some instances, from multiple oncologist to insure that one would be available to testify" and "to specifically rebut contentions made by Bristol in its initial expert reports." (RPR Opp. at 18.) It seems unlikely that a different expert was necessary for each tumor type. [FN12] In addition, RPR could have used the video-taped depositions of each of its experts at trial, thus its claimed need for duplicative expert oncologists was clearly without foundation. As a result of RPR's inordinate use of experts, Bristol was forced to take each expert's deposition as well as retain many experts to counter the proffered testimony. [FN13] In view of this conduct, Bristol's request for expert witness fees hardly seems inappropriate.

FN12. Of the eight oncologists retained to give testimony about Germany, one oncologist (Schmoll) was capable of testifying about all three tumor types and another oncologist (Koelbl) was capable of testifying about two types. Of the seven oncologists retained to give testimony about France, three oncologists (Bugat, Ciupa, and Mayeur) were capable of testifying as to all three tumor types. Of the six oncologists retained to give testimony about England, one oncologist (O'Brien) was capable of testifying about two tumor types. Of the ten oncologists retained in the United States, one oncologist (Justice) was capable of testifying about all three tumor types. (RPR Opp. at 9.)

FN13. Pursuant to Fed.R.Civ.P. 26(a)(2), RPR was required to produce expert witness reports for its medical oncologists first because it bore the burden of proof of infringement and lost profits. RPR attempted, however, to reverse the order of proof for expert depositions by submitting conclusory expert reports not in compliance with Fed.R.Civ.P. 26(a)(2), and then amending the expert reports after receiving Bristol's expert reports. *See* Order dated April 3, 2000.

Another vexatious tactic occurred in January 1999, at a time when document discovery, which had been extended to a period of over three years, was supposed to be ending. RPR suddenly began producing great numbers of documents, amounting to over 800 boxes worth and over 1.5 million pages. Given the volume of those materials, and their potential importance to depositions, Bristol was forced to hire temporary contract attorneys to perform an expedited initial review as to relevance prior to review by FCH & S attorneys. [FN14]

FN14. RPR also repeatedly failed to fully comply with the Court's orders requiring document production. For example, in April 1998, the Court sanctioned RPR for failure to comply with the Court's orders of June 30, 1997 and January 30, 1998, requiring RPR to produce all documents pertaining to RPR's TAX 311 Phase III study comparing Taxotere vs. paclitaxel and to reimburse Bristol for its reasonable attorney fees and expenses of conducting additional discovery necessitated by RPR's failure to disclose the TAX 311 study. *See* Order dated April 17, 1998. RPR offered no "affidavits explaining what search was conducted, and why the TAX 311 Interim Report December 1996 was not produced by July 17, 1997, as required by the Court's order of June 30, 1997." (Id. at 4-5.)
In January 1999, the Court cited RPR for its failure to comply fully with three prior orders of the Court requiring that RPR turn over for an *in camera* inspection all documents that it claimed were privileged. *See* Order dated January 6, 1999.
In June 1999, the Court reprimanded RPR for failure to comply with the Court's orders requiring RPR to produce all documents from RPR's in-house French patent agents' files pursuant to the crime-fraud exception to the attorney-client privilege. *See* Order dated June 10, 1999.

(2) RPR's Misconduct During Depositions

***13** In January 1998, counsel for RPR interfered

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with Bristol's deposition of Mr. Pilard by repeatedly engaging in improper speaking or coaching objections. Though the Court did not cite RPR for this behavior at the time, the Court's in-depth review of the Pilard transcripts in conjunction with the Court's opinion on inequitable conduct has made clear the extent of the misconduct by RPR's counsel at Mr. Pilard's initial deposition. In August 1999, the Court reprimanded RPR for engaging in similar misconduct during the deposition of Daniel Guenard, one of the named inventors of the '011 and '277 patents. *See* Order dated August 5, 1999. When called upon to review other depositions, the Court noted similar speaking or coaching objections.

In addition, in February 1999, the Court cited counsel for RPR for repeatedly harassing Ms. Elizabeth Yamashita, an employee of Bristol, "with unfounded accusatory questions" during her deposition. (Opinion and Order dated February 11, 1999 at 15.) [FN15]

FN15. The Court also cited RPR for engag[ing] in wasteful and lengthy questioning about draft documents not drafted by the witness, at a time when the final document communicated to the FDA was readily available to defendants' counsel." (Order dated February 11, 1999 at 15.)

D. Bristol's Conduct

RPR attempts to excuse its behavior by arguing that Bristol has also engaged in misconduct. RPR greatly overstates the extent of any misconduct by Bristol.

RPR asserts that Bristol "had to be ordered to produce its most basic information." (RPR's Submission in Opposition to Bristol's Mem. In Support of Its Accounting for Attorney Fees ("RPR Opp.") at 10.) In support of this contention, RPR asserts that Bristol would not produce its basic NDA documents, citing to the Court's Order dated July 31, 1996. The Court ordered production of these documents, though Bristol had produced the SNDA documents concerning Bristol's semi-synthetic process for making taxol at the outset of the litigation, based on its concept of liberal discovery but indicated its belief that the NDA documents weren't "too relevant." (7/30/96 Hearing at p. 48.)

RPR also asserts that Bristol violated the Court's Order dated June 14, 1999 requiring Bristol to produce Bristol's license agreements with potential oncology competitors by "failing to identify two agreements falling within that definition in its interrogatory responses or produce the agreements." (RPR Opp. at 11 .) The Court sanctioned Bristol one hour of attorney billing time for its "failure to give an accurate listing of agreements pursuant to the representation in its response to the interrogatory." (Order dated 11/9/99 at 2.) However, the Court also noted that "Bristol's response did not violate the court's order." (Id.) The Court further stated that "[i]t is also true, as Bristol urges, that both agreements may not be relevant to RPR's proof of the reasonable royalty rate in a license to a competitor." (Id.)

RPR also asserts that "Bristol had to be compelled to produce its own 'pleadings, contentions, and supporting documents' from a New Jersey litigation relating to generic Taxol." (RPR Opp. at 11.) Though the Court did order this discovery to ensure that Bristol was not taking inconsistent positions in the two contemporaneous litigations, RPR fails to mention that RPR had been pressing for "all documents produced or used in the New Jersey litigation," *see* Opinion and Order dated April 27, 2000 at 4, and that Bristol did not consent due to a sealing order of the New Jersey district court. The Court found "little value in ordering Bristol to provide discovery of all documents produced or used in the New Jersey litigation." (Id.)

***14** Though there have been instances where the Court has intervened as a result of Bristol's conduct, *see, e.g.,* Order dated September 17, 1996 (Court ordered Bristol to permit discovery of Bristol's research activities regarding the making or using of the claimed intermediates); Order dated March 31, 1998 (Court ordered Bristol to produce two fact witnesses for deposition); Order dated April 16, 1998 (Court ordered Bristol to produce fifty-six documents relating to pre-litigation attorney analyses or information and pre-litigation analyses prepared by others at the direction of Bristol's attorneys), based on the entire record, RPR's misconduct over the course of the past seven years has been of a far greater magnitude than any misconduct by Bristol. [FN16]

FN16. The Court takes this opportunity to clarify a misconception of the Court's order dated November 28, 2001, found at pages 4-5 of RPR's brief, that "the Court concluded that the JACS article was material to enablement but, on the other hand, concluded that there was evidence, submitted by Bristol, that the full scope of claim 2 was enabled." On November 28,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001, the Court did deny Bristol's motion for summary judgment on grounds of lack of enablement based on RPR's submission of an affidavit of Bristol's expert, Dr. Corey, filed in support of Bristol's defense of obviousness. Dr. Corey's affidavit stated that claims 1, 2, 6, 8-9, and 12- 17 of the '277 patent were obvious. (Id. at 2-4.) The Court rejected the argument of Bristol's counsel that Dr. Corey's affidavit should be construed more narrowly than its plain meaning in view of his testimony at the Markman hearing held on March 26-27, 2001 because Bristol was relying on counsel's arguments in a motion for summary judgment rather than providing an affidavit from Dr. Corey to that effect. (Id. at n. 6.) Had Bristol provided an affidavit from Dr. Corey harmonizing his affidavit on obviousness and his testimony at the Markman hearing that "TMS was known to be far less stable than TES," and "MOM was known to require 'much more forcing conditions," ' Bristol would have provided necessary evidence that the full scope of claim 2 was not enabled.

E. RPR Has Defiled the Temple of Justice

Having reviewed the record and considered the totality of the circumstances, including RPR's original fraud on the patent office in obtaining the '011 and ' 277 patents, RPR's obstruction of the deposition of Mr. Mosher, RPR's improper claims of privilege based on its misrepresentation of the nature of its communications and interactions with Mr. Mosher during the prosecution of the ' 011 patent application, RPR's improper claims that its French in-house patent agents' communications were privileged by French secrecy laws when RPR's own expert witness, Judge Dragne, testified that French secrecy laws do not apply to in-house patent agents such as Pilard and Savina, RPR's "loss" of key documents, the absence of documents from Pilard's files from which a clear inference is drawn that someone at RPR intentionally stripped the files of key documents and correspondence, RPR's obstructing conduct during the depositions of Mr. Pilard and Dr. Guenard and other witnesses, RPR's redaction of an identifier number on key experimental lab results without notice to Bristol, and RPR's inordinate discovery and retention of 49 medical oncologist experts, the Court finds that RPR has defiled the "temple of justice," to adopt the Supreme Court's phrase in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, 111 S.Ct. 2123, 2133, 115 L.Ed.2d 27 (1991), and invokes its inherent equitable authority to sanction RPR to pay Bristol's expert witness fees in the amount of $2,578,159. *See Mathis*, 857 F.2d at 759, *Amsted*, 23 F.3d at 378.

III. Prejudgment Interest

[2] Courts have inherent authority to award prejudgment interest where there was "bad faith or other exceptional circumstances." *Mathis v. Spears*, 857 F.2d at 761 (quoting *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 653, 103 S.Ct. 2058, 2061, 76 L.Ed.2d 211 (1983)). Based on the Court's findings of bad faith, fraud, and vexatious conduct by RPR, the Court invokes its inherent authority to sanction RPR to pay Bristol's prejudgment interest in the amount of $3,128,450.

IV. Disbursements Paid

Of the $6,177,876 that Bristol seeks for disbursements paid, RPR objects to Bristol's request for computer research costs in the amount of $563,479. "[A]ttorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *United States Football League v. National Football League*, 887 F.2d 408, 416 (2d Cir.1989) (citing *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 283 (2d Cir.1987)), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 (1990). There is no dispute that computer research is a reasonable out-of-pocket expense. In addition, it is an expense which is ordinarily charged to clients. As Judge Lynch recently noted:

> ***15** While some lawyers treat the cost of computerized research as part of overhead, others, including many firms comparable to [plaintiff's] counsel, pass these expenses on to clients as separately chargeable disbursements. *See, e.g.*, ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 379 (1993) (stating in a discussion of billing for professional fees, disbursement and other expenses that the "lawyer may recoup expenses reasonably incurred ... for services performed in-house, such as ... computer research ... so long as the charge reasonably reflects the lawyer's actual cost for the services rendered").

*Bleecker Charles Co. v. 350 Bleecker St. Apt. Corp.*, 2002 WL 538822 (S.D.N.Y. April 10, 2002) (GEL). Accordingly, where an attorney ordinarily charges computer research expenses separately to clients (rather than treating it as part of overhead), such expenses should be reimbursed in an award of attorney's fees. This position is consistent with the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Second Circuit's suggestion in *LeBlanc-Sternberg v. Fletcher* that computerized legal research expenses are recoverable as part of attorney's fees. 143 F.3d 748, 763 (2d Cir.1998) (citing *United States ex rel. Evergreen Pipeline Constr. Co., Inc. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 173 (2d Cir.1996)).

[3] In this case, Bristol accepted and paid the computer research charges from counsel and it should be allowed to recover these expenses. Accordingly, the Court awards Bristol $6,177,876 for disbursements paid, plus interest running "from the date of the judgment establishing the right to the award." *Mathis*, 857 F.2d at 760.

V. Attorney and Paralegal Fees

In ascertaining the amount of a reasonable attorney fee, the Federal Circuit and the Second Circuit have used a lodestar analysis. *See Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1068 (Fed.Cir.1983) (reasonableness of the award determined by examining the reasonableness of the billing rate and the number of hours expended); *see also City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.1974) (Second Circuit adopts the lodestar approach for determining the reasonableness of attorney fee applications). The lodestar is the number of hours reasonably expended multiplied by a reasonable hourly rate, which provides the presumptively reasonable fee. *Id.*

In support of its application, Bristol has submitted the bills Fitzpatrick, Cella, Harper, & Scinto sent to Bristol, printouts of all attorney time entries, a summary of hours spent by each attorney on a monthly basis, and information containing published rates for firms doing similar work. RPR does not challenge the reasonableness of the attorney and paralegal fees requested, and based on the Court's finding that the number of hours expended, the billing rates, and overall fees are reasonable, the Court awards Bristol its requested attorney and paralegal fees in the amount of $20,736,294, plus interest running "from the date of the judgment establishing the right to the award." *Mathis*, 857 F.2d at 760.

VI. Conclusion

***16** Pursuant to 35 U.S.C. § 285, the Court awards Bristol its reasonable attorneys fees and disbursements in the amount of $26,914,070, plus interest running from the date of the judgment establishing the right to the award.

In addition, in light of RPR's commission of fraud on the U.S. Patent & Trademark Office in obtaining the '011 and '277 patents and RPR's abuse of the judicial process, the Court invokes its inherent equitable authority to sanction RPR to pay Bristol its expert witness fees and prejudgment interest in the amount of $5,706,609.

IT IS SO ORDERED.

2002 WL 1733681 (S.D.N.Y.)

**Motions, Pleadings and Filings** (Back to top)

. 1:95CV08833 (Docket) (Oct. 17, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.